UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT G. LINENWEBER, Individually and on Behalf of All Others Similarly Situated, | § | Civil Action No. 3:20-cv-00408-K |
| | § | |
| | § | <u>CLASS ACTION</u> |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| SOUTHWEST AIRLINES CO., GARY C. KELLY, TAMMY ROMO and MIKE VAN DE VEN, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | <u>DEMAND FOR JURY TRIAL</u> |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................2

II.     JURISDICTION AND VENUE ..........................................................................7

III.    THE PARTIES......................................................................................................7

      A.      Lead Plaintiffs......................................................................................7

      B.      Defendants ...........................................................................................8

IV.     FACTUAL BACKGROUND ..............................................................................11

      A.      Regulatory Framework for U.S. Airlines..........................................11

      B.      Defendants Knew about Southwest's Widespread Safety Lapses and Regulatory Non-Compliance ...........................................................12

      C.      The Deadly Southwest Flight 1380.....................................................16

      D.      Southwest's Relationship with FAA Regulators ...............................19

V.      DEFENDANTS' FALSE OR MISLEADING STATEMENTS .......................28

      A.      Material Misrepresentations and Omissions Regarding Safety Lapses and Regulatory Non-Compliance ...........................................30

      B.      Material Misrepresentations and Omissions Regarding Aircraft Maintenance......................................................................................40

      C.      Material Misrepresentations and Omissions Regarding Aircraft Weight and Balance...........................................................................47

      D.      Material Misrepresentations and Omissions Regarding Pilot Training................49

      E.      False or Misleading SOX Certifications.............................................50

VI.     FURTHER EVIDENCE OF DEFENDANTS' SCIENTER...............................53

VII.    LOSS CAUSATION/ECONOMIC LOSS .......................................................63

      A.      April 17, 2018: Fatal Accident on Southwest Flight 1380 ...................65

      B.      April 18, 2018: The FAA Mandates Ultrasonic Inspections of The Type of Engines Involved in the Flight 1380 Accident ......................................68

C. June 25, 2019: The *WSJ* Reveals the Removal of Three FAA Senor Managers Overseeing Southwest ............................................................70

D. January 30, 2020: The *WSJ* Reveals Widespread Safety Lapses ...........................72

VIII. LEAD PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE .......................................................75

IX. NO STATUTORY SAFE HARBOR ..............................................................76

X. CLASS ACTION ALLEGATIONS ...............................................................77

XI. CAUSES OF ACTION ....................................................................................78

 COUNT I ........................................................................................................78

 COUNT II ......................................................................................................80

XII. PRAYER FOR RELIEF ...................................................................................81

XIII. JURY DEMAND ............................................................................................82

GLOSSARY OF DEFINED TERMS .........................................................................83

Lead Plaintiffs Canadian Elevator Industry Pension Trust Fund ("Elevator Pension Plan") and the Elevator Constructors Union Local No. 1 Annuity & 401(k) Fund ("Elevator Constructors Fund") (collectively referred to as "Lead Plaintiffs"), on behalf of themselves and a class of investors, bring this action for violations of the federal securities laws against Defendant Southwest Airlines Co. ("Southwest" or the "Company"), its Chief Executive Officer ("CEO") Gary C. Kelly ("Kelly"), its Chief Financial Officer ("CFO") Tammy Romo ("Romo"), and its Chief Operating Officer ("COO") Mike Van de Ven ("Van de Ven") (collectively, "Defendants").[1]

This Complaint is alleged on information and belief, except as to the allegations about Lead Plaintiffs, which are pled on personal knowledge. Lead Plaintiffs' information and belief are based on, *inter alia*, counsel's investigation, including analysis of (i) Southwest's U.S. Securities & Exchange Commission ("SEC") filings, (ii) transcripts of Southwest's earnings conference calls and securities pricing data, (iv) other public statements and presentations made by Southwest and/or its representatives, (v) media reports, (vi) documents released by the U.S. Department of Transportation ("DOT") Office of the Inspector General ("OIG") and the Federal Aviation Administration ("FAA"), (vii) securities and financial analyst reports, (viii) expert consultation, (ix) consultation with persons familiar with Southwest's business, and (x) publicly available material and data. Counsel's investigation is ongoing, and many relevant facts are known only to Defendants or are within their exclusive control. Lead Plaintiffs believe additional evidentiary support will exist for their allegations, given an opportunity for discovery.

---

[1]   Capitalized terms have the same meaning in the Glossary of Defined Terms, unless noted.

## I.  INTRODUCTION

1.      "Diversion, distraction, and power."   These were the undisclosed tenets of Southwest's "safety culture" during the Class Period,[2] according to a DOT OIG audit that was the subject of a January 30, 2020 *The Wall Street Journal* (the "*WSJ*") article ("January 30 *WSJ* Article").  The scathing *WSJ* article revealed a forthcoming OIG report that lambasted Southwest for failing to prioritize safety, flying over 17 million passengers on planes with unconfirmed maintenance records, and chronically operating planes with weight discrepancies over roughly two years.  The January 30 *WSJ* Article revealed that the OIG also took aim at FAA inspectors for allowing Southwest to "'continue[] noncompliance with safety regulations,'" thereby signaling that stricter oversight and fines may follow.  And the article revealed that two-thirds of FAA personnel interviewed as part of the OIG audit had "'raised concerns about the culture at Southwest.'"  Unsurprisingly, the price of Southwest common stock declined on this news.

2.      By way of background, Southwest operates a passenger airline that provides commercial flights across the United States and near-international markets.  The Company is regulated by, among other government entities, the FAA, an administration of the DOT.  The FAA regulates civil aviation in the U.S., including commercial airlines like Southwest.

3.      This case concerns Defendants' concealment of critical information about Southwest's lack of safety and regulatory non-compliance from its investors (and the public at large) throughout the Class Period.  Among others, Defendants failed to disclose the following facts:

(a)      For roughly two years, Defendants had reported inaccurate and noncompliant weight and balance data – a violation of FAA regulations and an important safety

---

[2]     The operative Class Period is February 7, 2017, and January 29, 2020, inclusive.

issue – using internal Safety Management System ("SMS") risk assessments.   In essence, Defendants had substituted Southwest's flawed SMS for regulatory compliance.

(b)     The process used by Southwest to obtain airworthiness certificates on 71 of 88 foreign-purchased aircraft was insufficient to ensure they met U.S. aviation standards prior to being placed into commercial passenger service.

(c)     For nearly two years, Defendants operated dozens of aircraft with confirmed safety deficiencies, putting 17.2 million passengers at risk and flying 49 aircraft in an unknown airworthiness condition, putting those passengers at risk as well.   Defendants continued operating aircraft without ensuring they conformed to U.S. aviation standards because they had substituted Southwest's flawed SMS for regulatory compliance.

(d)     Defendants bypassed FAA assessments of Southwest's SMS risk assessments, contrary to regulations.

(e)     Southwest's "safety culture" – a key tenet of its SMS program – was plagued with widespread concerns, including the use of "diversion, distraction, and power to get what the Company wants."   In fact, nearly two-thirds of FAA employees interviewed as part of the OIG audit had "raised concerns about the [safety] culture at Southwest."

(f)     Defendants aggressively and repeatedly lobbied the FAA to both slow down and decrease mandatory inspection requirements and schedules, which ultimately contributed to a April 17, 2018 passenger fatality on Flight 1380 ("April 17, 2018 Fatality").

(g)     Southwest's safety lapses and regulatory non-compliance increased the safety risks to passengers traveling on Southwest flights, as well as the likelihood of heightened governmental scrutiny into the Company, potential fines, remediation costs, and/or civil or criminal exposure, among other possible risks to the Company.

- 3 -

4.     Throughout the Class Period, Defendants touted Southwest's "safety culture," while concealing widespread safety issues from investors and consumers alike.  On February 7, 2017, the first day of the Class Period, Defendants represented in Southwest's 2016 Annual Report filed on SEC Form 10-K ("2016 10-K") that the Company: (1) "performs substantially all line maintenance on its aircraft"; (2) "has policies and procedures in place that are designed to promote compliance with the laws of the jurisdictions in which it operates"; and (3) "invest[s] significantly in technology resources including, among others, the Company's systems related to" "aircraft maintenance record keeping."  Defendants made these same representations in SEC filings on February 7, 2018, and February 5, 2019, among other dates.  Defendants also made numerous other misstatements and concealment of material information concerning Southwest's safety protocols and compliance with government maintenance and safety regulations.  *See* §V, *infra*.

5.     At all relevant times, Defendants acted with scienter.  They knew or were severely reckless in disregarding that Southwest's operations had been plagued by safety lapses for years. Instead, Defendants continued to deny wrongdoing and conceal from investors that Southwest planes remained in the air with unresolved safety concerns, endangering at least 17.2 million passengers and killing a passenger on April 17, 2018 – the first passenger death on a U.S. airline in nearly a decade.  And from 2018-2019, even after the FAA flagged discrepancies, Defendants continued to hide that Southwest was routinely reporting inaccurate and noncompliant weight and balance data in violation of FAA regulations and their own safety-risk assessments.  These concealed facts significantly increased safety risks to passengers and the attendant risks of heightened governmental scrutiny, fines, and liability, among other risks to the Company.  *See* ¶¶98(b)-(c), 98(h), 123(e), 125(b), 129(b), §VI, *infra*.

6.     Even as the FAA identified safety lapses, Defendants tried to persuade the FAA to conduct *fewer* inspections.  In 2017, for example, Southwest lobbied against an Airworthiness

Directive ("AD") for ultrasonic inspections of the type of engine that had failed in an August 27, 2016 incident when the aircraft suffered an engine failure (*see* ¶¶45-51, *infra*) and would later contribute to the April 17, 2018 Fatality involving the same type of engine.

7.      Throughout the Class Period, Defendants' material misstatements and omissions caused Southwest's stock to trade at artificially inflated prices, resulting in substantial damages to the Class when the truth was revealed to the market through a series of partial disclosures.

8.      For example, on April 17, 2018, news sources publicly reported that Southwest Flight 1380 from New York to Dallas had blown an engine, causing loss of altitude and violent depressurization after shrapnel from an engine explosion struck the plane.  The shrapnel shattered a cabin window and partially sucked out a passenger mid-flight.  The passenger, Jennifer Riordan, a Wells Fargo executive and mother of two, died of blunt trauma from the shrapnel.  Seven other passengers were injured and those who were not physically injured were traumatized by the ordeal, which necessitated an emergency landing in Philadelphia.  Ms. Riordan's death marked the first fatality onboard a U.S. airline in nine years.  The engine that exploded mid-flight was the same model as the one involved in the August 27, 2016 incident, and the same type of engine Southwest had lobbied the FAA not to inspect.  By the close of trading on April 17, 2018, Southwest's stock price had declined $0.62 per share to close at $54.27 – a decline of 1.132%.  In published reports, financial analysts covering Southwest attributed the drop to "the near-term impact of the Flight 1380" fatality and "safety-related concerns."  *See* ¶¶45-52, §VII(A), *infra*.

9.      During post-market hours on April 18, 2018, the day after Ms. Riordan died on Southwest Flight 1380, the FAA announced that it would issue an AD mandating ultrasonic engine inspections.  Southwest's stock price fell $1.02 per share, or -1.83%, to close at $54.80 per share on April 19, 2018.  News outlets publicly reported on the FAA's announcement, specifically that the agency would mandate all ultrasonic inspections.  *See* ¶¶53-55, §VII(B), *infra*.

10.     On June 25, 2019, after market close, the *WSJ* reported that the FAA had "removed three senior managers in the office overseeing [Southwest], amid allegations of lax safety enforcement raised by agency whistleblowers and various resulting government inquiries."  The *WSJ* also reported that the DOT's "inspector-general has been looking into some of the safety issues for many months."  By the close of trading on June 26, 2019, Southwest's stock price had declined $0.30 per share to close at $50.70 – a decline of 0.59%.  Multiple news outlets reported quickly, commenting on the *WSJ* article regarding the reassignment of the three FAA officers overseeing Southwest.  *See* ¶¶61-62, §VII(C), *infra*.

11.     On January 30, 2020, prior to the market opening, the *WSJ* published an article entitled "Southwest Flew Millions on Jets with Unconfirmed Maintenance Records, Government Report Says."  The lengthy January 30 *WSJ* Article reported that a soon-to-be-released report by the DOT OIG faulted Southwest for failing to prioritize safety and the FAA for lax oversight.  The article further revealed, *inter alia*, that "Southwest pilots flew more than 17 million passengers on planes with unconfirmed maintenance records [and unresolved safety concerns for] over roughly two years"; that Southwest experienced "chronic failure to accurately monitor the weight of checked baggage loaded into aircraft;" that "[s]uch noncompliance has persisted for roughly two years"; and that "nearly two-thirds of the 46 FAA employees interviewed [by the OIG] "'raised concerns about the culture at Southwest.'"  By the close of trading on January 30, 2020, Southwest's stock price had declined $1.06 per share to close at $55.83 – a decline of 1.86%.  News outlets from all over the country reported on the January 30 *WSJ* Article, commenting that the "[a]udit blasts Southwest's safety culture" and "paints a dark picture of Southwest's safety culture."  *See* ¶¶63-69, §VII(D), *infra*.

12.     To recover losses suffered by Southwest investors as a result of Defendants' fraudulent scheme, Lead Plaintiffs now bring this class action under §§10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, on behalf of themselves and all persons or entities (except Defendants) that purchased or otherwise acquired Southwest securities traded on the New York Stock Exchange ("NYSE") under the ticker "LUV" during the Class Period.

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) because Lead Plaintiffs' claims arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Southwest maintains its corporate headquarters in this District.  Additionally, many of the acts charged herein, including the preparation and dissemination of materially false or misleading information, occurred in substantial part in this District.

15.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and/or the facilities of the national securities exchanges.

## III.    THE PARTIES

### A.    Lead Plaintiffs

16.    Elevator Pension Plan is a multi-employer pension plan that manages the pension assets for its participants and their families.  Elevator Pension Plan is registered with the pension

regulatory authorities in Ontario, Canada.  Elevator Pension Plan purchased shares of Southwest common stock during the Class Period and was damaged thereby.[3]

17.     Elevator Constructors Fund is a defined contribution profit sharing plan with a tax deferred savings, 401(k), option covering eligible members of the Elevator Constructors Union Local No. 1.  The Elevator Constructors Fund is headquartered in New York, New York.  The Elevator Constructors Fund purchased Southwest common stock during the Class Period and was damaged thereby.[4]

### B.     Defendants

18.     Defendant Southwest operates a commercial passenger airline that provides scheduled air transportation services in the U.S. and near-international markets.  The Company was founded in 1967.  It is regulated by, among other government entities, the FAA.  Southwest's principal executive offices are located at 2702 Love Field Dr., Dallas, Texas 75235.  Southwest's common stock trades on the NYSE under the ticker symbol "LUV."

19.     Defendant Kelly has been Southwest's CEO and Chairman of the Board at all relevant times.  Defendant Kelly first joined the Company in 1986 and has held various management positions since then.  Defendant Kelly has served as the Company's Chairman of the Board since May 2008 and its CEO since July 2004.  In its April 11, 2017 Proxy Statement publicly filed with the SEC, Southwest emphasized defendant Kelly's ability to bring "invaluable operational, financial, regulatory, governance, and cultural perspectives to the Board" and to "continually educate and advise the Board on the Company's industry and related opportunities,

---

[3]   An updated certification reflecting the Elevator Pension Plan's relevant transactions in Southwest securities with respect to the operative Class Period is attached hereto as Exhibit A.

[4]   *See* ECF No. 7-1.  The Elevator Constructors Fund has no additional transactions in Southwest securities occurring within the operative Class Period that were not already listed on its original certification.

issues, and challenges." As CEO, defendant Kelly had, at all relevant times, the power to authorize or approve publicly disseminated information about the Company, was regularly quoted in Southwest's press releases, regularly spoke on Southwest's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, regularly made live presentations at analyst-sponsored investor conferences, and signed or authorized all of Southwest's reports filed with the SEC during the Class Period. During the fiscal years included in the Class Period (2017-2018), defendant Kelly received $15,286,655 million in total executive compensation and bonuses. Defendant Kelly also engaged in insider sales of Southwest common stock during the Class Period at inflated prices, from which he received proceeds of $13,557,631. *See* ¶137(e), *infra*.

20.     Defendant Romo, who joined Southwest in 1991, has been the Company's CFO and Executive Vice President since July 2015. According to her biography posted on the Company's website, as Executive Vice President and CFO defendant Romo is responsible for "the airline's overall Finance activities, including Reporting, Accounting, Investor Relations, Treasury, Tax, Corporate Planning and Financial Planning and Analysis" and "oversees the Company's Supply Chain Management." In this role, defendant Romo had, at all relevant times, the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Southwest's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, made live presentations at analysts sponsored investor conferences, and signed or authorized all of Southwest's reports filed with the SEC during the Class Period. During the fiscal years included in the Class Period (2017-2018), defendant Romo received $6,147,383 million in total executive compensation and bonuses. Defendant Romo also engaged in insider sales of Southwest common stock during the Class Period at inflated prices, from which she received proceeds of $1,800,449. *See* ¶137(e), *infra*.

21.     Defendant Van de Ven, who joined Southwest in 1993, has been the COO of Southwest since May 2008.  According to his biography on the Company's website, as COO, defendant Van de Ven provides "[e]xecutive leadership to many Departments including Air Operations, Ground Operations, Technical Operations, Customer Support & Services, Network Operations Control, Safety and Security, Operational Strategy & Performance, Labor Relations, and Hospitality Operations Support, which includes the Company's President's Council and Hospitality efforts."  In this role, defendant Van de Ven had, at all relevant times, the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Southwest's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, and made live presentations at analyst sponsored investor conferences.  During the fiscal years included in the Class Period (2017-2018), defendant Van de Ven received $7,224,687 million in total executive compensation and bonuses.  Defendant Van de Ven also engaged in insider sales of Southwest common stock during the Class Period at inflated prices, from which he received proceeds of $3,497,366.  *See* ¶137(e), *infra*.

22.     Defendants Kelly, Romo and Van de Ven are collectively referred to herein as the "Individual Defendants."

23.     The Individual Defendants made, or caused to be made, false statements that caused the prices of Southwest securities to be artificially inflated during the Class Period.

24.     The Individual Defendants, by virtue of their positions with the Company, possessed the power and authority to control the contents of Southwest's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  By virtue

of their positions within the Company, and their personal knowledge and/or access to material non-public information, the Individual Defendants knew or were severely reckless in disregarding that material facts were being withheld from the investing public, thereby rendering Defendants' statements to be materially false or misleading.  The Individual Defendants are liable for the false or misleading material misstatements and omissions alleged herein, as well as others that may be revealed as such with the benefit of further investigation and/or discovery.

## IV.    FACTUAL BACKGROUND

### A.    Regulatory Framework for U.S. Airlines

25.    The DOT regulates U.S. transportation systems to ensure safe, efficient, and modern transportation nationwide.  The FAA, a sub-agency of the DOT, regulates safety aspects of civil aviation operations.   As Southwest has recognized, the Company is "subject to the jurisdiction of the FAA with respect to aircraft maintenance and operations, including equipment, ground facilities, dispatch, communications, flight training personnel, and other matters affecting air safety."  To address compliance with its regulations, the FAA requires airlines to obtain an Air Carrier Operating Certificate and other certificates, approvals, and authorities.  These certificates, approvals, and authorities are subject to suspension or revocation for cause.

26.    The FAA maintains oversight of the airlines through its Flight Standards Service, which is comprised of thousands of inspectors.  Each major airline is assigned a Certificate Management Office ("CMO"), which is responsible for overseeing it.  The FAA relies heavily on programs such as the Voluntary Disclosure Reporting Program ("VDRP") and the Aviation Safety Action Program ("ASAP") for airlines, mechanics, and other operational personnel to self-disclose violations as a means of identifying non-compliance with the regulations that the FAA might not otherwise have the resources to detect.  There are incentives to airlines and certificate holders (in

the form of immunity from a finding of violation) for self-disclosing as a means of correcting compliance problems and detecting important safety-related trends.

27.     To align with international standards and enhance safety, on March 9, 2015, the FAA established requirements for air carriers to implement a formal, top-down approach consisting of systematic procedures, practices and policies to identify and manage safety risks, known as "SMS."  An SMS is comprised of four functional components: safety policy, safety risk management, safety assurance, and safety promotion.  Under this approach, airlines developed an SMS to identify hazards, root causes for hazards, implement corrective actions that mitigate risk, and proactively manage risk to prevent accidents.  The FAA is responsible for ensuring that the airlines' SMS systems effectively manages safety risk – including compliance with existing regulatory standards.  According to the DOT OIG, an SMS, however, "does not take the place of regular FAA oversight, inspection, and audits to ensure compliance with regulations."

**B.     Defendants Knew about Southwest's Widespread Safety Lapses and Regulatory Non-Compliance**

28.     Southwest has been plagued with safety and maintenance issues for over a decade, some of which has sparked government probes, some of which resulted in fines, and some of which prompted the FAA to issue new ADs.  Yet, Defendants have continued to publicly deny wrongdoing and assured the public that Southwest was remediating problems, thereby concealing from investors Southwest's systemic safety failures.

29.     As background, since 2016, Southwest has been the largest operator of Boeing 737 aircraft worldwide.  As of December 21, 2019, Southwest had nearly 750 Boeing 737 aircraft in its fleet, which included 506 Boeing 737-700s, 207 Boeing 737-800s, and 34 Boeing Maxs.  The average age of these various Boeing aircraft in Southwest's fleet is approximately 11 years.

30.     Unlike other airlines, however, Southwest 737s average more than five flights per day per plane, subjecting their skin, parts, and engines to additional stress.  That is more than ten

- 12 -

takeoffs and landings per day per plane.  These flights feature frequent pressurization and depressurization, processes that cause stress that can result in fractures in the bodies, skins, and engine parts of 737s.  In 2019, Southwest's average trip length for its aircraft was only 749 miles, with an average duration of only two hours and four minutes.

31.     On March 6, 2008, the FAA issued a press release proposing a $10.2 million penalty against Southwest for operating 46 Boeing 737 airplanes on more than 58,000 flights without performing mandatory inspections for fuselage fatigue cracking.  Yet, according to a March 8, 2008 article from the *WSJ*, Southwest insisted that it was "at no time" operating in an unsafe manner, and defendant Kelly misleadingly attributed the maintenance lapse to a simple "gap" in the Company's documentation.  This led to a Congressional probe of Southwest's alleged interference with the FAA's inspections.  While defendant Kelly admitted at an April 3, 2008 hearing with the U.S. House of Transportation and Infrastructure Committee that there was "a mistake with our regulatory compliance," then co-founder of Southwest and Chairman of the Board, Herbert D. Kelleher ("Kelleher"), reassured lawmakers and the public that "[w]e have learned our lesson."

32.     On March 2, 2009, news sources reported that Southwest agreed to pay $7.5 million in penalties to settle the FAA allegations.  Just over seven months later, on October 23, 2009, Southwest agreed to pay $3.5 million to settle a related shareholder derivative lawsuit.

33.     On July 13, 2009, Southwest Flight 2294 suffered a rapid depressurization of the passenger cabin caused by a failure in the fuselage skin due to metal fatigue.  The FAA issued an AD on January 12, 2010, mandating external inspections to detect any cracks in this more-vulnerable area of the fuselage skin.

34.     On August 21, 2009, the FAA discovered that 82 Southwest Airlines Boeing 737s were flying with unapproved parts and gave the Company four months to replace the parts on up to 50 of Southwest's 737 fleet.

35.     In February 2010, FAA inspectors accused Southwest and a Seattle area repair station of failing to follow federally approved procedures in carrying out repair work on sections of planes' fuselages that needed repair due to damage and failing to report the variance to the FAA.

36.     On March 19, 2010, the *WSJ* reported that Southwest had "failed to complete certain required maintenance involving rivets around the window frames of 55 of its Boeing 737 aircraft."  The article went on to state that Southwest "waited 22 days to inform the FAA about its maintenance lapses" instead of the typical 24 hours and "initially indicated only a single plane was affected."  Moreover, Southwest apparently "failed to provide the necessary backup documents to show all the work eventually was done" and "indicated that all compliance problems had been resolved, even though that was not the case."  Yet, "[d]espite the infractions, one of the FAA managers agreed to close the matter 'without reviewing the file,'" thereby "allowing the airline to avoid any potential penalties."

37.     On April 1, 2011, a Boeing 737 operating Southwest Airlines Flight 812 from Phoenix to Sacramento experienced a rapid decompression due to "the improper installation of the fuselage crown skin panel at the S-4L lap joint during the manufacturing process," prompting an emergency landing and injuring a crewmember and an employee passenger.

38.     On April 2, 2011, Southwest grounded 79 of its Boeing 737 planes and canceled hundreds of flights after an incident similar to the one on July 13, 2009, when the ceiling of Southwest Flight 812 tore open in mid-air causing a sudden loss of cabin pressure followed by a rapid descent and, ultimately, an emergency landing.   An investigation by the National

- 14 -

Transportation Safety Board ("NTSB") revealed that a section of fuselage skin fractured and flapped open due to pre-existing fatigue.

39.     On April 5, 2011, the FAA issued an Emergency Airworthiness Directive ("EAD"), mandating operators of 737 series 300, 400 and 500 aircraft to increase the frequency of inspections of lap joints on high flight cycle airframes.

40.     On July 22, 2013, a Boeing 737 operating Southwest Airlines Flight 345 from Nashville to New York City suffered a front landing gear collapse while landing in New York City, injuring nine people on board.  The NTSB concluded that the crash was due to pilot error. In July 2014, the FAA imposed a $12 million fine against Southwest after finding that the Company performed improper repairs on 44 of its Boeing 737 jetliners, and that it flew the planes in violation of safety regulations on more than 30,000 flights.  In 2015, Southwest agreed to operational changes in its aircraft maintenance and paid a $2.8 million civil penalty to settle the FAA lawsuit.

41.     On August 27, 2016, a Boeing 737 operating Southwest Flight 3472 from New Orleans to Orlando suffered an uncontained engine failure near Mississippi.  A fan blade from its CFM International ("CFM") CFM56-7 engine broke sending debris into the plane's fuselage, wing and tail, and the aircraft was diverted for an emergency landing.

42.     In March 2017, CFM, a joint venture of General Electric Co. and France's Safran S.A., which produces CFM56 engines, issued a "service bulletin" to airlines, urging them to implement "'as soon as possible'" a newly developed ultrasonic inspection that could detect cracks and flaws that would not be "visible to the naked eye."

43.     On August 25, 2017, the FAA issued a Notice of Proposed Rulemaking ("NPRM") for possible new inspections of aircraft, proposing for the first time a voluntary AD to conduct ultrasonic inspections on fan blades on CFM56-7B engines that had reached a certain number of

- 15 -

takeoffs and landings.  Despite the fact that other major U.S. airlines began incorporating the new inspection regime into their own maintenance programs, Southwest resisted CFM's and the FAA's increased inspection regime, instead lobbying the FAA against making the AD mandatory, complaining it was too costly and unnecessary.  In contrast, the Airline Pilots Association said in a letter to the agency that it "fully supported" the mandatory inspections.

44.     As reported by *NBC News* on April 20, 2018, Southwest filed "formal comments with the agency [in October 2017] . . . saying it would need 18 months to inspect the 732 engines that would be subject to an order."  News sources also publicly reported on April 18, 2018, that Southwest planned to only inspect "certain fan blades" within the engine.  The DOT regulates economic operating authority for air carriers and consumer protection for airline passengers "not all 24 as per CFM's bulletin.

C.      **The Deadly Southwest Flight 1380**

45.     On April 17, 2018, news outlets throughout the country publicly reported that New York to Dallas Southwest Flight 1380 blew an engine, causing shrapnel to strike the plane.  The engine was the same CFM56 model engine and on the same Boeing 747 model plane as the one involved in the August 27, 2016 incident. *See* ¶41, *infra*.  The explosion resulted in the death of one passenger, Jennifer Riordan, who was partially pulled through a cabin window as the cabin suffered rapid decompression, and injured seven others.  According to the Chairman of the NTSB, the incident marked "the first passenger fatality in a U.S. airline accident since 2009."  The NTSB Chairman said he was "very concerned" about metal fatigue of this type of engine and that NTSB will "focus on a missing engine fan blade."

46.     After this fatal accident, the FAA made Airworthiness inspections of the CFM56-7B mandatory.

- 16 -

47.     On this news, Southwest's stock price fell $0.62 per share, or 1.13%, to close at $54.27 per share on April 17, 2018.

48.     A NTSB November 19, 2019 Aircraft Accident Report reported that Flight 1380 experienced "a left engine [CFM International CFM-56-7B] failure while climbing through flight level 320 en route to the flight's assigned cruise altitude" and that "fragments from the inlet and fan cowl struck the left wing, the left-side fuselage, and the left horizontal stabilizer," which "resulted in a rapid depressurization" after "a window departed the airplane."  The fan blade showed "signs of metal fatigue," for example, microscopic cracks that could splinter open under the kind of stress placed on jetliners and their engines.  NTSB Chairman Robert Sumwalt ("Sumwalt") said during a public press briefing, "with microscopic cracking on the interior of the fan blade that would not have been visible to the naked eye."  According to Sumwalt, "'[e]ngine failures like this should not occur.'"

49.     New sources publicly reported that the accident was similar to, and mirrored, the August 27, 2016 incident in which the fan blade separated from the fan disk and there were signs of "metal fatigue at the location where the 24 titanium alloy fan blade detached."

50.     Southwest was one of several airlines that called for slower implementation of the proposed FAA rule that would require inspections of the type of engines that failed on April 17, 2018.  As a result of Southwest's resistance to inspections and safety, the FAA investigation into Southwest's August 27, 2016 incident was still ongoing when the April 17, 2018 Fatality occurred, and the ultrasonic inspections of fan blades which were supposed to replace "visual inspections" had not been mandated by the FAA.  Speaking on the condition of anonymity, an FAA official told *The Washington Post* ("*The Post*") that "[w]ork on the FAA's proposed inspection rules bogged down for months over just what the requirements should be" and that "'[b]ecause of the comments that came in from the airlines . . . there was a lot of hand-wringing going on.'"  News

- 17 -

sources reported on April 20 2018, that "critics, including two airline consumer watchdogs and a union leader who represents mechanics, say that slow action by the FAA exemplifies the agency's cozy relationship with the industry."  According to Gary Peterson, an international vice president of the Transport Workers Union: "The airlines are dictating to the FAA what they think should happen versus the FAA saying 'No, you are going to do this right now.'"

51.     On December 2, 2019, *The Post* reported that Southwest said its inspectors visually examined the blade in question on Flight 1380, but as investigators explained, "a metal coating on the blades sometimes 'masked' cracks" so "'not all cracks are detectable by visual inspections.'" *The Post* further reported that Southwest was "in the process" of inspecting blades of CFM56 engines with the ultrasonic tool when the April 17, 2018 Fatality occurred.

52.     Southwest's 2018 Annual Report filed on Form 10-K ("2018 10-K") with the SEC on February 5, 2019, stated that "[p]assenger revenues for 2018 included an estimated $130 million negative impact to revenue due to temporarily lower passenger yields from an aggressive May 2018 fare sale for June through October 2018 travel, which was offered in conjunction with the Company's broad marketing efforts following the Flight 1380 accident."

53.     On April 18, 2018, after market close, the FAA announced that it would "issue an [AD] within the next two weeks that will require inspections of certain CFM56-7B engines," that the "directive will require an ultrasonic inspection of fan blades when they reach a certain number of takeoffs and landings," and that "[a]ny blades that fail the inspection will have to be replaced." News sources on April 19, 2018 publicly reported that the FAA would "order inspection of about 220 aircraft engines as investigators have found that a broken fan blade touched off an engine explosion this week on a Southwest flight, killing a passenger."

54.     On this news, Southwest's stock price dropped $1.02 per share, or -1.83%, to close at $54.80 per share on April 19, 2018.

55.     On April 18, 2018, Southwest announced it would perform ultrasonic scans in the following 30 days on all of its CFM56 engines that had not recently undergone such an inspection.

56.     On June 21, 2018, news sources publicly reported that eight passengers had sued Southwest in connection with the April 17, 2018 Fatality.

### D.     Southwest's Relationship with FAA Regulators

57.     As reported by *The Dallas Morning News* on February 19, 2019, the FAA launched an investigation in February 2018 into Southwest's weight and balance performance data.

58.     From July 2018 through December 2019, Southwest and the FAA also faced separate scrutiny by the DOT's OIG.  On June 20, 2018, the *WSJ* reported in an article entitled "DOT Watchdog Examines FAA Oversight of Southwest Airlines," which stated in part that:

> The Transportation Department's inspector general is examining whether federal aviation inspectors have done enough to ensure safety in policing operations of Southwest Airlines Co.
>
> Scrutiny of the Federal Aviation Administration's oversight office in the Dallas area, responsible for supervising the carrier with the largest number of domestic passengers, was disclosed Wednesday in a one-paragraph statement devoid of details.  But the audit was prompted, at least in part, by months of allegations coming from inside the local office that some FAA supervisors were too cozy with airline managers, according to two people familiar with the details.
>
> Some of the issues auditors are delving into, according to one of these people, include allegations that certain FAA supervisors have disregarded various inspector complaints and failed to aggressively carry out enforcement actions after they were drafted.  At least one inspector has filed a formal whistleblower complaint and alleged that he suffered retaliation from management.
>
> Practices under review in the audit range from changes in the way pilots compute takeoff distances and set flight controls to how the airline runs specific training programs to help pilots deal with stalls, these people said.  The complaints filed to the inspector general include alleged violations of FAA requirements to accurately record the number of bags loaded in the belly of each jet, according to these people, leading to questionable weight and balance calculations.
>
> *               *               *
>
> "We have a very transparent and professional relationship with the Federal Aviation Administration," Southwest said in response to questions about the audit.

- 19 -

"Our absolute goal at Southwest is to meet or exceed every requirement of our Safety Management System, and we believe we are held accountable to that goal by the FAA."

\*       \*       \*

Separately, the DOT watchdog has been given details about close calls over the past few years in which two Southwest aircraft barely managed to get airborne due to significant mistakes in takeoff weights entered into flight computers, according to one knowledgeable person.

59.     On February 26, 2019, an incident with Southwest Flight 2169 resulted in both wings of an aircraft being damaged during the first of three unsuccessful landing attempts into Bradley International Airport in Connecticut, before diverting to another airport (the "Flight 2169 Incident").

60.     News sources publicly reported that, on March 8, 2019, a top FAA official sent a letter to Southwest and its mechanics union, warning them about the safety risks of their dispute. Southwest and its mechanics were in contract negotiations for six years and Aircraft Mechanics Fraternal Association ("AMFA") members rejected a tentative agreement in fall 2018.   On February 28, 2019, Southwest "filed a lawsuit against the union, which alleged that a small group of its 2,400 mechanics are writing up an unprecedented number of planes for maintenance in a deliberate work slowdown as contract talks drag on." Ali Bahrami, Associate Administrator for Aviation Safety, cautioned in a letter that "'a breakdown in the relationship between Southwest and AMFA . . . raises concern about the ongoing effectiveness of the airline's safety management system.'"

61.     On June 25, 2019, after the close of market, the *WSJ* published an article entitled "FAA Reassigns Senior Managers in Office Overseeing Southwest Airlines." The article stated that on June 25, 2019, the FAA announced it "removed three senior managers in the office overseeing Southwest Airlines Co., amid allegations of lax safety enforcement raised by agency whistleblowers and various resulting government inquiries." The reassigned employees included

- 20 -

Carroll Hebert, office manager, and two of his lieutenants responsible for operations and maintenance.  According to the article, the DOT's inspector-general "has been looking into some of the safety issues for many months . . . including lapses by the airline in documenting maintenance for more than 100 of its jets."  The DOT's inspector general was also investigating "failures to reliably compute the weight of checked baggage and hazardous landing incidents in which one aircraft smacked a wingtip on the tarmac and another ran off the strip in stormy weather."  The article also noted that the union representing FAA safety inspectors nationwide "complained to both FAA headquarters and congressional staffers about alleged management retaliation against inspectors who raised safety concerns, according to people familiar with the details."  As the article reported, Southwest denied any wrongdoing, stating that they "'remain absolutely confident that our maintenance procedures ensure the airworthiness of our aircraft.'"

62.     On this news, Southwest's stock price fell $0.30 per share, or 0.59%, to close at $50.70 per share on June 26, 2019.

63.     On January 30, 2020, the *WSJ* published an article entitled "Southwest Flew Millions on Jets With Unconfirmed Maintenance Records, Government Report Says – Transportation Department report to fault FAA for what it calls ineffective oversight of carrier," reporting that the soon-to be-released OIG Report faulted Southwest for failing to prioritize safety and the FAA for lax oversight.  The January 30 *WSJ* article stated in part:

> A government report to be released in coming days says Southwest Airlines Co. failed to prioritize safety and the airline's regulator, the Federal Aviation Administration, hasn't done enough about it.
>
> Southwest pilots flew more than 17 million passengers on planes with unconfirmed maintenance records over roughly two years, and in 2019 smashed both wingtips of a jet on a runway while repeatedly trying to land amid gale-force winds, according to the Transportation Department report, reviewed by The Wall Street Journal.
>
> The lapses are highlighted in a draft audit by the agency's inspector general that also criticizes the FAA's oversight of the carrier as lax, ineffective and

inconsistent.  The document indicates no agency enforcement action resulted from those safety slip-ups or certain other alleged hazards.  In some cases, the report alleges, the FAA's overall approach served to "justify continued noncompliance with safety regulations."

Following a roughly 18-month inquiry, the inspector general found FAA managers in the Dallas-area office that supervises Southwest routinely allowed the carrier "to fly aircraft with unresolved safety concerns."  And it said they failed to adequately confront shortcomings in the airline's approach to safety, which were recognized by agency officials ranging from senior headquarters personnel to local inspectors.  The audit indicates nearly two-thirds of the 46 FAA employees interviewed "raised concerns about the culture at Southwest."

"It is clear that the Agency is not yet effectively navigating the balance between industry collaboration and managing safety risks at the carrier," according to the report.

64.    The January 30 *WSJ* Article also provided new details about the problems that led to Southwest's incomplete documentation of certain aircraft inspections and repairs over the years. According to the article, the draft OIG Report "reveals that initial FAA approval of mandatory maintenance certificates for 71 of 88 used aircraft – a process the agency told investigators typically takes three or four weeks – occurred in one day."  The *WSJ* noted that "[a]fter problems with that process were identified, the FAA gave Southwest two years to fully inspect and verify that the planes – already phased into the fleet – met all safety requirements."

65.    With regard to Southwest's weight and balance discrepancies, the January 30 *WSJ* Article stated that the OIG Report found such noncompliance had "persisted for roughly two years" and that Southwest – rather than federal inspectors – had "determine[d] potential hazards stemming from the airline's chronic failures to accurately monitor the weight of checked baggage loaded into aircraft."  It also stated that "[t]he FAA closed that enforcement case without taking action against the carrier, though people familiar with the details said agency inspectors continue to find weight discrepancies."  As the *WSJ* noted in the article, Southwest "has long held that heavier-than-expected baggage loads fall well within its planes' operating safety margins and that its system for calculating weight and balance data didn't present a systemic safety risk."  According

- 22 -

to the article, defendant Kelly acknowledged in a December 2019 interview that regarding weight and balance monitoring, "'we have opportunities to improve there.'"

66.     As noted by the January 30 *WSJ* Article, "[p]reviously, Southwest executives characterized many of these same issues, which concern both maintenance documentation and the weight of planes at takeoff, as differences of opinion between the airline and its regulators – and sometimes between various groups of regulators – that didn't affect safety."

67.     The January 30 *WSJ* Article noted that the OIG interviewed numerous FAA officials, who "complained Southwest often was slow or resistant to providing the agency with safety information."

68.     The January 30 *WSJ* Article also noted that the OIG faulted both Southwest and the FAA for "failing to adequately investigate the root causes" of the Flight 2169 Incident.  Further, the  FAA's review of the Flight 2169 incident "failed to determine whether Southwest's safety system 'was effective in achieving the highest possible degree of safety.'"

69.     The January 30 *WSJ* Article further noted that the draft OIG Report "offers additional details and provides official findings and recommendations.  Operational problems such as the wingtip strikes haven't been revealed before."   It also reported that "Southwest was concerned enough about the audit to request a September meeting between [defendant] Kelly and Calvin Scovel, then the inspector general" and that "[i]nvestigators for the House Transportation Committee and the Senate Commerce Committee have been looking into that meeting, according to people familiar with those inquiries."  On this news, Southwest's stock price fell $1.06 per share, or 1.89%, to close at $55.83 per share on January 30, 2020.

70.     On January 30, 2020, *USA Today* published an article entitled "Southwest speaks out about draft government report saying it neglected to prioritize safety."  The *USA Today* reported that Southwest had once again denied any wrongdoing:

"We have communicated our disappointment in the draft audit report to the Office of Inspector General (OIG)," Southwest spokesman Brian Parrish told USA TODAY in a statement. "Southwest maintains a culture of compliance, recognizing the safety of our operation as the most important thing we do."

"As part of our safety culture, we have a transparent relationship with the Federal Aviation Administration (FAA), which includes an FAA-approved safety management system designed to manage and mitigate operational risks and execute safe operating programs and practices," the statement continued.

Parrish concluded the statement, "The success of our business depends on the safety of our operation, and, while we work to improve each and every day, any implication that we would tolerate a relaxing of standards is unfounded."

71.    On February 11, 2020, the DOT OIG published its final report, the result of an 18-month audit to review Southwest's safety and FAA's oversight of Southwest' systems for managing risk.  According to the January 30 *WSJ* Article, the draft report was substantially the same as the final report that was to be released.  The OIG audit had been prompted by the April 17, 2018 Fatality and a hotline complaint in 2018 regarding the FAA's oversight of Southwest and a number of operational issues at Southwest, "such as alleged pilot training deficiencies and inaccurate information being provided to pilots prior to flight."

72.    The OIG Report, first reported to the market in the January 30 *WSJ* Article, found that, for nearly two years, Southwest "regularly and frequently communicated incorrect aircraft weight and balance data to its pilots . . . a violation of FAA regulations and an important safety issue" "as an airplane's weight and center of gravity can greatly affect its performance and safety" and "result in hazardous or catastrophic conditions, including during take-off and landing."  The OIG Report stated that these discrepancies had continued for two years because, after the FAA learned about these weight and balance issues in January 2018 and required Southwest to take corrective steps, it did not ensure that Southwest took the agreed-upon action steps.  Nor did the FAA ensure that Southwest had determined the root cause of safety concerns "even though the principal inspector did not feel [Southwest] had identified the true cause."  Specifically, the OIG

- 24 -

Report noted there were "more than 4,000 errors of 300 pounds or more, by month from March 2018 through July 2019."

73.     The OIG further found that, from early 2018 until August 2019, Southwest had continued reporting inaccurate and non-compliant weight and balance data based on its own risk assessment that any error less than 1,500 pounds did not negatively impact safety, rather than complying with regulatory requirements.  Southwest reported between "7 to 24 incidents per month of discrepancies greater than 1,500 pounds between March 2018 and July 2019."

74.     The OIG also found that the "process used by Southwest . . . and FAA to issue airworthiness certificates on [Southwest's pre-owned] aircraft was insufficient to ensure they met U.S. aviation standards prior to being placed into commercial passenger service."   In December 2017, the FAA had begun identifying discrepancies with 88 previously owned aircraft that Southwest Airlines purchased primarily from foreign carriers.   The FAA and Southwest "agreed to a 2-year action plan for the carrier to verify that the 88 aircraft conformed to U.S. aviation standards."   The OIG found that out of 88 previously-owned aircraft that Southwest purchased primarily from foreign carriers, 71 were approved as airworthy by FAA designees (aviation representatives designated to perform this work on FAA's behalf) "*on the same day*" Southwest "submitted them for approval" and the FAA-certified repair station conducted its inspection, when "[a]ccording to FAA, the entire process . . . normally takes 3 to 4 weeks per aircraft."  According to the designees that the OIG interviewed, "they used [Southwest's] summary documentation to complete their review expeditiously to meet [Southwest's] timelines, rather than performing an independent analysis."

75.     Further, three years after designees approved the first aircraft, FAA inspectors from the local oversight office began identifying "maintenance discrepancies with these [previously-owned] aircraft" during routine surveillance.  After the local oversight office brought the issues to

- 25 -

Southwest's attention, the FAA and Southwest agreed to a 2-year action plan for the carrier to verify that the 88 aircraft conformed to U.S. aviation standards.  However, the OIG found that the FAA agreement "to allow Southwest . . . to continue operating these aircraft under the agreed upon action plan for nearly 2 additional years (until July 2020) while completing the comprehensive inspections and repairs on all 88 aircraft" despite the numerous identified discrepancies such as "concerns with improper repairs," "unresolved safety concerns," "undocumented, nonconforming, or unverifiable repairs," "undocumented major repairs and aircraft records not complying with regulatory standards" and "supporting documentation that was not translated into English during the conformity process" was "[c]ontrary to FAA regulations."  Examples of findings related to major repairs included "improper repairs to vapor barriers and fuselage skin."  Similarly to the weight and balance issue, the OIG revealed that Southwest continued operating non-confirming aircraft based on its own SMS risk assessments, rather than regulatory compliance.  In total, the OIG reported that "Southwest . . . operated more than 150,000 flights on these 24 aircraft with confirmed safety deficiencies, putting as many as 17.2 million passengers at risk."  Additionally, Southwest had operated 49 aircraft without verifying they conform to U.S. aviation standards, continuing to put the passengers on these aircraft at risk.

76.     In the case of both the weight and balance discrepancies and the inspection/maintenance problems, the OIG Report revealed that Southwest "continues operating aircraft without ensuring compliance with regulations."

77.     In addition, the OIG  reported that "FAA's SMS Program Office raised concerns that Southwest . . . may have devised a process that allows them to potentially bypass" the FAA's review of Southwest's risk assessments, contrary to regulations.  For example, the OIG noted that "FAA inspectors approved major pilot training program changes proposed by Southwest," when the Company "did not conduct a risk assessment, as required, for this new training program."  The

OIG also cited as an example the fact that Southwest's risk assessment related to the Flight 2169 Incident did not adequately represent the hazards.

78.     Further, the OIG found that FAA inspectors had failed to evaluate safety culture as part of their oversight of Southwest' SMS – "a key tenet in an effective SMS program" – despite widespread concerns, including mechanics being "pressured not to document aircraft discrepancies" and "'the absence of a "Just Safety Culture.'"  The OIG Report stated that 28 of 46 (61 percent) oversight staff the OIG interviewed, including senior level managers, raised concerns about the culture at Southwest.  These statements included for example:

(a)     "The safety culture at Southwest Airlines consists of using '***diversion, distraction, and power' to get what the company wants***";

(b)     "Regarding Southwest Airlines bypassing the local oversight office by going directly to FAA Headquarters when there is a disagreement, 'They've always done that – just more blatant now.'"  Contrary to Defendants' prior representations, those aircraft were not safe to continue flying and endangered the lives of millions of passengers;

(c)     "Southwest's management is very skilled in what they have to do.  If it costs money, they won't do it";

(d)     "Whatever Southwest puts on paper for us to see never seems to get done the way they wrote it";

(e)     "It's not a positive culture with these issues at Southwest Airlines. Arrogance gets the best of them"; and

(f)     Southwest's attitude toward FAA appears to take the form of "I'll respond to you when I damn well please."

79.     Additionally, the OIG noted that Southwest began operating flights in Hawaii despite inspectors' and senior management concerns with Southwest's safety culture, – "a process that requires an even higher attention to safety."

80.     The OIG report made 11 recommendations for the FAA to step up its oversight of Southwest including, *inter alia*, "[e]nsure Southwest . . . complies with regulatory requirements to provide accurate weight and balance information to pilots, or grant an exemption that justifies the non-compliance being in the public interest"; "[e]nsure Southwest complies with regulatory requirements that the 88 previously owned aircraft conform to U.S. aviation standards"; and "[d]evelop and implement a management control to ensure air carriers and inspectors do not use Safety Management Systems as a substitute for regulatory compliance."

## V.     DEFENDANTS' FALSE OR MISLEADING STATEMENTS

81.     Throughout the Class Period, Defendants concealed the truth from investors about Southwest's widespread safety issues and regulatory non-compliance.  As part of their effort to suppress the truth, Defendants made false or misleading misstatements regarding, *inter alia*, the Company's purported compliance with government maintenance and safety regulations, safety and security standards, culture of safety and security, and denial of wrongdoing as set forth herein. Defendants' misstatements were each materially false or misleading at the time they were made because they failed to disclose, among others, the following facts:

(a)     For roughly two years, Defendants reported inaccurate and noncompliant weight and balance data – a violation of FAA regulations and an important issue – using their internal SMS risk assessments.  Defendants had improperly used their own SMS as a substitute for regulatory compliance.

(b)     The process used by Southwest for obtaining airworthiness certificates on 71 of 88 foreign-purchased aircraft was insufficient to ensure they met U.S. aviation standards prior to being placed into commercial passenger service.

(c)     For nearly two years, Defendants operated 24 aircraft with confirmed safety deficiencies putting as many as 17.2 million passengers at risk and 49 aircraft in unknown airworthiness condition, also putting those passengers at risk.   Contrary to Defendants' representations, those aircraft were not safe to continue flying and endangered the lives of millions of passengers.   Defendants continued operating aircraft without ensuring they conform to U.S. aviation standards.

(d)     Defendants "may have devised a process that allows them to potentially bypass these assessments [of their SMS risk assessments] that are required by regulation."

(e)     Southwest's "safety culture" – a key tenet of its SMS program – was plagued with widespread concerns, including the use of "diversion, distraction, and power" to get what the Company wanted.

(f)     Defendants aggressively and repeatedly lobbied the FAA to both slow down and decrease mandatory inspection requirements and schedules, which contributed to the April 17, 2018 Fatality.

(g)     As a result, based on the above facts, Defendants significantly increased the safety risks to passengers traveling on Southwest flights and risked harm to Southwest's reputation and brand, as well as subjected the Company to potential heightened governmental scrutiny, penalties, fines, remediation costs, and civil/criminal liability, among other risks.

82.     Defendants knew that discovery of the foregoing conduct could imperil the Southwest brand, subject the Company and its executives to criminal and/or civil exposure,

endanger the Company's reputation, and lead to other regulatory scrutiny and financial risks, but Defendants hid the wrongful conduct nevertheless.

83.     As a result of Defendants' false and misleading statements, Southwest shares traded at artificially inflated prices during the Class Period, and members of the Class suffered significant losses and damages once the truth began to seep into the market.

84.     Defendants' false or misleading statements known to date are detailed below.  Lead Plaintiffs reserve their rights to amend or argue additional false and misleading statements by Defendants as they are discovered and/or occur.

**A.     Material Misrepresentations and Omissions Regarding Safety Lapses and Regulatory Non-Compliance**

85.     In January 2017, the Company revised a press release entitled "Safety and Security Commitment."  This press release was signed by defendants Kelly and Van de Ven and the January 2017 version remained publicly available on the Company's website throughout the Class Period.  It stated:

> Southwest Airlines is committed to ensuring the Safety and Security of our Customers and Employees – ***it's our number one priority***.  We continually work to create and foster a ***Culture of Safety and Security*** that proactively identifies and manages risks to the operation and workplace before they can become injuries, accidents, or incidents.  We've established Company policies and governance to drive our focus on Safety and Security:
>
> *      *      *
>
> • All Southwest Airlines Employees, from Leadership to Frontline Employees, are responsible for:
>
> –   Establishing and upholding ***the highest levels of Safety and Security*** in our operation and our workplaces
>
> –   Complying with all Company Safety and Security policies and procedures, along ***with all government regulations and guidelines***
>
> – Proactively identifying and reporting hazards in the operation and contributing to our ***positive Safety and Security Culture and performance***

- 30 -

• Southwest Airlines is committed to:

– Establishing and annually reviewing specific Safety-related objectives by Executive Leadership which will be published in the Safety Management Manual and visible to all Employees

– Monitoring, measuring, and tracking Safety objectives to ensure they are met

– Establishing and promoting *Safety and Security reporting processes* that allow all Employees to report any condition, action, or process which could adversely affect Safety or Security and ensure that the hazards are proactively addressed

– Creating and maintaining a *proactive reporting Culture* and ensuring that no disciplinary action will be taken against any Employee for reporting a Safety or Security occurrence or hazards, except in cases where behavior is ultimately deemed to be reckless defined as making a behavioral choice to consciously take a substantial and unjustifiable Safety/operational risk, and specifically including criminal behavior, intentional falsification, and/or abuse of drugs and/or alcohol

– Evaluating and implementing practical administrative, engineering, and process control systems to lessen the risk to Employees or the operation

– Establishing, maintaining, and periodically exercising an emergency response plan and procedures to ensure safe transition from normal operations to emergency operations as described in Southwest's Emergency Procedures Manual (EPM).

• . . . The Chief Operating Officer is committed to and responsible for the development, operation, and quality control of Southwest Airlines' Safety and Security Management System (SMS), including provision of the necessary financial, personnel, and other resources to establish and maintain a fully functional SMS, and is the Accountable Executive in all matters of Safety and Security.

86.     On February 7, 2017, Southwest publicly filed its 2016 10-K with the SEC.  The 2016 10-K was signed and certified by defendants Kelly and Romo pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").  Southwest's 2016 10-K reported the Company's financial and operating results for the fourth quarter ("4Q16") and year ended December 31, 2016 ("FY16").  The 2016 10-K represented that "the Company has policies and procedures in place that are designed to promote *compliance with the laws* of the jurisdictions in which it operates."

- 31 -

87.     On February 7, 2018, Southwest publicly filed its 2017 Annual Report on Form 10-K ("2017 10-K") with the SEC.  The 2017 10-K was signed and SOX-certified by defendants Kelly and Romo and reported the Company's financial and operating results for the fourth quarter ("4Q17") and year ended December 31, 2017 ("FY17").  The 2017 10-K reiterated that Southwest has "policies and procedures in place that are designed to promote *compliance with the laws* of the jurisdictions in which it operates."  Additionally, the 2017 10-K touted that Southwest "participated in Required Navigation Performance ('RNP') operations as part of the FAA's Performance Based Navigation program, which is intended to modernize the U.S. air traffic control system by . . . making more *safe and efficient use of airspace*."  Furthermore, the 2017 10-K claimed that participation in this program allowed Southwest to "improve[s] operational capabilities by opening up many new and more direct airport approach paths to produce *safer* and more efficient flight patterns."  According to the 2017 10-K, since its first use of RNP in 2011, "Southwest has conducted approximately 58,000 RNP approaches, including over 19,000 in 2017."

88.     On April 26, 2018, following the Flight 1380 accident, Southwest publicly filed a form 8-K with the SEC, signed by defendant Romo and attaching a press release as an exhibit.  In addition to announcing Southwest's financial results for 1Q18, in the press release defendant Kelly told investors:

> We continue to cooperate with the National Transportation Safety Board's thorough investigation to understand the cause of the accident.  *We will never compromise the Safety of our Customers and Employees.  It is our highest priority – today and always*.

89.     On February 5, 2019, Southwest publicly filed its 2018 10-K with the SEC, signed and SOX-certified by defendants Kelly and Romo.  The 2018 10-K reported the Company's financial and operating results for the fourth quarter ("4Q18") and year ended December 31, 2018 ("FY18").  The 2018 10-K reemphasized that Southwest has "policies and procedures in place that

- 32 -

are designed to promote **compliance with the laws** of the jurisdictions in which it operates." Additionally, the 2018 10-K represented that since its first use of RNP in 2011, "Southwest has conducted approximately 143,000 RNP approaches, including over 85,000 in 2018."

90.     On March 4, 2019, Southwest published a press release on its website stating that it would begin service to Hawaii on March 17, 2019.  The release also quoted defendant Van de Ven proudly stating, "'[f]rom our work with airports under the direction of the State of Hawaii, to our California airports, and to all business partners who collaborated with us to **safely prepare our operation**, we gratefully share our thanks.'"

91.     On March 13, 2019, Southwest issued a statement on the Company's website entitled "Southwest Airlines Statement Regarding 737 MAX 8."  The statement noted that"[t]he **Safety** of our Customers and Employees is our **uncompromising priority**."  The statement further quoted defendant Kelly as saying, "[d]uring our 48-year history, Southwest has continuously demonstrated our **commitment to Safety**."

92.     Also on March 13, 2019, Southwest posted a video on its website addressing the FAA's order for all U.S. airlines to temporarily ground the Boeing 737 MAX aircraft series.  In this video, defendant Kelly emphasized that **safety** was Southwest's "**top-priority**," that every operative detail is operated according to the "independent oversight" of the FAA and that its mechanics are trained to "**safely maintain every airplane in our fleet**."

93.     On April 25, 2019, Southwest publicly filed a form 8-K with the SEC, attaching a press release as an exhibit, signed by defendant Romo, announcing the Company's financial results for 1Q19.  In the press release, defendant Kelly stated that "**[s]afety is our top priority**, and that commitment will never be compromised."

94.     Also on April 25, 2019, during a conference call with investors and financial analysts to discuss the Company's 1Q19 financial results, defendant Van de Ven reassured

investors that Defendants are "focused on getting our customers the *safe*, reliable, on-time and fun experience that they're accustomed to on Southwest."  Defendant Kelly also added during that call, "We're the – I think without a doubt, the most successful airline in history.  We've got *an impeccable safety record*."

95.     On July 25, 2019, during a conference call with investors and financial analysts to discuss the Company's 2Q19 financial results, defendant Van de Ven once again stressed to investors that Defendants "remain focused on running a *safe*, reliable, and on time and an enjoyable operation. . . ."

96.      On October 24, 2019, during a conference call with investors and financial analysts to discuss the Company's 3Q19 financial results, defendant Van de Ven repeated to investors that Defendants' "focus remains on running a *safe*, reliable, hospitable and efficient operation.  And I think we've got the best team in the industry to do it."

97.     On November 8, 2019, Southwest publicly filed its 3Q19 10-Q with the SEC. Southwest's 3Q19 10-Q was signed by defendant Romo and SOX-certified by defendants Kelly and Romo and represented that the "*FAA continues to exercise extensive regulatory oversight* of the Company's operations."

98.     These statements were materially false or misleading for the following reasons, unbeknownst to investors:

(a)     Defendants represented that they established and upheld "the highest levels of Safety and Security," that their "focus remains on running a safe" operation, that safety is their "highest priority – today and always," that their participation in RNP made for a "more safe use" of airspace and that they complied with "all government regulations and guidelines."  However, Defendants failed to disclose that:

(i)     Over the course of two years, Defendants had reported inaccurate and noncompliant weight and balance data, which was "a violation of FAA regulations and an important safety issue."  Defendants did not disclose that they failed to remedy those issues pursuant to their agreement with the FAA following the FAA's investigation in January 2018 and continued to operate flights with weight and balance non-compliances for nearly 2 years after the FAA identified the issue.  Specifically, Southwest had "more than 4,000 errors of 300 pounds or more, by month from March 2018 through July 2019."  These violations of the weight and balance limits "can result in hazardous or catastrophic conditions, including during take-off and landing," and were contrary to Defendants' representations that they were running a safe and compliant operation.  *See* ¶¶65-66, 72-73, 76, *supra*.

(ii)     Defendants used their own risk assessments that deemed any weight error less than 1,500 pounds to be "low risk" rather than comply with regulatory requirements, which risked leading to "hazardous or catastrophic conditions."  Specifically, Southwest reported "from 7 to 24 incidents per month of discrepancies greater than 1,500 pounds between March 2018 and July 2019."  Therefore, Defendants' internal risk assessments/SMS for weight and balance calculations did not comply with "all government regulations and guidelines" and did not ensure the "highest levels of Safety and Security."   *See* ¶¶65-66, 72-73, 76, *supra*.

(iii)     The process used by Southwest to obtain airworthiness certificates on 71 of 88 foreign-purchased aircraft had "serious gaps" and was "insufficient to ensure they met U.S. aviation standards prior to being placed into commercial passenger service."  Southwest rushed the FAA to approve them for service "*on the same day*" Southwest "submitted them for approval" and the FAA-certified repair station conducted its inspection in order "to meet [Southwest's] own timelines, rather than letting the FAA perform its own independent analysis, which normally takes "3 to 4 weeks."  As a result, these aircraft were placed into commercial

- 35 -

passenger service when they did not meet U.S. aviation standards and posed a safety risk. Therefore, Defendants' process for verifying the condition of its pre-owned aircraft did not comply with "all government regulations and guidelines" and did not ensure the "highest levels of safety and security." *See* ¶¶64, 66, 74, 76, *supra*.

        (iv)    Southwest "operated more than 150,000 flights" on 24 aircraft "with confirmed safety deficiencies, ***putting as many as 17.2 million passengers at risk***." Additionally, Southwest "continue[d] flying 49" aircraft without "verifying they conform to U.S. aviation standards, continuing to put the passengers on these aircraft at risk." *See* ¶¶59, 63, 66, 68, 75-76, *supra*. Southwest failed to address the following issues that posed serious safety concerns:

- "maintenance discrepancies" with "previously owned aircraft";

- "concerns with improper repairs";

- "unresolved safety concerns";

- "had undocumented, nonconforming, or unverifiable repairs";

- "supporting documentation that was not translated into English during the conformity process"; and

- "undocumented major repairs and aircraft records not complying with regulatory standards." *See* ¶¶63, 75, *supra*.

Additionally, Defendants failed "to adequately investigate the root causes" of the Flight 2169 Incident. *See* ¶¶59, 68, *supra*. Therefore, Defendants' maintenance program did not comply with "all government regulations and guidelines" nor did it proactively identify and report hazards in the operation of its purported "positive Safety and Security Culture and performance," contradicting the public representations Defendants made to consumers and investors on Southwest's website and elsewhere.

        (v)    Southwest continued operating aircraft for nearly two years without ensuring they conform to U.S. aviation standards. Such maintenance issues included

"undocumented, nonconforming and unverifiable repairs."  Examples of findings related to major repairs included "improper repairs to vapor barriers and fuselage skin."  As a result, Defendants failed to identify numerous maintenance and safety discrepancies and the Company's aircraft was not operating in a safe condition.  Therefore, contrary to Defendants' public representations, they concealed from investors that Southwest's internal risk assessments/SMS for assessing the airworthiness of pre-owned aircraft and maintaining aircraft in airworthy condition did not comply with "all government regulations and guidelines" and did not ensure the "highest levels of Safety and Security."  *See* ¶¶63, 66, 75, 76, *supra*.

(vi)    Southwest "may have devised a process that allows them to potentially bypass these [safety risk] assessments that are required by regulation."  For example, Southwest may have devised a process that allowed them to bypass the FAA's evaluation of Southwest's risk assessments related to the February 2019 Incident.  Had the FAA reviewed Southwest's assessments, it would have found that they were inadequate.  Likewise, Southwest's undue influence over the FAA may have prevented the FAA from reviewing Southwest's risk assessments as they pertain to changes to a new pilot training program.  Again, had the FAA reviewed those assessments, it would have found that Southwest "did not conduct a risk assessment, as required, for [a] new [pilot] training program."  *See* ¶¶68, 77, *supra*.

(b)    Defendants knew or were severely reckless in disregarding the Company's weight and balance discrepancies and regulatory noncompliance because the FAA had been investigating those issues since January 2018 and Southwest had entered into an agreement with the FAA, under which it was required to take a series of steps to remedy those issues.  It is implausible that Defendants were unaware of the FAA investigation and the subsequent agreement, given the importance of the government investigations, especially in light of Defendants' representations that safety was Southwest's "top-priority."  Yet, Defendants

- 37 -

knowingly or recklessly allowed those discrepancies to continue for nearly two years without taking action to remedy those issues – despite the fact that they knew (or at least should have known) of the grave consequences that could unfold as a result of such violations.  Further, the January 30 *WSJ* Journal article reported that addressing the weight and balance discrepancies, defendant Kelly acknowledged "'we have opportunities to improve there.'"  *See* ¶¶65, 72, 92, *supra.*

(c)     Defendants knew or were severely reckless in disregarding serious gaps in Southwest's process for verifying the condition of its aircraft, and for maintaining its aircraft because the FAA had begun identifying these issues since 2017 and had entered into a two-year action plan with Southwest, whereby the Company was required to verify that the 88 previously owned aircraft conformed to U.S. aviation standards.  It is implausible that Defendants were unaware of the FAA investigation and action plan.  Yet, Defendants knowingly or recklessly allowed those discrepancies to continue for nearly two years without taking action to remedy those issues – despite the fact that they knew (or at least should have known) of the grave consequences that could unfold as a result of such violations.  *See* ¶¶64, 74, *supra.*

(d)     Contrary to Defendants' public representations, they concealed from investors the fact that Southwest did not proactively identify and manage risks "to the operation and workplace before they can become injuries, accidents, or incidents."  Defendants repeatedly and aggressively lobbied the FAA to slow down and decrease inspection requirements and schedules concerning all CFM56 engines following the August 27, 2016 accident.  This practice of resisting inspections contributed to the April 17, 2018 inflight death of a passenger who was partially sucked out of a window on a Southwest flight during an emergency landing.  *See* ¶¶41-51, *supra.*

- 38 -

(e)     Contrary to Defendants' public representations, they did not "ensure that the hazards are proactively addressed."  For example, Defendants "failed to adequately investigate the root causes" of the Flight 2169 Incident.  *See* ¶¶59, 68, *supra*.  Likewise, Defendants failed to determine the root cause of the weight and balance safety issue.  *See* ¶72, *supra*.

(f)     Contrary to Defendants' public representations, they concealed from investors that the FAA's oversight of Southwest was neither "independent" nor "extensive."  Instead, Defendants "may have devised a process that allows [Southwest] to potentially bypass these assessments that are required by regulation."  FAA officials represented to the OIG that the lack of safety was part of the Company's culture, consisting of  "using 'diversion, distraction, and power' to get what [it] wants."  Additionally, unbeknown to investors, Defendants did not "safely" prepare Southwest's Hawaii operations.  *See* ¶¶63, 67, 77-79, *supra*.

(g)     Contrary to their public representations on Southwest's website, Defendants concealed from investors that they did not establish and promote safety and security reporting processes or create and maintain a proactive reporting culture.  Southwest's "safety culture" was plagued with widespread issues, including that the Company "pressured" mechanics to not document "aircraft discrepancies."  FAA representatives – ranging from senior executives to local inspectors – expressed concerns about the lack of a safety culture at Southwest.  *See* ¶¶63, 67, 78, *supra*.

(h)     Defendants knew or were severely reckless in their disregard of Southwest's internal processes for bypassing the FAA's regulatory oversight because numerous FAA officials, ranging from senior executives to local inspectors, stated that was engrained in the Company culture:

- "The safety culture at Southwest Airlines consists of using 'diversion, distraction, and power' to get what the Company wants";

- 39 -

- Southwest "bypass[ed] the local oversight office by going directly to FAA Headquarters when there is a disagreement";

- "Southwest's management is very skilled in what they have to do.  If it costs money, they won't do it";

- "Whatever Southwest puts on paper for us to see never seems to get done the way they wrote it"; and

- "Southwest's attitude toward FAA appears to take the form of 'I'll respond to you when I damn well please.'"  *See* ¶78, *supra*.

**B.    Material Misrepresentations and Omissions Regarding Aircraft Maintenance**

99.    On February 7, 2017, Defendants represented in Southwest's 2016 10-K that the Company "performs substantially **all line maintenance on its aircraft** and provides ground support services at most of the airports it serves."  Southwest's 2016 10-K also stated that "the Company has arrangements with certain aircraft maintenance firms for major component inspections and repairs for its airframes and engines, which comprise the majority of the Company's annual aircraft maintenance costs."

100.    Additionally, Southwest's 2016 10-K discussed specific maintenance, aspects of the Company's operations, including that "Southwest's use of a single aircraft type" has allowed for "simplified" maintenance during the past year and that "the Company continued to replace its older aircraft with newer aircraft that are **less maintenance intensive** and more fuel efficient."

101.    Southwest's 2016 10-K also represented that the Company "continues to invest significantly in technology resources including, among others, the Company's systems related to (i) aircraft **maintenance record keeping**, (ii) flight planning and scheduling, (iii) crew scheduling, and (iv) technical operations."

102.    On May 3, 2017, Southwest publicly filed its 1Q17 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter ending March 31, 2017. Southwest's 1Q17 10-Q was signed by defendant Romo and was SOX-certified by both defendants

- 40 -

Kelly and Romo.  The 1Q17 10-Q represented that Southwest's ***"regular maintenance checks"*** which together with the "continued retirement of the Classic fleet aircraft as part of the Company's fleet modernization initiative" contributed to lower maintenance costs.

103.    On August 1, 2017 Southwest publicly filed its 2Q17 10-Q with the SEC, reporting the Company's financial and operating results for the second quarter ending June 30, 2017. Southwest's 2Q17 10-Q was signed by defendant Romo and was SOX-certified by both defendants Kelly and Romo.  The 2Q17 10-Q again stated that the majority of Southwest's lower maintenance materials and repairs costs "were attributable to the decrease in airframe expenses primarily the result of the accelerated retirement schedule for the Company's Classic fleet."

104.    On October 26, 2017, during Southwest's 3Q17 conference call with investors and financial analysts to discuss the Company's quarterly financial results, Defendants were asked "about the next maybe 2, 3, 4 IT systems that are in the pipeline," as well as the "next 2 or 3 priorities" for Southwest.  Southwest President Thomas M. Nealon ("Nealon") explained that the Company is replacing their maintenance systems which he emphasized was "really pretty darn solid" and "pretty good."

105.    On November 1, 2017, Southwest publicly filed its 3Q17 10-Q with the SEC, reporting the Company's financial and operating results for the third quarter ending September 30, 2017.  Southwest's 3Q17 10-Q was signed by defendant Romo and was SOX-certified by both defendants Kelly and Romo.  Southwest's 3Q17 10-Q, again attributed the majority of the Company's lower maintenance materials and repairs costs "to a decrease in airframe expenses primarily as a result of the retirement of the Company's Classic fleet, partially offset by increases in Boeing 737-700 engine maintenance due to increased utilization and additional flight hours."

106.    On January 25, 2018, during Southwest's 4Q17 conference call with investors and financial analysts to discuss the Company's quarterly financial results, defendant Romo represented that the Company's "aging" fleet required "increased maintenance."

107.    The 2017 10-K contained the same public representations described in ¶¶99-101, *supra*, as in the 2016 10-K, concerning Southwest's purported maintenance efforts. Specifically, Southwest's 2017 10-K represented that the Company "performs substantially ***all line maintenance on its aircraft*** and provides ground support services at most of the airports it serves." The 2017 10-K also stated that "the Company has arrangements with certain aircraft maintenance firms for major component inspections and repairs for its airframes and engines, which comprise the majority of the Company's annual aircraft maintenance costs."

108.    Additionally, Southwest's 2017 10-K discussed specific maintenance, aspects of the Company's operations, including that "Southwest's use of a single aircraft type" has allowed for "simplified" maintenance during the past year and that "the Company continued to replace its older aircraft with newer aircraft that are ***less maintenance intensive*** and more fuel efficient."

109.    Southwest's 2017 10-K also represented that the Company "continues to invest significantly in technology resources including, among others, the Company's systems related to (i) aircraft ***maintenance record keeping***, (ii) flight planning and scheduling, (iii) crew scheduling, and (iv) technical operations."

110.    On May 1, 2018, Southwest publicly filed its 1Q18 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter ending March 31, 2018. Southwest's 1Q18 10-Q was signed by defendant Romo and was SOX-certified by both defendants Kelly and Romo. Southwest's 1Q18 10-Q represented that the majority of the increased maintenance materials and repairs expenses "were attributable to higher Boeing 737-700 engine

maintenance expense due to increased flight hours" and that the "remainder of the increases were due to the timing of *regular maintenance checks*."

111.    On August 1, 2018, Southwest publicly filed its 2Q18 10-Q with the SEC, reporting the Company's financial and operating results for the third quarter ending June 30, 2018. Southwest's 2Q18 10-Q was signed by defendant Romo and was SOX-certified by both defendants Kelly and Romo.   Southwest's 2Q18 10-Q represented that the majority of the increased maintenance materials and repairs expenses were caused by three factors: (1) "the timing of *regular maintenance checks*"; (2) "higher Boeing 737-700 engine maintenance expense due to increased flight hours"; and (3) an increase in engines being leased since 2Q17.

112.    On October 30, 2018, Southwest publicly filed its 3Q18 10-Q with the SEC, reporting the Company's financial and operating results for the third quarter ending September 30, 2018.   Southwest's 3Q18 10-Q was signed by defendant Romo and was SOX-certified by defendants Kelly and Romo, Southwest's 3Q18 10-Q represented that the majority of the increased maintenance materials and repairs expenses "were due to engine maintenance and repairs" and that  the remainder was "due to the timing of *regular airframe maintenance checks*."

113.    On January 24, 2019, during the Company's 4Q18 conference call with investors and financial analysts to discuss the Company's quarterly financial results, defendant Romo represented that the fleet's modernization had resulted in improved maintenance burden. Specifically, the Southwest CFO stated that:

> As we mentioned, we'll start retiring some of our oldest -700s this year as we continue with our fleet modernization efforts, which will help improve our fuel efficiency, operational reliability and *maintenance burden*.  Our current plan is to retire around 20 of our -700s this year, resulting in about 25 net aircraft additions for 2019 and a year-end 2019 fleet of approximately 775 aircraft.

114.    The 2018 10-K contained substantively the same public representations described in ¶¶99-101, *supra*, as in the 2016 10-K and ¶¶107-109, *supra*, as in the 2017 10-K, concerning

- 43 -

Southwest's purported maintenance efforts.  Specifically, Southwest's 2018 10-K represented that

the Company "performs substantially *all line maintenance on its aircraft* and provides ground

support services at most of the airports it serves."  The 2018 10-K also stated that "the Company

has arrangements with certain aircraft maintenance firms for *major component inspections and*

*repairs for its airframes and engines*, which comprise the majority of the Company's annual

aircraft maintenance costs."

115.    Additionally, Southwest's 2018 10-K discussed specific maintenance, aspects of

the Company's operations, including that "Southwest's use of a single aircraft type" has allowed

for "*simplified" maintenance* during the past year.

116.    Southwest's 2018 10-K also represented that the Company "continues to invest

significantly in technology resources including, among others, the Company's systems related to

(i) *aircraft maintenance record keeping*, (ii) flight planning and scheduling, (iii) crew scheduling,

and (iv) technology infrastructure."

117.    On March 27, 2019, Southwest publicly filed an 8-K with the SEC, signed by

defendant Romo, providing guidance for its first quarter 2019 operational and financial trends.

The 8-K represented that:

> Since mid-February and through March 31, 2019, the Company currently
> expects cancellations of approximately 9,400 flights (the "cancellations") due to
> weather and unanticipated events.  Of these expected cancellations, approximately
> 3,800 are due to weather-related and other disruptions; approximately 2,800 are due
> to *unscheduled maintenance disruptions* arising from contract negotiations with
> the Aircraft Mechanics Fraternal Association (AMFA); and approximately 2,800
> are due to the grounding of the Boeing 737 MAX 8 (the "MAX groundings").

118.    Southwest's 8-K and press release, publicly filed with the SEC on April 25, 2019

stated that there were "'*unscheduled maintenance disruptions* in connection with efforts to reach

a Tentative Agreement (TA) with the Aircraft Mechanics Fraternal Association (AMFA)'" during

the first quarter which was one of several events to "contribute[] to a negative revenue impact of more than $200 million."

119.   During an April 25, 2019 conference call with investors and financial analysts, defendant Van de Ven stated that Southwest had experienced "unexpected maintenance write-ups" but that the Company's "operational foundation" is "strong" and "unexpected maintenance events" are behind Southwest.

120.   On April 30, 2019, Southwest publicly filed its 1Q19 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter ending March 31, 2019. Southwest's 1Q19 10-Q was signed by defendant Romo and was SOX-certified by defendants Kelly and Romo.   Southwest's 1Q19 10-Q represented that "***unscheduled maintenance disruptions***" during 1Q19 was one of the reasons that "contributed to a negative revenue impact of more than $200 million."  Additionally, the Company's 1Q19 10-Q stated that the increases in maintenance materials in repairs were "primarily due to the timing and ***increased scope of regular airframe maintenance checks***."

121.   On July 30, 2019, Southwest publicly filed its 2Q19 10-Q with the SEC, reporting the Company's financial and operating results for the second quarter ending June 30, 2019. Southwest's 2Q19 10-Q was signed by defendant Romo and was SOX-certified by defendants Kelly and Romo, Southwest's 2Q19 10-Q stated that "***unscheduled maintenance disruptions***" in 1Q19 was one of the primary reasons for the Company's 7.2% year-over-year decrease in GAAP net income.  The 2Q19 also commented that the increases in maintenance materials and repairs "were primarily due to the timing and ***increased scope of regular airframe maintenance checks***." Additionally, the 2Q19 10-Q represented that the increases in maintenance materials in repairs were "primarily due to the timing of ***regular airframe maintenance checks***."

122.    Southwest's 3Q19 10-Q, publicly filed with the SEC on November 8, 2019, represented that "unscheduled maintenance disruptions" in 3Q19 was one of the primary causes behind the Company's decrease in GAAP net income for the nine months ending September 30, 2019.  Southwest's 3Q19 10-Q also stated that the increases in maintenance materials and repairs were primarily due "to the timing of ***regular airframe maintenance checks***."

123.    Defendants' statements above were materially false or misleading for at least the following reasons, unbeknownst to investors:

(a)    Contrary to their public representations, Defendants concealed from investors that Southwest did not perform "regular airframe maintenance checks" and did not perform "substantially all line maintenance on its aircraft."  Instead, over the previous couple years, Southwest had operated more than 150,000 flights on 24 aircraft with "confirmed safety deficiencies," thereby "putting as many as 17.2 million passengers at risk."  Southwest continued to fly 49 aircraft "without verifying they conform to U.S. aviation standards, continuing to put the passengers on these aircraft at risk."  Southwest failed to address issues such as "maintenance discrepancies" with the aircraft, "concerns with improper repairs" and "unresolved safety concerns" during this time.  *See* ¶¶63, 66, 75-76, *supra*.

(b)    Defendants publicly claimed that their maintenance system was "pretty good," while concealing that: (1) Southwest had failed to document major repairs; (2) Southwest's documentation of mandatory repairs was incomplete; (3) Southwest's aircraft records did not comply with regulatory standards; (4) Southwest's supporting documentation was not translated into English; and (5) the foregoing issues persisted for nearly two years in violation of federal regulations.  *See* ¶¶63, 66, 75, 76, *supra*.

(c)    In Southwest's 8-Ks filed on March 27, 2019, and April 25, 2019, Defendants blamed the "unexpected maintenance write-ups" from mid-February to April 2019 on

- 46 -

Southwest's labor dispute with the AMFA.  The reality, however, was that Southwest was not performing all required maintenance work and was pressuring its mechanics to not report those events.  *See* ¶¶63, 66, 75-76, 78, *supra*.

(d)     Defendants represented that their use of single aircraft allowed for "simplified" maintenance, that their newer aircraft was "less maintenance intensive," that the retirement of the Classic fleet lowered their maintenance costs, and that the Boeing 737-700 engine maintenance increased their maintenance burden.  However, Defendants concealed that Southwest failed to make proper repairs on aircraft with known safety deficiencies for nearly two years, putting as many as 17.2 million passengers at risk.  Additionally, Defendants concealed that they did not conduct all required maintenance checks, thereby putting untold additional passengers at risk.  *See* ¶¶63, 66, 75, 76, *supra*.

(e)     Defendants knew or were severely reckless in their disregard of serious gaps in Southwest's process for maintaining its aircraft because the FAA had begun identifying these issues since December 2017 and Southwest had entered into a 2-year action plan for the Company to verify that the 88 aircraft conformed to U.S. aviation standards.  It is implausible that Defendants, as Southwest's chief executives, were unaware of the FAA investigation and its two-year action plan.  Yet, Defendants knowingly, or were severely reckless in their disregard of, the discrepancies and/or failure to remedy those issues in light of the grave consequences of such violations and the danger they were posing to millions of passengers.  *See* ¶¶64, 74, *supra*.

## C.     Material Misrepresentations and Omissions Regarding Aircraft Weight and Balance

124.    During a 1Q19 conference call with investors and financial analysts on April 25, 2019, Defendants were asked to "talk about the 800 in Hawaii and any maybe operational challenges that you've had with that plane."  In response to the question, defendant Van de Ven stated that Southwest's "***weight balance program works well***."

- 47 -

125.    The statement above was materially false or misleading for at least the following reasons, unbeknownst to investors at the time:

(a)    Over the course of two years, Defendants reported inaccurate and noncompliant weight and balance data, "a violation of FAA regulations and an important safety issue" and failed to remedy those issues pursuant to the agreement it entered with the FAA following the FAA's investigation in 2018.  Specifically, there were "more than 4,000 errors of 300 pounds or more, by month from March 2018 through July 2019."  Additionally, Southwest used its own risk assessments that deemed any weight error less than 1,500 pounds to be "low risk" rather than comply with regulatory requirements, which could have led to "hazardous or catastrophic conditions."  Specifically, Southwest reported "from 7 to 24 incidents per month of discrepancies greater than 1,500 pounds between March 2018 and July 2019."  *See* ¶¶65-66, 72-73, 76, *supra*.

(b)    Defendants knew or were severely reckless in their disregard of the Company's weight and balance discrepancies and noncompliance issues because the FAA had been investigating those issues since January 2018 and Southwest had entered into an agreement with the FAA, under which it was required to take a series of steps to remedy those issues.  It is implausible that Defendants, *i.e.*, Southwest's chief executives, were unaware of the FAA investigation and the subsequent agreement given the importance of the government investigations and its findings, especially in light of their representations that safety was their "top-priority."  Yet, Defendants knowingly, or were severely reckless in their disregard of, the discrepancies and/or failure to remedy them in light of the grave consequences of such violations.  Further, the January 30 *WSJ* Journal article reported that addressing the weight and balance discrepancies, defendant Kelly acknowledged "'we have opportunities to improve there.'"  *See* ¶¶65-66, 72-73, 76, 92, *supra*.

### D.       Material Misrepresentations and Omissions Regarding Pilot Training

126.    In the March 13, 2019 video posted on the Company's website, while addressing the FAA's order for U.S. airlines to temporarily ground the Boeing 737 MAX aircraft series, defendant Kelly represented that "*all pilots at Southwest are deeply experienced and highly trained*."

127.    According to a December 12, 2019 *Reuters* article, defendant Kelly was interviewed at the Wings Club Foundation Luncheon in December 2019.  In the video of the interview posted online, defendant Kelly represented that Southwest's pilots are well trained and prepared:

> We hire very experienced pilots in the first place at Southwest.  On average they have about 6000 hours of experience and then they go through *extensive training* to fly for Southwest Airlines and I feel like our pilots are not only *very well prepared* but they are very confident of their skills and of that airplane.

128.    On January 23, 2020, defendant Kelly was interviewed by Jim Cramer on *CNBC's Squawk on the Street*.  When asked whether Dennis Muilenberg (ex-CEO of Boeing) was wrong in saying "we don't need new training," he boasted that Southwest was "the gold standard when it comes to hiring, our flight crews, our training, our procedures, all of that."

129.    The statements above were materially false or misleading for at least the following reasons, unbeknownst to investors:

(a)      Southwest's operational issues included "alleged pilot training deficiencies" and Southwest "did not conduct a risk assessment, as required, for [a] new [pilot] training program."  *See* ¶77, *supra*.

(b)      Defendants knew or were severely reckless in their disregard of deficiencies in the Company's pilot training risk assessments because, as stated in Southwest's "Safety and Security Commitment" release (signed by defendants Kelly and Van de Ven), they were "responsible" for "[e]stablishing and upholding the highest levels of Safety and Security" in their

- 49 -

operation.  Therefore, Defendants were responsible for ensuring pilot trainings were compliant with government regulations and guidelines.  Likewise, Defendants were responsible for ensuring that the Company's pilot training risk assessments were adequate.  Additionally, according to Defendants' "Safety and Security Commitment," defendant Van de Ven was "committed to and responsible for the development, operation, and quality control of Southwest Airlines' Safety and Security Management System (SMS)" which includes risk assessments related to pilot training. *See* ¶¶77, 85, *supra*.

### E.   False or Misleading SOX Certifications

130.   In connection with Southwest's public filing of its 2016 10-K, 2017 10-K, and 2018 10-K with the SEC during the Class Period (*see* ¶¶86-87, 89, 99-101, 107-109, 114-116, *supra*), defendants Kelly and Romo signed SOX certifications, each certifying that they reviewed the 10-K for that particular year and:

> (2)   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> (3)   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> (4)   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> > (a)   designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> > (b)   designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our

- 50 -

supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

131.   In connection with Southwest public filing of its 1Q17 10-Q through 3Q19 10-Q with the SEC during the Class Period (*see* ¶¶97, 102-103, 105, 110-112, 120-122, *supra*), defendants Kelly and Romo signed SOX certifications, each certifying that they reviewed the 10-Q for that particular quarter and:

(2)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

- 51 -

(4)    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

(5)    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

132.    The statements above regarding Southwest's internal controls and procedures and disclosure controls and procedures, were materially false or misleading for the reasons stated in ¶¶98, 123, 125, 129, *supra*.  In addition, these statements were materially false or misleading when

- 52 -

made because they misrepresented or failed to disclose the following facts which were known or recklessly disregarded by Defendants: (i) Southwest's disclosure controls and internal controls were materially deficient and not operating effectively; and (ii) based on the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's operations.

## VI.    FURTHER EVIDENCE OF DEFENDANTS' SCIENTER

133.    As detailed herein, Defendants concealed the truth from investors during the Class Period.  At all relevant times, Defendants knew or were severely reckless in disregarding that material facts were being concealed and/or misrepresented, and Defendants omitted material information necessary for investors to properly evaluate the Company.

134.    During the Class Period, Defendants had the motive and opportunity to commit the alleged fraud.  Defendants had actual knowledge of the misleading statements they made and/or acted in severe reckless disregard of the truth at the time they spoke.  In doing so, Defendants participated in a scheme to defraud and/or a course of business that operated as a fraud or deceit on purchasers of Southwest securities during the Class Period.  Defendants and third parties have exclusive control over communications concerning their fraudulent scheme.

135.    Defendant Southwest is liable for all the actions of its agents and subsidiaries, including the Individual Defendants and all other Southwest personnel and representatives. Through the actions and knowledge of, or severe reckless disregard by, persons or entities acting on behalf of Southwest, Defendant Southwest had the requisite scienter under the Exchange Act. Further, Southwest acted with scienter because the scienter of its most senior executives – including each of the Individual Defendants – is imputed to the Company.  At all relevant times, defendant Kelly was Southwest's Chairman of the Board and CEO, defendant Romo was the Company's CFO and Executive Vice President, and defendant Van de Ven was Southwest's COO.

As Southwest's most important executives and corporate representatives, the Individual Defendants' scienter, as detailed herein, is imputed to the Company.

136.     Throughout the Class Period, Defendants' misstatements and omissions were made knowingly or with severe recklessness based on, *inter alia*:

(a)     **The Allegations Concern Core Operations**:  Throughout the Class Period, the Individual Defendants were top executives at the Company and led its day-to-day operations. Defendants had responsibility for monitoring the most critical aspect of its operations – safety and security.  Likewise, the Individual Defendants closely monitored all matters directly related to safety and security because it concerned a critical aspect of Southwest's operations.  *See* ¶¶19-21, 24, 85, 88, 91-96, *supra*.

(b)     **Defendants Said Safety Was Their Highest Priority**:  On numerous occasions throughout the Class Period, Defendants each emphasized the importance of safety and security and publicly touted their involvement with – and awareness of – such matters.  By way of example:

(i)     Throughout the Class Period, the Company website featured Southwest's "Safety and Security Commitment," which stated that "ensuring the Safety and Security" of Southwest's customers and employees was the "number one priority," and was signed by defendants Kelly and Van de Ven.  The "Safety and Security Commitment" represented that Defendants had "established Company policies and governance to drive our focus on Safety and Security" and that all Southwest employees, including its "*leadership*" are responsible for ensuring the safety of Southwest's customers and employees.  The "Safety and Security Commitment" also emphasized Southwest's purported commitment to "[m]onitoring, measuring, and tracking Safety objectives to ensure they are met."  *See* ¶85, *supra*.

- 54 -

(ii)     In an April 26, 2018 8-K (and attached press release) filed with the SEC, defendant Kelly proudly claimed that safety was Southwest's "'highest priority – today and always.'"  *See* ¶88, *supra*.

(iii)    In a March 13, 2019 statement on the Company's website, defendant Kelly proclaimed that "Southwest has continuously demonstrated our commitment to Safety."  *See* ¶91, *supra*.

(iv)     In a video post on the Company's website of the same date, defendant Kelly proclaimed that safety was the Company's "top-priority."  *See* ¶92, *supra*.

(v)      On an April 25, 2019 investor call, defendant Kelly emphasized that Southwest has "an impeccable safety record."  *See* ¶94, *supra*.

(vi)     In an April 25, 2019 8-K (and attached press release) filed with the SEC, defendant Kelly emphasized that "[s]afety is our top priority, and that commitment will never be compromised."  *See* ¶94, *supra*.

(vii)    On investor calls on April 25, 2019, July 25, 2019, and October 24, 2019, defendant Van de Ven assured investors that Defendants were "focused" on safety.  *See* ¶¶94-96, *supra*.

(c)      **Defendants Were Personally Involved**:   By addressing safety on numerous occasions, the Individual Defendants evidenced their involvement in the underlying facts.  Such facts necessarily included the fraud alleged herein, thus providing a strong inference that the Individual Defendants were aware of the fraud, or severely reckless in failing to be aware of it – particularly in light of the critical importance and public scrutiny attached to such matters. Defendant Kelly was apparently aware of these issues during the OIG audit, as he requested a meeting with the Inspector General in September 2019.  And not only did defendant Van de Ven sign the "Safety and Security Commitment" release, but he was held out as the "Accountable

- 55 -

Executive in all matters of Safety and Security" and "responsible for the development, operation, and quality control of [Southwest's] Safety and Security Management System (SMS), including provision of the necessary financial, personnel, and other resources to establish and maintain a fully functional SMS, and is the Accountable Executive in all matters of Safety and Security." Finally, defendant Romo was charged with responsibility for safety as part of leadership pursuant to Defendants' "Safety and Security Commitment."  *See* ¶¶69, 85-97, *supra*.

(d)     **Defendants Held Themselves out as Knowledgeable on the Issues**: Throughout the Class Period, the Individual Defendants held themselves out to investors and the market as the persons most knowledgeable about matters of maintenance, safety, security and compliance at Southwest in discussing such matters in the "Safety and Security Commitment" and during quarterly conference calls, video posts posted on the Company's website and public interviews.  The Individual Defendants were the persons with ultimate responsibility for directing and managing the Company's business, operations and communications to investors, and they were required to keep themselves informed of the Company's day-to-day business and operations. *See* ¶¶19-21, 24, 85-97, 99-122, 124, 126-128, *supra*.

(e)     **Defendants Received Briefings on Safety and Security**:   As senior executive officers and the Chairman of Southwest, the Individual Defendants were privy to confidential and proprietary information concerning Southwest, and its operations, including maintenance, safety, security and compliance.  Each of them also had access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, as well as reports and other information provided to them in connection therewith.  Because of their possession of such information, each of them knew or were severely reckless in their disregard that adverse facts had

not been disclosed to, and were being concealed from, the investing public. *See* ¶¶19-21, 24, *supra*.

(f)     **Defendants Spoke to the Issues**:  During the Class Period, the Individual Defendants made specific statements about the safety and security of Southwest's operations, as well as statements regarding internal controls, further confirming that they had access to such reports and information.  It is implausible that Defendants were unaware of the widespread safety and regulatory non-compliance issues that carried grave public safety and regulatory consequences, including potential fines, penalties, increased governmental scrutiny, and civil or criminal liability for them or the Company.  *See* ¶¶85-97, 99-122, 124, 126-128, 130-131, *supra*.

(g)     **Defendants Executed SOX Certifications**:  During the Class Period, the Individual Defendants, namely Kelly and Romo, signed SOX certifications as alleged herein, undertaking the affirmative obligation to ensure the Company's disclosures to the market were true, including but not limited to the Company's maintenance of its aircraft fleet and its compliance with safety protocols and regulations.  In fact, through signing the SOX Certifications, defendants Kelly and Romo certified that they had designed "disclosure controls and procedures . . . to ensure that material information relating to the registrant . . . is made known to us by others . . . particularly during the period in which [each] report [was] being prepared."  *See* ¶¶130-131, *supra*.

(h)     **Defendants Directed Public Statements**:  In their respective roles as CEO, CFO, and COO, the Individual Defendants were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  The Individual Defendants attended conference calls and spoke on behalf of the Company throughout the Class Period.  *See* ¶¶94-96, 106, 113, 119, 124, *supra*.  Defendant Kelly also spoke on behalf of Southwest in videos posted on the Company's website and held public interviews.  *See* ¶¶92, 126-128, *supra*.  Defendants Kelly and Van de Ven signed the "Safety and Security

- 57 -

Commitment" alleged herein to be false and misleading (*see* ¶¶85, 98, *supra*), defendant Romo signed the Forms 8-Ks and 10-Qs filed with the SEC (*see* ¶¶88, 93, 97, 102-103, 105, 110-112, 117, 120-121, *supra*), and defendants Kelly and Romo signed the Forms 10-Ks (*see* ¶¶86-87, 89, *supra*). The Individual Defendants participated in the drafting, preparation, and/or approval of such public statements and were provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.

(i) **Defendants Had Access to the Relevant Documents**: Defendants also had access to maintenance, compliance and weight and balance records and the Company's SMS/risk assessments. This is confirmed both by the Individual Defendants' affirmative obligation to ensure that material information relating to maintenance and safety was provided to them and the fact that maintenance and safety matters were discussed at conference calls, in releases and other public statements by the Company and the Individual Defendants. *See* ¶¶19-21, 24, 85-97, 99-122, 124, 126-128, 130-131, *supra*.

(j) **"Safety and Compliance Oversight Committee" Met with Defendants**: In the Company's proxy filings and on its website, Defendants represented that the Southwest Board of Directors, which included defendant Kelly throughout the Class Period, was assisted by a "Safety and Compliance Oversight Committee" to oversee "the Company's activities with respect to safety and operational compliance." The Safety and Compliance Oversight Committee was "responsible for periodically assessing the Company's safety and operational compliance obligations and associated risks and performance relative to those standards." It held meetings to address specifies security areas that involved "individuals from a variety of operational areas and levels." The Safety and Compliance Oversight Committee's primary functions included meeting

regularly with the Company's management – which included the Individual Defendants – and periodically reporting to the Board of Directors, on which defendant Kelly sat:

> The primary functions of the Safety and Compliance Oversight Committee include: (i) assisting the Board in overseeing the Company's activities with respect to safety and operational compliance; (ii) periodically assessing the Company's safety and operational compliance obligations and associated risks and performance relative to those standards; (iii) reviewing such policies, programs, and procedures as it shall deem necessary, including the Company's safety and operational compliance reporting systems; (iv) meeting regularly with Company management to assess the Company's safety and operational compliance practices generally; and (v) periodically reporting to the Board on the adequacy and effectiveness of the Company's safety and operational compliance programs.

The specific areas of assessments during meetings between management and the Safety and Compliance Oversight Committee included "the adequacy of the resources, training, communications, risk assessments, and auditing of operational processes directed towards supporting safety and operational compliance."   The committee would also "make recommendations to the Board regarding the Company's safety and operational compliance practices generally."

(k)    **Safety Lapses and Non-Compliance Carried Grave Consequences**: Defendants' scienter is also supported by the grave public safety consequences of Southwest's maintenance lapses, compliance issues, and its undue influence over the FAA's oversight of the Company.  Following the August 27, 2016 accident involving Flight 3472, Defendants knew or were severely reckless in disregarding that all of their aircraft equipped with CFM56 engines should have been immediately inspected using the new ultrasonic tool developed by CFM.  Yet, instead of quickly ensuring that all concerned engines, which included the one involved in the April 17, 2018 Fatality were promptly tested, Defendants sought to delay the inspections.  Again, despite the gravity of that incident – the first fatality aboard a U.S. aircraft in nine years – Defendants still failed to comply with safety regulations.  The extent of the safety hazards and potential catastrophic conditions that could have resulted from putting 17.2 million passengers at

- 59 -

risk by operating aircraft in an unknown airworthiness state and millions more by not conforming to the baggage weight and balance safety threshold demonstrates, at the very least, a severe reckless disregard for public safety, contrary to Defendants' public representations on the Southwest website, in Company SEC filings, and during quarterly conference calls with investors and financial analysts. *See* ¶¶41-56, 63-69, 71-80, 98, 123, 125, 129, *supra*.

(l)   **Defendants Were Aware of Government Investigations**:  Defendants' scienter is supported by government investigations into Southwest's safety issues during or in 2017 and 2018.  The FAA's 2018 investigation into Southwest's weight and balance performance data resulted in an agreement in 2018, whereby Southwest was required to take a series of corrective steps.  Yet, discrepancies continued for nearly two years.  Likewise, even though the FAA's 2017 investigation into Southwest's certification and maintenance discrepancies was stark and deserving of serious attention, Defendants continued operating 24 aircraft with known maintenance deficiencies and 49 more in unknown airworthiness state.  These red flags indicating major operational issues were known or available to the Individual Defendants and yet, instead of taking swift action to ensure that Southwest's fleet was properly tested, approved, maintained and operated – as they had publicly represented – they persisted in non-compliant maintenance and safety practices for two years.   The above investigations provide additional evidence of Defendants' fraudulent course of conduct and intent to deceive.  Moreover, the additional attention that Defendants have necessarily been required to devote to the investigations serves as an additional red flag that makes it even further inconceivable that the Individual Defendants would not have been aware of the fraud alleged herein. *See* ¶¶63-65, 72, 74, 98(b)-(c), 123(e), 125(b), *supra*.

(m)   **Defendants Knew about Prior Safety and Security Lapses**:  Concerns over safety and security have been an extremely important issue for the Company for years.  *See*

§IV(B), *supra*. Such matters have drawn scrutiny from many corners. *See id*. As such, it is inconceivable that Southwest's top executives would not have been aware of the fraud alleged herein, which directly concerns Southwest's safety lapses. Defendants knew or were severely reckless in disregarding Southwest's history of aviation safety violations, maintenance lapses and interference with FAA oversight. Again, the failures of Southwest's top executives, including the Individual Defendants, to ensure that the Company complied with all maintenance and safety regulations following this decade-long history of maintenance and safety issues demonstrates a complete disregard for public safety. *See id*.

137. Defendants were motivated to conceal the truth, moreover, for a variety of reasons:

(a) **The Southwest Brand**: Defendants were motivated to conceal or downplay the facts alleged herein, due to the damaging impact that their disclosure would have on Southwest's brand, reputation, and consumer confidence. Defendants knew that disclosure of any of these safety and security issues would severely undermine their public claims and cause significant damage to the brand and corporate reputation they so frequently touted – not to mention the damage such disclosures would cause to Southwest's stock price. As Nealon stated during an October 24, 2019 3Q19 conference call with investors and financial analysts, "Southwest has a very, very strong reputation of being a safe flying to – a safe airline to fly. They have confidence in Southwest and they trust us, number one."

(b) **Customer Bookings**: Defendants were motivated to conceal Southwest's maintenance and safety issues and its influence over the FAA from the general public to ensure consumers would keep booking flights with Southwest. As detailed *supra*, throughout the Class Period, Defendants repeatedly claimed that Southwest was a safe airline. *See, e.g.*, ¶¶85, 88, *supra*. It is, therefore, reasonable to infer that Defendants were motivated to withhold from the public that they were flying over 17.2 million passengers on planes with known maintenance deficiencies and

in unknown airworthiness condition and that they were also exposing passengers to the risk of a catastrophe by failing to comply with weight and balance thresholds. This knowledge of the possible negative effects on customer confidence and airline choice added additional motivation for Defendants to conceal their fraud, and thus, provides additional evidence of their scienter. *See* ¶¶63-69, 71-86, 98, 123, 125, 129, *supra*.

(c) **Exposure to Fines and Liability**: Defendants were also motivated to conceal or downplay the truth because its revelation would subject the Company, its executives, and/or Board to penalty, fines and/or civil or criminal liability.

(d) **Increased Regulatory Scrutiny**: Defendants were motivated to conceal Southwest's maintenance and safety issues from the FAA – and the general public – and/or to bypass the FAA's review of the Company's risk assessments so that their flights and aircraft would be approved for service and remain in service. By improperly influencing the FAA to quickly approve 71 of its 88 newly purchased aircraft without performing its own independent analysis, Southwest was able to place these aircraft into commercial passenger service to meet its own timeline without getting bogged down by the regulatory framework that keeps passengers safe and secure. *See* ¶¶64, 74, 98(a)(iii), *supra*.

(e) **Insider Sales**: Simply put, Defendants were also motivated by greed. Their compensation was tied to the performance of the Company. Further, while in possession of material, nonpublic information regarding Southwest's noncompliance with government maintenance and safety regulations, the Individual Defendants sold substantial amounts of Southwest common stock at artificially inflated prices, reaping enormous profits. In total, during the Fiscal Years 2017-2018, defendant Kelly sold 235,653 shares of Southwest common stock for proceeds of more than $13,557,631, which was over 18 times defendant Kelly's base salary (of $740,626 for 2017 and $750,000 for 2018) for that period and corresponded to 31.83% of his

holdings. Similarly, defendants Romo and Van de Ven made substantial sales of Southwest common stock at artificially inflated prices during Fiscal Years 2017-2018. Specifically, defendant Romo sold 30,894 shares of Southwest common stock for proceeds of more than $1,800,449, which was almost four times defendant Romo's base salary (473,125 for 2017 and $488,125 for 201) for that period and corresponded to 15.35% of his holdings. And defendant Van de Ven sold 60,944 shares of Southwest common stock for proceeds of more than $3,497,366, which was over six times defendant Van de Ven's base salary ($514,375 for 2017 and $533,125 for 2018) for that period and corresponded to 20.08% of his holdings. These lucrative stock sales paint a clear picture of three knowledgeable Southwest insiders looking to cash out before the truth regarding Southwest's compliance and safety issues emerged and caused the Company's stock price to decline.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

138.    As a result of Defendants' scheme, Southwest securities were overvalued throughout the Class Period. Like other members of the Class who purchased at artificially inflated prices during the Class Period, Lead Plaintiffs suffered an economic loss, *i.e.*, damages, when the trading price of Southwest shares declined upon the revelation of the truth to the market through a series of partial disclosures. Specifically, the Class was damaged as set forth herein and as Lead Plaintiffs may further discover in the course of their investigation and formal discovery.

139.    As described further above, during the Class Period, Defendants misrepresented and/or omitted material facts relating to, among other things: (1) the Company's widespread safety issues; (2) the Company's non-compliance with government maintenance and safety regulations; (3) Southwest's undue influence over FAA officials; (4) the fact that the foregoing significantly increased the safety risks to passengers traveling on Southwest flights; (5) the fact that the

foregoing would increase the likelihood of regulatory scrutiny, fines, or civil/criminal liability, among other matters; and/or (6) the fact that this would harm Southwest's brand or reputation.

140.    As a result of Defendants' misrepresentations and omissions of material facts, the price of Southwest's common stock was artificially inflated throughout the Class Period.

141.    Members of the Class purchased Southwest's common stock at artificially inflated prices during the Class Period.  But for Defendants' misrepresentations and omissions, members of the Class would not have purchased Southwest's common stock at artificially inflated prices.

142.    Defendants' various misrepresentations and omissions were gradually revealed through a series of partial corrective disclosures beginning on April 17, 2018, when the price of Southwest's common stock declined.  These declines, including those summarized herein, are largely attributable to the market absorbing information partially correcting Defendants' prior misrepresentations and omissions.  The corrective impact of the disclosures alleged herein was tempered by Defendants' continued denial of wrongdoing and misstatements and omissions regarding, *inter alia*, Southwest's purported compliance with government safety and maintenance regulations, as well as its manipulation of the FAA inspection process.

143.    The timing and magnitude of the price declines negate any inference that the losses suffered by Lead Plaintiffs and other Class members were caused entirely by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated in any way to Defendants' fraudulent course of conduct. The economic losses, *i.e.*, damages, suffered by Lead Plaintiffs and other members of the Class, were a direct result of Defendants' scheme.

144.    The Class suffered economic losses as the price of Southwest's common stock fell in response to the issuance of partial corrective disclosures, as outlined by way of example below.

- 64 -

A.      **April 17, 2018: Fatal Accident on Southwest Flight 1380**

145.    On April 17, 2018, news sources publicly reported that a Southwest plane, *i.e.*, Flight 1380, blew an engine, which exploded and caused shrapnel to strike the plane.  The explosion resulted in the death of Ms. Riordan, a passenger who was partially pulled through a large hole as the cabin suffered rapid decompression and injured seven others.  The NTSB's April 17, 2018, Aviation Accident Preliminary Report reported that the fan blade showed signs of metal fatigue.  According to Sumwalt, the incident marked "the first passenger fatality in a U.S. airline accident since 2009" and "'[e]ngine failures like this should not occur.'"  *See* ¶¶45-52, *supra*.

146.    Southwest issued a press release the same day, assuring investors and passengers that the Company's "officials are in direct contact with the [NTSB] and the [FAA] to support an immediate, coordinated response to this accident," and that "Southwest is in the process of gathering additional information regarding flight 1380 and will fully cooperate in an investigative process."

147.    This disclosure partially corrected certain of Defendants' prior misstatements and omissions.

148.    Investors reacted to the news, causing a significant drop in the price of Southwest's common stock on April 17, 2018, from $54.89 per share to $54.27 per share, a decline of 1.13%.

149.    Analysts attributed that drop to the Flight 1380 accident.  For example:

(a)     On April 26, 2018, an analyst for Evercore ISI commented, "[t]otal unit revenue expected to be down 1-3% y/y in 2Q18 (in line) with 1-2 % points attributed to softness in bookings following the Flight 1380 accident."  The analyst continued, "Southwest guided June quarter unit revenue outlook down 1-3% including an estimated 1-2%-points bookings impact

from the tragic accident on Flight 1380, (may include some conservatism as company has observed half a point to 1%-point impact thus far)";

(b)     Also on April 26, 2018, an analyst for Cowen commented on the stock's reaction, writing,

> [w]e look for Southwest Airlines common shares to be under pressure today even though 1Q18 results were slightly better than expected. . . .  Southwest is also seeing weakness in the booking curve as a result of the incident on Flight 1380.
>
> *     *     *
>
> The company stated they have seen bookings soften post the engine incident on Flight 1380, reducing 2Q18 RASM by as much as 1 to 2 pts. As a result, Southwest forecasts 2Q18 RASM will decline 1% to 3%, below our assumption of flat to down 2%. . . .  Overall, the guidance is likely to be disappointing to investors, however, expectations were low and the market has been attempting to quantify the impact from Flight 1380 which lowered expectations even more.

(c)     Also on April 26, 2018, an analyst for Deutsche Bank commented that "[e]xpenses tied to accelerated engine checks following the company's recent accident will be in the 'millions of dollars' range in the June Q, which is included in the company's guidance";

(d)     On April 27, 2018, an analyst for Imperial Capital stated that "short-term results are likely to be choppy, due to the fallout from the accident on flight 1380";

(e)     Also on April 27, 2018, an analyst for BRG stated, "As anticipated, 2Q revenue disappointed, though our full year pre-tax outlook nonetheless falls 3% on Flight 1380 which is resulting in some near-term revenue book-away";

(f)     On June 14, 2018, an analyst for Argus Research Corp. noted, "We believe the shares adequately reflect prospects for weaker RASM and less rapid capacity growth in the coming quarters, ***as well as the near-term impact of the Flight 1380 accident***"; and

(g)     On September 5, 2018, an analyst for Zacks Equity Research noted:

> Shares of Southwest Airlines have shed more than 5% of their value on a year-to-date basis due to multiple factors. ***The Flight 1380 incident in April was a major headwind for the company and has raised safety-related concerns***.  In

- 66 -

fact, Southwest Airlines is struggling on the unit revenue front mainly due to the above mid-air accident.

150. However, because the fatal accident only revealed some of the information concerning Defendants' fraud, and because Defendants continued to deny wrongdoing and affirmatively conceal the truth, the price of Southwest's common stock remained artificially inflated following the market's reaction on April 17, 2018.

151. The decline in the price of Southwest's stock would have been far more severe had Defendants revealed the complete truth regarding the following material facts, among others:

(a)     For roughly two years, Defendants reported inaccurate and noncompliant weight and balance data – a violation of FAA regulations and an important safety issue – because Defendants used their own SMS risk assessments as a substitute for compliance.

(b)     The process used by Southwest to obtain airworthiness certificates on 71 of 88 foreign-purchased aircraft was insufficient to ensure they met U.S. aviation standards prior to being placed into commercial passenger service.

(c)     For nearly two years, Defendants operated at least 24 aircraft with confirmed safety deficiencies, putting 17.2 million passengers at risk, and 49 aircraft in unknown airworthiness condition, putting those passengers at risk as well.  Defendants continued operating aircraft without ensuring they conform to U.S. aviation standards.

(d)     Defendants "may have devised a process that allows them to potentially bypass these assessments [of their SMS risk assessments] that are required by regulation."

(e)     Southwest's safety culture – a key tenet of its SMS program – was plagued with widespread concerns, including that Defendants used "diversion, distraction, and power" to get what the Company wanted.

- 67 -

(f)     As a result, Defendants significantly increased the safety risks to passengers traveling on Southwest flights, subjected the Company to reputational and brand harm, and risked heightened governmental scrutiny, penalties, fines, remediation costs, and criminal/civil liability.

**B.     April 18, 2018: The FAA Mandates Ultrasonic Inspections of The Type of Engines Involved in the Flight 1380 Accident**

152.    Following market close on April 18, 2018, the FAA announced that following the April 17, 2018 Flight 1380 fatal accident, it would issue an AD within the next two weeks "that will require inspections of certain CFM56-7B engines," that the "directive will require an ultrasonic inspection of fan blades when they reach a certain number of takeoffs and landings," and that any "blades that fail the inspection will have to be replaced."  *See* ¶¶53-55, *supra*.

153.    This disclosure partially corrected certain of Defendants' prior misstatements and omissions.

154.    Investors reacted  to the news, causing a significant drop in the price of Southwest's common stock on April 19, 2018, from $55.82 per share to $54.80 per share, a decline of 1.83%.

155.    News outlets publicly reported on the FAA's announcement that it would mandate all ultrasonic inspections of fan blades in certain CFM56-7B engines.  For example:

(a)     On April 18, 2018, *The Post* published an article entitled "FAA orders tests on type of engine that exploded during Southwest flight."  The article noted that that the FAA "ordered inspections of the type of engine that exploded Tuesday on Southwest Airlines flight 1380" and that "it will issue an [AD]  within the next two weeks that will require inspections of certain CFM56-7B engines";

(b)     On or about April 19, 2018, *Reuters* published an article entitled "FAA to order inspections of jet engines after Southwest blast."  The article reported that the FAA would "order inspection of about 220 aircraft engines as investigators have found that a broken fan blade touched off an engine explosion this week on a Southwest flight, killing a passenger";

- 68 -

(c)     On April 20, 2018, *The New York Times* (the "*NYT*") published an article entitled "F.A.A. Orders Closer Engine Inspections After Southwest Airlines Failure."  The article stated that the FAA "on Friday issued an emergency order, instructing airlines with the same type of engine as the one that failed catastrophically on Tuesday on a Southwest Airlines Boeing 737 to more thoroughly inspect the engines' fan blades"; and

(d)     On April 20, 2018, *CNBC* published an article entitled "FAA orders 'emergency' engine inspections after deadly explosion during Southwest flight."  The article commented that the FAA "on Friday ordered airlines to inspect the fan blades of some engines of the same type that exploded on a [Southwest] flight earlier this week."

156.    However, because the FAA mandated engine inspections only revealed some of the information concerning Defendants' fraud, and because Defendants continued to deny any wrongdoing and affirmatively conceal the truth regarding their scheme, the price of Southwest's common stock remained artificially inflated following the market's reaction on April 19, 2018.

157.    The decline in the price of Southwest's stock would have been far more severe had Defendants revealed the complete truth regarding the following material facts, among others:

(a)     For roughly two years, Defendants reported inaccurate and noncompliant weight and balance data – a violation of FAA regulations and an important safety issue – because Defendants used their own SMS risk assessments as a substitute for compliance.

(b)     The process used by Southwest to obtain airworthiness certificates on 71 of 88 foreign-purchased aircraft was insufficient to ensure they met U.S. aviation standards prior to being placed into commercial passenger service.

(c)     For nearly two years, Defendants operated at least 24 aircraft with confirmed safety deficiencies, putting 17.2 million passengers at risk, and 49 aircraft in unknown

airworthiness condition, putting those passengers at risk as well.  Defendants continued operating aircraft without ensuring they conform to U.S. aviation standards.

(d)    Defendants "may have devised a process that allows them to potentially bypass these assessments [of their SMS risk assessments] that are required by regulation."

(e)    Southwest's safety culture – a key tenet of its SMS program – was plagued with widespread concerns, including that Defendants used "diversion, distraction, and power" to get what the Company wanted.

(f)    As a result, Defendants significantly increased the safety risks to passengers traveling on Southwest flights, subjected the Company to reputational and brand harm, and risked heightened governmental scrutiny, penalties, fines, remediation costs, and criminal/civil liability.

### C.    June 25, 2019: The *WSJ* Reveals the Removal of Three FAA Senor Managers Overseeing Southwest

158.   On June 25, 2019, during after-market hours, the *WSJ* published an article entitled "FAA Reassigns Senior Managers in Office Overseeing Southwest Airlines."  The *WSJ* article reported that the FAA "removed three senior managers in the office overseeing Southwest Airlines Co., amid allegations of lax safety enforcement raised by agency whistleblowers and various resulting government inquiries."  The article also noted that "[t]he [DOT]'s inspector-general has been looking into some of the safety issues for many months . . . including lapses by the airline in documenting maintenance for more than 100 of its jets," as well as "failures to reliably compute the weight of checked baggage and hazardous landing incidents in which one aircraft smacked a wingtip on the tarmac and another ran off the strip in stormy weather."  *See* ¶¶61-62, *supra*.

159.   These disclosures partially corrected certain of Defendants' prior misstatements and omissions.

160.     Investors responded to the June 25, 2019 disclosures, causing a price decline of Southwest's common stock on June 26, 2019, from $51 per share to $50.70 per share, a decline of 0.59%.

161.     Other news outlets publicly reported on the June 25, 2019 *WSJ* article.   For example:

(a)     On June 25, 2019, *Reuters* published an article entitled "FAA reassigns three in office overseeing Southwest Airlines: source."   The article stated that the *WSJ* "which reported the FAA reassignments earlier on Tuesday, said they were 'also prompted by allegations that managers retaliated against whistleblowers,' citing sources familiar with the matter"; and

(b)     On June 26, 2019, *ABC News* published an article entitled "FAA removes 3 managers in office that monitors Southwest."   The article noted that "[t]he [*WSJ*] reported that the reassignments were partly due to allegations that FAA managers retaliated against safety inspectors who raised concerns about oversight of Southwest."

162.     However, because these disclosures only revealed some of the information concerning Defendants' fraud, and because Defendants continued to deny any wrongdoing and affirmatively conceal the truth regarding their fraudulent scheme, the price of Southwest's common stock remained artificially inflated following the market's reaction on June 26, 2019.

163.     The decline in the price of Southwest's stock would have been far more severe had Defendants revealed the complete truth regarding, *inter alia*:

(a)     The extent of Southwest's non-compliance with weight and balance regulatory thresholds.   In truth, the Company continued to report inaccurate and noncompliant weight and balance data at the time – and for a period of two years – and failed to remedy those issues as it had agreed with the FAA to do.   In addition, Defendants used their own flawed SMS as a substitute for regulatory compliance.

- 71 -

(b)     The extent of Southwest's maintenance lapses.   In truth, Southwest's process for obtaining airworthiness certificates on 71 of 88 foreign-purchased aircraft was insufficient to ensure they met U.S. aviation standards prior to being placed into commercial passenger service.  Additionally, for nearly two years, Defendants operated at least 24 aircraft with confirmed safety deficiencies, putting 17.2 million passengers at risk, and 49 aircraft in unknown airworthiness condition, putting those passengers at risk as well.  Defendants continued operating aircraft without ensuring they conform to U.S. aviation standards.

(c)     Defendants' bypass of assessments required by regulation.

(d)     The extent to which Southwest's safety culture – a key tenet of its SMS program – was plagued with widespread concerns, including that Defendants used "diversion, distraction, and power" to get what Defendants wanted.

(e)     As a result, Defendants significantly increased the safety risks to passengers traveling on Southwest flights, subjected the Company to reputational and brand harm, and risked heightened governmental scrutiny, penalties, fines, remediation costs, and criminal/civil liability.

### D.     January 30, 2020: The *WSJ* Reveals Widespread Safety Lapses

164.    On January 30, 2020, prior to the market opening, the *WSJ* published an article entitled "Southwest Flew Millions on Jets With Unconfirmed Maintenance Records, Government Report Says – Transportation Department report to fault FAA for what it calls ineffective oversight of carrier."  The January 30 *WSJ* Article reported that a DOT OIG report faulted Southwest for failing to prioritize safety and the FAA for lax oversight.  The article revealed that "Southwest pilots flew more than 17 million passengers on planes with unconfirmed maintenance records [and unresolved safety concerns for] over roughly two years," and that "no agency enforcement action resulted from those safety slip-ups or certain other alleged hazards."  The article further revealed that the OIG Report found "initial FAA approval of mandatory maintenance certificates for 71 of

- 72 -

88 used aircraft – a process the agency told investigators typically takes three or four weeks – occurred in one day." *See* ¶¶63-69, *supra*.

165.    According to the January 30 *WSJ* Article, with respect to  the weight and balance discrepancies, "the [OIG] audit blames local FAA managers as having allowed Southwest, rather than federal inspectors, to determine potential hazards stemming from the airline's chronic failures to accurately monitor the weight of checked baggage loaded into aircraft."  The January 30 *WSJ* Article noted these weight and balance discrepancies persisted because Southwest claimed the "heavier-than-expected baggage loads fall well within its planes' operating safety margins and that its system for calculating weight and balance data didn't present a systemic safety risk."  The January 30 *WSJ* Article indicated that according to the OIG's audit, "[s]uch noncompliance has persisted for roughly two years" and that "[t]he FAA closed that enforcement case without taking action against the carrier, though people familiar with the details said agency inspectors continue to find weight discrepancies."  As further revealed by the *WSJ*, "nearly two-thirds of the 46 FAA employees interviewed [by the OIG] 'raised concerns about the culture at Southwest.'"  *See* ¶¶63, 65, *supra*.

166.    The January 30 *WSJ* Article revealed that "[p]reviously, Southwest executives characterized many of these same issues, which concern both maintenance documentation and the weight of planes at takeoff, as differences of opinion between the airline and its regulators – and sometimes between various groups of regulators – that didn't affect safety." *See* ¶66, *supra*.

167.    This disclosure corrected certain of Defendants' prior misstatements and omissions.

168.    Investors reacted strongly to the January 30, 2020 disclosures, causing a significant drop in the price of Southwest's common stock on January 30, 2020, from $56.89 per share to $55.83 per share, a decline of 1.86%.

169.    Other media sources were quick to comment on the January 30 *WSJ* Article and the subsequent release of the OIG Report on February 11, 2020.  For example:

(a)    On January 30, 2020, USA Today published an article entitled "Southwest speaks out about draft government report saying it neglected to prioritize safety."  The article noted that "[a] draft government report obtained by The [*WSJ*] says that Southwest Airlines neglected to prioritize safety and that the [FAA] hasn't been enough of a watchdog."  Following the official publication of the OIG Report, *USA Today* published a follow-up article that same day entitled "'Diversion, distraction and power': Audit blasts Southwest's safety culture, FAA oversight."  The article reported that the OIG Report "blasts the [FAA]'s lax oversight of [Southwest], but reserves some of the harshest criticism for the airline."  It continued:  "The highlighted comments from unidentified FAA employees paint a damning picture of the nation's largest domestic airline, a darling of travelers and Wall Street";

(b)    Also, on January 30, 2020, the *Dallas Morning News* published an article entitled "Soon-to-be released government report questions Southwest Airlines' safety and FAA ties," quoting the January 30 *WSJ* Article.  Following the official publication of the OIG Report, the *Dallas Morning News* published a follow-up article that same day, entitled "'Diversion, distraction and power': Federal investigation slams FAA oversight of Southwest Airlines."  The article commented that the OIG Report "paints a dark picture of Southwest's safety culture, as described by FAA employees in interviews with investigators";

(c)    On February 12, 2020, *Forbes* published an article entitled "DOT's Inspector General Slams Southwest Airlines And The FAA Inspectors Who Monitor It, Cites Long-Standing Safety Failures By Both."  The article stated that the OIG Report "heavily criticizing Southwest Airlines' safety practices and culture" and "includes damning comments

- 74 -

about Southwest maintenance officials' attitudes toward the FAA and toward inspectors' safety concerns";

(d)    On February 11, 2020, the *NYT* published an article entitled "F.A.A. Failed to Assure Southwest Airlines Safety, Report Says," noting that "[a] federal watchdog says the agency allowed 150,000 flights on planes that had not been proved airworthy"; and

(e)    On February 11, 2020, *The Post* published an article entitled "Lax FAA oversight allowed Southwest to put millions of passengers at risk, IG says," commenting that "[e]ven as the report faulted FAA officials for not holding the airline accountable, it also offered a sharp rebuke of Southwest, which has built a loyal following among travelers for its folksy approach to flying."

## VIII.    LEAD PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

170.    Lead Plaintiffs and the Class will rely upon the presumption of reliance available in securities class actions under *Affiliated Ute v. United States*, 406 U.S. 128 (1972); *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988); and any other applicable authorities.

171.    Lead Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute* because this case primarily concerns Defendants' concealment of material facts.

172.    Alternatively, Lead Plaintiffs and the Class are entitled to a presumption of reliance under the *Basic* fraud-on-the-market doctrine because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    Defendants' misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- 75 -

(e)     Lead Plaintiffs and other members of the Class purchased Southwest securities between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

173.    At all relevant times, the market for Southwest securities was efficient for the following reasons, among others:

(a)     Southwest stock was actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Southwest filed periodic public reports with the SEC; and

(c)     Southwest regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

174.    Lead Plaintiffs reserve their rights to modify these allegations by way of a motion for class certification.

## IX.   NO STATUTORY SAFE HARBOR

175.    Many (if not all) of Defendants' false or misleading statements during the Class Period were not forward-looking statements ("FLS") and/or were not identified as such by Defendants, and thus did not fall within any "Safe Harbor."

176.    Southwest's verbal "Safe Harbor" warnings accompanying its oral FLS issued during the Class Period were ineffective to shield those statements from liability.

177.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Southwest who knew that the FLS was false.

## X.      CLASS ACTION ALLEGATIONS

178.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") on behalf of all members of the Class.  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

179.    The members of the Class are so numerous that joinder of all members is impracticable.  The Company's stock is actively traded on the NYSE, and there are over 589 million shares of Southwest stock outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Southwest or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

180.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Questions of law and fact that are common to the Class include, among other things:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants publicly omitted and/or misrepresented material facts;

(c)    whether Defendants knew or were severely reckless in disregarding that their statements were false or misleading;

(d)    whether Defendants' material misstatements and/or omissions artificially inflated the prices of Southwest securities during the Class Period; and

4833-8441-9009.v1

(e)     the extent and appropriate measure of damages sustained by Lead Plaintiffs and members of the Class.

181.    Lead Plaintiffs' claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' unlawful conduct alleged herein.

182.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel who are competent and experienced in class action securities litigation.  Moreover, neither Lead Plaintiffs nor Lead Counsel has any interests that conflict with those of the Class.

183.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

184.    Lead Plaintiffs reserve their rights to amend or modify the class allegations by way of an amended complaint or a motion for class certification.

## XI.    CAUSES OF ACTION

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

185.    Lead Plaintiffs incorporate by reference and expressly re-allege all of the above allegations, as if fully set forth herein.

186.    This count is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

187.    During the Class Period, Defendants disseminated and/or approved materially false or misleading statements and omissions of material facts as alleged herein, and knew or were severely reckless in disregarding the falsity or misleading nature of the statements or omissions.

4833-8441-9009.v1

188.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that, by the use of means and instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Southwest securities during the Class Period.

189.    Defendants and the Company's officers, management and agents did not have a reasonable basis for their alleged false or misleading statements and omissions and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Southwest securities during the Class Period.

190.    As detailed *supra*, Defendants and the Company's officers, management and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about Southwest's maintenance and safety issues, as exacerbated by the Company's undue influence over the FAA.

191.    Southwest is liable for all false or misleading material misstatements and omissions made during the Class Period, as alleged above, including the false or misleading statements and omissions made by the Individual Defendants and the Company's other officers and agents, as alleged above, as the maker of such statements and under the principle of respondent superior.

192.    The allegations above establish a strong inference that Southwest, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual

knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were done knowingly or with severe recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about Southwest's maintenance and safety issues.  By concealing these material facts from investors, Southwest's share price was artificially inflated during the Class Period.

193.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Southwest securities.  Lead Plaintiffs and the Class would not have purchased Southwest securities at the prices they paid if they had been aware that the market prices had been artificially and falsely inflated by Defendants' material misstatements and omissions.

194.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Southwest publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Kelly, Romo and Van de Ven

195.    Lead Plaintiffs incorporate by reference and expressly re-allege all of the above allegations, as if fully set forth herein.

196.    This count is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

197.    As detailed *supra*, Defendants each violated §10(b) and Rule 10b-5, and Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of Southwest publicly traded securities as a direct and proximate result of Defendants' wrongful conduct.

- 80 -

198.    In addition, during the Class Period, Individual Defendants acted as controlling persons of Southwest within the meaning of §20(a) of the Exchange Act.  Specifically, by virtue of their high-level positions, and their ability to control and direct the Company's decision making and day-to-day operations, the Individual Defendants had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the content and dissemination of the false or misleading material misstatements and omissions set forth *supra*.

199.    Defendants Kelly, Romo, and Van den Ven, individually and as a group, are liable as control persons within the meaning of §20(a) of the Exchange Act.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as Southwest is liable to Lead Plaintiffs and the other members of the Class.

200.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Southwest publicly traded securities during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A.    Certifying this action as a class action pursuant to Rule 23, and certifying Lead Plaintiffs to serve as Class Representatives and Lead Plaintiffs' counsel as Class counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expenses, and expert fees; and

D.      Such equitable, injunctive or other further relief as the Court may deem just.

## XIII.  JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED:  July 2, 2020                    KENDALL LAW GROUP, PLLC
                                        JOE KENDALL (Texas Bar No. 11260700)


                                                  s/ *Joe Kendall*
                                        _____
                                             JOE KENDALL

                                        3811 Turtle Creek Blvd., Suite 1450
                                        Dallas, TX  75219
                                        Telephone:  214/744-3000
                                        214/744-3015 (fax)
                                        jkendall@kendalllawgroup.com

                                        THE LAW OFFICE OF BALON B. BRADLEY
                                        BALON B. BRADLEY (Texas Bar No. 02821700)
                                        11910 Greenville Avenue, Suite 220
                                        Dallas, TX  75243
                                        Telephone:  972/991-1582
                                        972/755-0424 (fax)
                                        balon@bbradleylaw.com

                                        Local Counsel

                                        ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                        RACHEL L. JENSEN
                                        MATTHEW I. ALPERT
                                        CAROLINE M. ROBERT
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)
                                        rjensen@rgrdlaw.com
                                        malpert@rgrdlaw.com
                                        crobert@rgrdlaw.com

                                        Lead Counsel for Lead Plaintiffs and the Putative Class

- 82 -

## GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
| --- | --- |
| 4Q16 | Fourth quarter 2016 |
| FY16 | Year ended December 31, 2016 |
| 2016 10-K | Form 10-K publicly filed with the SEC on February 7, 2017, signed and SOX certified by defendants Kelly and Romo, reporting Southwest's fourth quarter and full year 2016 results |
| 1Q17 | First quarter 2017 |
| 2Q17 | Second quarter 2017 |
| 3Q17 | Third quarter 2017 |
| 4Q17 | Fourth quarter 2017 |
| FY17 | Year ended December 31, 2017 |
| 2017 10-K | Form 10-K publicly filed with the SEC on February 7, 2018, signed and SOX-certified by defendants Kelly and Romo, reporting Southwest's fourth quarter and full year 2017 results |
| 1Q18 | First quarter 2018 |
| 2Q18 | Second quarter 2018 |
| 3Q18 | Third quarter 2018 |
| 4Q18 | Fourth quarter 2018 |
| FY18 | Year ended December 31, 2018 |
| 2018 10-K | Form 10-K publicly filed with the SEC on February 5, 2019, signed and SOX-certified by defendants Kelly and Romo, reporting Southwest's fourth quarter and full year 2018 results |
| 1Q19 | First quarter 2019 |
| 2Q19 | Second quarter 2019 |
| 3Q19 | Third quarter 2019 |
| AD | Airworthiness Directive |
| AMFA | Aircraft Mechanics Fraternal Association |
| April 17, 2018 Fatality | April 17, 2018, Southwest flight that resulted in the first passenger death on a U.S. airline in nearly a decade |
| ASAP | Aviation Safety Action Program |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| COO | Chief Operating Officer |
| CFM | CFM International |
| Class Period | Southwest securities traded on the NYSE under the ticker "LUV" between February 7, 2017 and January 29, 2020, inclusive |
| CMO | Certificate Management Offices |
| Defendants | Southwest Airlines Co., Gary C. Kelly, Tammy Romo, and Mike Van de Ven |
| DOT | U.S. Department of Transportation |

4833-8441-9009.v1

| Defined Term | Definition |
|---|---|
| EAD | Emergency Airworthiness Directive |
| Elevator Constructors Fund | Lead Plaintiff Elevator Constructors Union Local No. 1 Annuity & 401(k) Fund |
| Elevator Pension Plan | Lead Plaintiff Canadian Elevator Industry Pension Trust Fund |
| Exchange Act | Securities Exchange Act of 1934 |
| FAA | Federal Aviation Administration |
| Flight 2169 Incident | February 26, 2019 incident on Southwest Flight 2169 resulting in damage to both wings of the aircraft during the first of three unsuccessful landing attempts |
| Foushee | H. Clayton Foushee, director of the FAA Audit and Evaluation Office |
| Individual Defendants | Defendants Gary C. Kelly, Tammy Romo and Mike Van de Ven |
| January 30 *WSJ* Article | *WSJ* Article published prior to market open on January 30, 2020, entitled "Southwest Flew Millions on Jets with Unconfirmed Maintenance Records, Government Report Says" |
| Kelleher | Herbert D. Kelleher, co-founder of Southwest and Chairman of the Board from March 1978 to May 2008 |
| Kelly | Defendant Gary C. Kelly, Southwest's Chief Executive Officer and Chairman of the Board throughout the Class Period |
| Lead Plaintiffs | Lead Plaintiffs Canadian Elevator Industry Pension Trust Fund and the Elevator Constructors Union Local No. 1 Annuity & 401(k) Fund |
| Nealon | Thomas M. Nealon, President of Southwest throughout the Class Period |
| NPRM | Notice of Proposed Rulemaking |
| NTSB | National Transportation Safety Board |
| NYSE | New York Stock Exchange |
| OIG | U.S. Department of Transportation Office of the Inspector General |
| OIG Report | Report from the OIG publicly reported on January 30, 2020 by the *Wall Street Journal* and officially released on February 11, 2020, entitled "FAA Has Not Effectively Overseen Southwest Airlines' Systems for Managing Safety Risks" |
| Romo | Defendant Tammy Romo, Southwest's Executive Vice President and Chief Financial Officer throughout the Class Period |
| Rule | Federal Rule of Civil Procedure |
| "Safety and Security Commitment" release | Southwest's press release, entitled "Safety and Security Commitment," revised in January 2017, signed by defendants Kelly and Van de Ven and available on the Company's website throughout the Class Period |
| SEC | U.S. Securities and Exchange Commission |
| SMS | Safety Management Systems |
| Southwest | Defendant Southwest Airlines Co. |
| SOX | Sarbanes-Oxley Act of 2002 |
| Sumwalt | Robert Sumwalt, Chairman of the NTSB since 2017 |
| The Company or Southwest | Defendant Southwest Airlines Co. |

| Defined Term | Definition |
|---|---|
| The *NYT* | *The New York Times* |
| *The Post* | *The Washington Post* |
| Van de Ven | Defendant Mike Van de Ven, Southwest's Chief Operating Officer throughout the Class Period |
| VDRP | Voluntary Disclosure Reporting Program |
| *WSJ* | *The Wall Street Journal* |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served upon its filing via this Court's CM/ECF system on this 2nd day of July, 2020, to all counsel of record.

s/ <em>Joe Kendall</em>
_____
JOE KENDALL

4833-8441-9009.v1