UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT G. LINENWEBER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SOUTHWEST AIRLINES CO., et al.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:20-cv-00408-K<br><br>CLASS ACTION |

**NOTICE OF RECENT AUTHORITIES**

Lead Plaintiffs respectfully submit this Notice of Recent Authorities to inform the Court of the decisions in *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 2021 WL 182316 (S.D. Tex. Jan. 19, 2021) and *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2021 WL 195370 (M.D. Tenn. Jan. 20, 2021), attached hereto as Exhibits A and B, respectively. The decision in *Anadarko* addresses issues of law in Lead Plaintiffs' opposition to Defendants' first motion to dismiss, namely, whether the Complaint sufficiently pleads the §10(b) elements of falsity and scienter. *See Anadarko*, 2021 WL 182316, at *6, *8-*9; *see also* Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint for Violations of the Federal Securities Laws ("ECF No. 29") at 19, 23. Judge Atlas's holding in *Anadarko* that plaintiffs there sufficiently alleged scheme liability and that defendants waived any such argument to the contrary by failing to raise it in their opening brief is also relevant to Lead Plaintiffs' opposition to Defendants' motions to dismiss. *See Anadarko*, 2021 WL 182316, at *5 ("Defendants did not move to dismiss and, in any event, Plaintiff adequately alleges, a Rule 10b-5(a) 'scheme to defraud' claim in Count I of the Complaint."); *see also* ECF No. 29 at 7-8; Lead Plaintiffs' Opposition to Defendants' Second Motion to Dismiss ("ECF No. 32").

Judge Campbell's decision in *Acadia* finding that plaintiffs there sufficiently pleaded that defendants' statements were materially misleading (and not immaterial puffery), and that plaintiffs' allegations created a strong inference of defendants' scienter, is also relevant to Lead Plaintiffs' opposition to Defendants' motion to dismiss. *See Acadia*, 2021 WL 195370, at *4-*7; *see also* ECF No. 29 at 8-15, 20-21. Like *Anadarko*, Judge Campbell held that "[d]efendants did not raise or articulate any arguments specific to the scheme liability allegations in their opening brief, and the Court declines to consider the arguments raised for the first time in their Reply in ruling on the pending motion to dismiss." *Id*. at *2 n.1; *see also* ECF No. 32; ECF No. 29 at 7-8.

- 1 -

Absent a court request for briefing, Lead Plaintiffs have limited this Notice to simply notifying the Court of the *Anadarko* and *Acadia* decisions (and the portions relevant to the current briefing pending before the Court), but if the Court desires supplemental briefing, Lead Plaintiffs are prepared to submit additional argument concerning the decisions.

DATED:  February 3, 2021

Respectfully submitted,

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)


                              */s/ Joe Kendall*
                              JOE KENDALL

3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

THE LAW OFFICE OF BALON B. BRADLEY
BALON B. BRADLEY (Texas Bar No. 02821700)
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
Telephone:  972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
RACHEL L. JENSEN
MATTHEW I. ALPERT
CAROLINE M. ROBERT
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
rjensen@rgrdlaw.com
malpert@rgrdlaw.com
crobert@rgrdlaw.com

Lead Counsel for Lead Plaintiff

4849-6302-9210.v1

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of February 2021, a copy of the foregoing was served electronically and notice of service of this document will be sent to all parties by operation of the Court's electronic filing system to CM/ECF participants registered to receive service in this matter. Parties may access this filing through the Court's system.

/s/ Joe Kendall
JOE KENDALL

4849-6302-9210.v1

# EXHIBIT A

2021 WL 182316
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

GEORGIA FIREFIGHTERS' PENSION
FUND, Individually and On Behalf of
All Others Similarly Situated, Plaintiff,

v.

ANADARKO PETROLEUM
CORPORATION, et al., Defendants.

CIVIL ACTION NO. H-20-0576
|
Filed 01/19/2021

**MEMORANDUM AND ORDER**

**\*1**  This securities case is before the Court on the Motion to Dismiss [Doc. # 60] filed by Defendants Anadarko Petroleum Corporation ("Anadarko"), and R. A. Walker, Robert G. Gwin, Robert P. Daniels, and Ernest A. Leyendecker III ("Individual Defendants"), seeking dismissal of the Amended Complaint ("Complaint") [Doc. # 55] filed by Lead Plaintiffs Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Iron Workers Local # 580 Joint Funds, and Building Trades United Pension Trust Fund ("Plaintiff"). [1] Plaintiff filed its Opposition [Doc. # 61] to the Motion to Dismiss, and Defendants filed a Reply [Doc. # 62]. The Court has reviewed the full record and applicable legal authorities. Based on this review, the Court **denies** the Motion to Dismiss.

**I. BACKGROUND**
Prior to its acquisition by Occidental Petroleum Corporation ("Occidental") in August 2019, Anadarko "was one of the world's largest independent oil and natural gas exploration and production companies." Complaint, ¶ 2. Anadarko was publicly traded on the New York Stock Exchange. *See id.* Defendant Walker was Anadarko's Chairman, President, and Chief Executive Officer ("CEO"). Defendant Gwin was Anadarko's Executive Vice President of Finance and Chief Financial Officer ("CFO") from May 2013 until November 2018. Defendant Daniels was Anadarko's Executive Vice President of International and Deepwater Exploration from

May 2013 until he retired in December 2016. Defendant Leyendecker was Senior Vice President of Exploration Gulf of Mexico from February 2014 until he was promoted to Senior Vice President of International Exploration in April 2015, then promoted to Executive Vice President of International and Deepwater Exploration in August 2016. Walker, Gwin, and Daniels were members of Anadarko's Executive Committee.

In early 2009, Anadarko discovered the "Shenandoah" oil field in the Gulf of Mexico and began drilling appraisal wells. *See id.*, ¶ 3. The Shenandoah field is located approximately 200 miles south of New Orleans and spans an area of approximately 13,000 acres. *See id.*, ¶ 26. "Anadarko operated the Shenandoah field with a 30% working interest" with partners "ConocoPhillips (40% working interest), Cobalt International Energy, L.P. (20% working interest), and Marathon Oil Corporation (10% working interest)." *Id.*, ¶ 28.

Plaintiff alleges that based on the results of the "Shen 2" appraisal well in 2013, "Defendants hailed the Shenandoah basin as 'one of the largest discoveries in the company's history' with 'the potential to become one of the most prolific new areas in the deep-water Gulf of Mexico.' " *Id.*, ¶ 3. Plaintiff alleges that Defendants stated that data acquired from Shen 2 indicated "excellent-quality reservoir and fluid properties." *Id.*

**\*2**  Plaintiff alleges that Anadarko described the next appraisal well, Shen 3, "as an even greater success" when, in reality, "Shen 3 was a dry hole." *See id.*, ¶ 4. Plaintiff alleges that, notwithstanding the "bad information about Shenandoah," Defendants "continued to provide glowing reports quarter-after-quarter and for two more appraisal wells in 2015 and 2016." *Id.*

Plaintiff alleges that "it was known internally" at Anadarko that appraisal well Shen 4, drilled in 2015, "was 'garbage.' " *Id.*, ¶ 54. Plaintiff alleges specifically that "Shen 4 showed poor results due to poor production and bottom-hole pressure and had relied on a bad model, leading to oil column content which had more water versus oil than previously estimated." *Id.* Plaintiff alleges that "data obtained from Shen 4 mandated a downward adjustment to Shenandoah's size estimates [but] Defendants elected to manipulate the data to maintain their exaggerated narrative without revealing materially adverse known facts." *Id.*, ¶ 58. Plaintiff alleges that Defendants manipulated the data by recalibrating Shenandoah maps "to hide known faults from their partners so they could not

detect or expose the scheme." *See id.*, ¶ 60. Plaintiff alleges that Anadarko, through Leyendecker's directives, "concealed data highly relevant to an assessment of the size and overall economic analysis of Shenandoah" and that the "true maps were not shown to Anadarko's partners or to the public." *Id*.

Plaintiff alleges that Lea Frye, Anadarko's Senior Reservoir Engineer and team lead for the Shenandoah project, "repeatedly objected to Anadarko's dissemination of misleading information about Shenandoah and urged the Company to come clean with investors." *Id*., ¶ 6. Plaintiff alleges that as a reservoir engineer, "it was Frye's job to evaluate the size of an oil field resource to develop economic models." *Id*., ¶ 39. Plaintiff alleges that by February 2014, "Frye had assembled and presented undeniable evidence that Anadarko was exaggerating Shenandoah's potential to the market." *Id*., ¶ 6. Plaintiff alleges that in late April 2016, "Frye provided Defendants with a detailed 20-page letter previewing much of the same information" she would later submit to the Securities and Exchange Commission ("SEC") on May 6, 2016. *See id.*, ¶¶ 73-74. Frye resigned on May 18, 2016. *Id*., ¶ 75.

Plaintiff alleges that Anadarko's Risk Consistency Team ("RCT") "served an internal audit function by reviewing the exploration team's methods for reporting on resources to prevent 'salesmanship and overly optimistic evaluations of exploration prospects.' " *Id*., ¶ 66. Plaintiff alleges that the RCT was asked to examine the Shenandoah project, specifically its size. *See id.* Plaintiff alleges that the RCT determined that the "resource claims made by exploration executives needed a significant downward adjustment." *Id*., ¶ 67.

Plaintiff alleges that "[e]ach new appraisal, and Anadarko's own RCT findings that the Shenandoah resource needed a significant downward adjustment, confirmed Frye's analysis." *Id*., ¶ 6. Plaintiff alleges that Anadarko persisted in its refusal to "level with investors." *Id*. Plaintiff alleges that, instead, Anadarko continued "to overstate Shenandoah's size and economic viability, while concealing known adverse information necessary to enable investors (and their partners) to avoid being deceived." *Id*., ¶ 67.

 **\*3**  On May 2, 2017, in its first quarter 2017 SEC Form 10-Q ("2017 10-Q"), Anadarko disclosed "a $467 million impairment charge and expensed $435 million in suspended exploratory well costs for Shenandoah." *See id.*, ¶ 7. Plaintiff alleges that this further validated the analyses prepared and provided to Defendants by Frye and the RCT. *See id.* On May 3, 2017, Anadarko's common stock price fell approximately 8%. *See id.*

On August 17, 2020, Plaintiff filed its Amended Complaint alleging in Count I that Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiff alleges that Defendants (a) engaged in a scheme to defraud; (b) "omitted to state one or more material facts necessary" to make statements "not misleading;" and (c) engaged in a fraudulent or deceptive act, practice, and course of business. *See id.*, ¶ 174. In Count II, Plaintiff alleges that the Individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons of Anadarko. Defendants filed their Motion to Dismiss, which has been fully briefed and is now ripe for decision.

## II. LEGAL STANDARDS FOR MOTION TO DISMISS § 10(b) CLAIMS

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Harrington*, 563 F.3d at 147. The complaint must, however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012). A claim is "plausible on its face" when the plaintiff pleads sufficient facts to enable the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *See Frye v. Anadarko Petroleum Corp.*, 953

F.3d 285, 290 (5th Cir. 2019). When there are well-pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679.

The basic elements of a § 10(b) claim involving publicly traded securities are:

(1) a material misrepresentation or omission, (2) in connection with the purchase or sale of a security, (3) scienter by the defendant, (4) justifiable reliance by the plaintiff,

(5) damages; and (6) a causal connection between the material misrepresentation and the loss, referred to a "loss causation." *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009). The Private Securities Litigation Reform Act ("PSLRA") imposes a heightened pleading requirement for two elements of a § 10(b) claim – the misrepresentation and scienter elements. *See Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (citing 15 U.S.C. § 78u-4; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)). Specifically, "the PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading, the so-called 'particularity' requirement." *Lormand*, 565 F.3d at 239 (citing 15 U.S.C. § 78u-4(b)(1)).

**\*4** Additionally, the PSLRA requires a plaintiff to allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)). To satisfy the pleading standard for the required "strong inference" of scienter, the allegations must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Owens*, 789 F.3d at 536 (quoting *Tellabs*, 551 U.S. at 324). "[A] tie favors the plaintiff." *Id.* (quoting *Lormand*, 565 F.3d at 254).

### III. ANALYSIS

In Count I of the Complaint, Plaintiff alleges that Defendants (a) engaged in a scheme to defraud; (b) "omitted to state one or more material facts necessary" to make statements "not misleading;" and (c) engaged in a fraudulent or deceptive act, practice, and course of business. *See* Complaint, ¶ 174; *see also* 17 C.F.R. § 240.10b-5(a)-(c).[2] Defendants argue that Count I should be dismissed because Plaintiff did not adequately allege that Defendants omitted material facts that were necessary to make the cited statement not misleading. Specifically, Defendants argue that Plaintiff failed to allege with sufficient particularity how the cited statements about Shenandoah were misleading. Defendants argue also that Plaintiff failed to allege facts supporting a strong inference of scienter.

### A. Claim Based on a Scheme to Defraud – Rule 10b-5(a)

In its Motion to Dismiss, Defendants do not address the Rule 10b-5(a) "scheme to defraud" aspect of Plaintiff's claim in Count I. In response to Plaintiff's assertion that Defendants were not seeking dismissal of this aspect of the claim,

Defendants stated that the "Complaint presents a typical Rule 10b-5(b) suit, as it alleges that Defendants defrauded investors through misrepresentations in public filings." *See* Response, pp. 16-17. The United States Supreme Court has held, however, that the "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5." *Lorenzo v. Sec. & Exch. Comm'n*, __ U.S. __, 139 S. Ct. 1094 (2019).

Notwithstanding Defendants' characterization of the Complaint, Plaintiff clearly alleges "Defendants' Fraudulent Scheme" as the heading of the first substantive section. *See* Complaint, p. 9. In the Complaint, Plaintiff alleges a scheme to defraud that involved more than making misleading statements to the public. *See id.*, ¶ 3; ¶ 29 ("Defendants engaged in a fraudulent scheme through various means that operated as a deception on the investing public concerning the size and commercial viability of the Shenandoah project and a whistleblower complaint about Defendants' multi-billion dollar securities fraud as described herein"); ¶¶ 30-93. For example, Plaintiff alleges that, as part of the scheme to defraud, Anadarko retaliated "against employees who tried to stand up for the truth about Shenandoah." *Id.*, ¶ 3(h). Plaintiff alleges that Defendants concealed the scheme to defraud by "representing to employees that the [confidentiality agreement] prohibited them from disclosing to investors the truth about Shenandoah or any aspect of Defendants' scheme." *Id.*, ¶ 3(k).

**\*5** Defendants did not move to dismiss and, in any event, Plaintiff adequately alleges, a Rule 10b-5(a) "scheme to defraud" claim in Count I of the Complaint.

### B. Claim Based on Misleading Statements – § 10(b) and Rule 10b-5(b)

*Pre-Class Period Statements.–* In the Complaint, Plaintiff identifies statements to investors that were made prior to the Class Period (February 20, 2015 through May 2, 2017). *See id.*, ¶¶ 30-34. Defendants argue these statements cannot be considered because they were made outside the Class Period. Although it is clear that these statements were made prior to the Class Period, they are not an independent basis for liability under § 10(b). Instead, these statements are Anadarko's original statements regarding Shenandoah and they help inform the reasonable understanding of later statements made during the Class Period.

For example, Plaintiff alleges that on March 19, 2013, prior to the Class Period, Defendants issued a press release regarding

Case 3:20-cv-00408-K   Document 37   Filed 02/03/21   Page 9 of 21   PageID 730

the Shen 2 appraisal well, quoting Daniels's statements about the "successful Shenandoah-2 well" being "one of Anadarko's largest oil discoveries in the Gulf of Mexico, with more than 1,000 net feet of oil pay and reservoir rock and fluid properties of much higher quality than previously encountered ...." *See id.*, ¶ 32. Later, on March 3, 2015, during the Class Period, Defendants stated that Shen 3 "was a very successful appraisal well." *See id.*, ¶ 102. The description of Shen 2 as a "successful Shenandoah-2 well" based on its large oil pay made it reasonable for investors to understand that the "very successful appraisal well" Shen 3 also had a large oil pay. Yet Plaintiff alleges that Shen 3 was a dry hole.

Similarly, a slide presented by Anadarko at a March 4, 2014 conference, showed the Shenandoah basin as a "-$2 - $4 Billion Net Opportunity." *See id.*, ¶ 34. Although this was prior to the Class Period, it provides background and context for Class Period Statements regarding the Shenandoah project being "well within the range of expectation of what we had put out there" (*id.*, ¶ 110), and "we're right where we thought" (*id.*, ¶ 112). Therefore, the statements set forth in the Complaint that were made prior to the Class Period are relevant to an understanding of the statements made during the Class Period.

***Statements During Class Period.–*** As noted above, an essential element of a § 10(b) claim is that the defendant made a material statement that was false or misleading. *See Lormand*, 565 F.3d at 238. Defendants argue that Plaintiff's § 10(b) claim should be dismissed for failure to explain how the challenged statements made during the Class Period were misleading.

Plaintiff alleges that Defendants made multiple statements during the Class Period that were misleading because they failed to disclose material information necessary so the statements would not be misleading. Plaintiffs identify specifically the challenged statements made during the Class Period, which include SEC filings, press releases, statements during conference calls with investors and analysts, and earnings calls. *See* Complaint, ¶¶ 97-140. Plaintiff in the Complaint also states specifically the material facts that Defendants omitted even though the facts were "necessary not to make their statements misleading." *See id.*, ¶ 95; ¶ 141 (for statements after April 2016).

 ***\*6*** As an example, Anadarko stated in its 2014 Form 10-K that the "Shenandoah-3 well confirmed the...excellent reservoir qualities [and] reduced the uncertainty of the

resource range." *Id.*, ¶ 97. Similarly, in a March 3, 2015 conference call with investors and analysts, Daniels stated that Shen 3 "was a very successful appraisal well." *Id.*, ¶ 102. Significantly, Plaintiff alleges that Anadarko failed to disclose that Shen 3 was a dry hole, an omission which could have created "an impression of a state of affairs that differs in a material way from the one that actually exists." *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 541 (5th Cir. 2008).

Although Plaintiff does not individually tie each challenged statement to a specific omitted fact, it explains clearly its position that the cited statements regarding the future commercial viability of Shenandoah were rendered misleading by the omission of information demonstrating that Anadarko and the Individual Defendants already knew that the original projections required significant downward adjustment. *See, e.g.*, Complaint, ¶¶ 36; 58; 67. Plaintiff adequately alleges in the Complaint why it believes the omitted information renders the cited statements misleading.

***Forward-Looking Statements.–*** Defendants argue that certain statements by Walker, Gwin and Daniels are protected by the PSLRA's Safe Harbor clause as forward-looking.

Under the Safe Harbor clause, a forward-looking statement is not actionable if:
(1) it is identified as forward-looking and is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially;" (2) it is immaterial; or (3) the plaintiff fails to plead that the forward-looking statement was made with actual knowledge that it was false or misleading. *See Lormand*, 565 F.3d at 243 (citing 15 U.S.C. § 78u-5(c)(1)(A), (B); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371-72 (5th Cir. 2004)). "Whether or not a statement is forward-looking is governed by the nature of the statement, not a litigant's allegations about the statement." *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, 2015 WL 7760201, \*10 (W.D. Tex. Dec. 1, 2015).

As an initial matter, Defendants have failed to establish that each forward-looking statement was identified as forward-looking and was accompanied by meaningful cautionary statements. Plaintiff alleges that many of the statements at issue "were not identified" as forward-looking by Defendants. *See* Complaint, ¶ 162. Plaintiff alleges also that the statements were not accompanied by meaningful cautionary language. "When risks have already begun to materialize, it is no

longer sufficient to generally warn of the possibility of these risks in the future." *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, *3 (E.D. Tex. Sept. 29, 2015). "When cautionary language is glossed over as a future risk rather than the certain dangers that had already begun to materialize then the warnings are no longer meaningful." *Id.* (internal quotations and ellipsis omitted). In this case, Plaintiff alleges that by the time Defendants made "forward-looking" statements during the Class Period regarding Shenandoah, Defendants already knew that the potential for Shenandoah was being exaggerated and needed "a significant downward adjustment." *See, e.g.*, Complaint, ¶ 6. As a result, Plaintiff has adequately alleged that the Safe Harbor provision does not apply to protect the "forward-looking" statements Defendants assert exist.

Additionally, many courts have held that the Safe Harbor clause does not protect statements when the plaintiff adequately alleges that the defendant knew his statements were misleading when made. *See, e.g., Lormand*, 565 F.3d at 244 ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations."); *Marcus*, 2015 WL 5766870 at *2. Plaintiff in this case clearly alleges that at the time each statement was made, "the speaker knew the [statement] was misleading" and the statement "was authorized and/or approved by an executive director of Anadarko who knew that the [statement] was misleading." Complaint, ¶ 164.

 **\*7**  Plaintiff adequately alleges facts that, if proven, would preclude application of the Safe Harbor provision to the challenged statements. As a result, the Court denies the Motion to Dismiss to the extent it is based on the Safe Harbor provision.

***Conclusion Regarding Misleading Statements.*–**Plaintiff has adequately alleged with particularity the factual basis for the misleading statements which form the basis for the § 10(b) and Rule 10b-5(b) claim in Count I.

## D. Claim Based on Deceptive Business Practices – Rule 10b-5(c)

As with the Rule 10b-5(a) claim in Count I, Defendants did not address Rule 10b-5(c) in their Motion to Dismiss. To establish liability under Rule 10b-5(c) for deceptive business practices, the plaintiff must prove that "the defendant... engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *S.E.C. v. Farmer*, 2015 WL 5838867, *14 (S.D. Tex. Oct. 7, 2015). A cause of action exists under Rule 10b-5(c) "for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant." *Id*. (quoting *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004)). There can be, however, significant overlap among the theories of liability under Rule 10b-5. *See Lorenzo*, 139 S. Ct. at 1102 (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983)).

Plaintiff alleges that Anadarko and the Individual Defendants engaged in a "course of conduct to conceal adverse material information." Complaint, ¶ 176. Other deceptive business acts or practices alleged include "directing employees to use outdated, misleading maps that made Shenandoah seem more commercially viable that it really was so as to ensure that Anadarko's partners could not expose the truth." *Id.*, ¶ 3(g). Plaintiff alleges that Defendants knew by the end of 2014 that there was substantial doubt about Shenandoah's value and economic viability, yet failed to disclose this in the Forms 10-K and 10-Q SEC filings. *Id.*, ¶ 142. Plaintiff alleges that Defendants engaged in a deceptive business practice by failing to disclose complete information necessary to understand Anadarko's "financial condition, changes in financial condition and results of operations" in violation of SEC Regulation S-K Item 303 ("Item 303"). *Id.*, ¶ 143. Plaintiff alleges that the Item 303 requirement is "intended to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management." *Id*. Plaintiff alleges that "Defendants understood that investors were keenly interested in the Shenandoah project, as evidenced by the fact that the project's ongoing status was repeatedly discussed during Company presentations and earnings conference calls with investors and security analysts." *Id.*, ¶ 144.

Defendants did not move to dismiss, and Plaintiff adequately alleges, a Rule 10b-5(c) "deceptive business practices" claim in Count I of the Complaint.

## E. Allegations of Scienter

Scienter is an element of Plaintiff's claims. In the Fifth Circuit, "[t]he required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684

Case 3:20-cv-00408-K    Document 37    Filed 02/03/21    Page 11 of 21    PageID 732

(5th Cir. 2014). "[Severe recklessness is] limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Id*. (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003)).

**\*8** Circumstantial evidence can support a strong inference of scienter, but "allegations of motive and opportunity standing alone will not suffice." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). "Appropriate motive and opportunity allegations may, however, meaningfully enhance the strength of the inference of scienter." *Id*.

The Court employs a three-step process to evaluate allegations of scienter:
(1) the Court accepts the factual allegations in the Complaint as true; (2) the Court considers the entire Complaint as a whole; and (3) the Court considers "plausible inferences supporting as well as opposing a strong inference of scienter." *See Neiman v. Bulmahn*, 854 F.3d 741, 747 (5th Cir. 2017). "When analyzing a complaint for scienter, a court must 'assess all the allegations holistically,' not in isolation." *Owens*, 789 F.3d at 536 (quoting *Tellabs*, 551 U.S. at 326). The allegations in the Complaint must create an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. (quoting *Tellabs*, 551 U.S. at 324). "[A] tie favors the plaintiff." *Id*. (quoting *Lormand*, 565 F.3d at 254).

***Allegations of Knowledge.–*** Plaintiff has alleged that Defendants each "knew or were severely reckless in disregarding that material facts were being concealed from investors." Complaint, ¶ 146. Plaintiff alleges further that Defendants each "had actual knowledge of the misleading statements they made and/or acted in severe reckless disregard of the truth at the time they spoke." *Id.*, ¶ 147. Although these general allegations are against "Defendants" as a group, the specific allegations discussed below are tied to specific Individual Defendants.[3]

Plaintiff alleges that Defendants knew their statements were misleading because Frye repeatedly told them. Plaintiff alleges that in January 2014, "Defendants tasked Frye with evaluating Shenandoah and analyzing the available scientific data to assess whether the project should move forward to production." *Id.,* ¶ 41. "Specifically, Frye was asked to focus on Shenandoah's perceived value and any risks to that perceived value." *Id*. Plaintiff alleges that the objective was to use Frye's "economic model to assist the Executive Committee in establishing budgets for the following year." *Id*. Walker, Gwin and Daniels were on the Executive Committee. *Id*. Plaintiff alleges that by February 2014, "Frye had assembled and presented undeniable evidence that Anadarko was exaggerating Shenandoah's potential to the market." *Id.*, ¶ 6. Plaintiff alleges that on February 19, 2014, Frye attended a meeting about Shenandoah at which Leyendecker was present. *Id.*, ¶ 42. Plaintiff alleges that on or about August 18, 2014, Leyendecker "insisted Frye and other scientists conceal maps revealing the existence of faulting and instead use false maps of Shenandoah," maps that had been manipulated "by recalibrating." *Id.*, ¶ 60. Plaintiff alleges that on February 1, 2016, Frye met with Walker, Gwin, Daniels, and others to discuss the proposal for Shen 5. *See id.*, ¶ 70. Plaintiff alleges that "the attendees discussed the Shenandoah project at large, and Defendants appeared to be familiar with and well-versed in the subject." *Id*. Plaintiff alleges that in late April 2016, Frye provided to Defendants "a detailed 20-page letter previewing much of the same information she intended to submit to the SEC." *Id.*, ¶ 73. Plaintiff alleges that in the summer of 2016, Frye "met with lawyers for Anadarko's Audit Committee" over two occasions, during which "she provided additional detailed information regarding the scheme." *See id.*, ¶ 78.

**\*9** Plaintiff alleges that Anadarko's RCT also informed Defendants that they should revise downward the assessment of Shenandoah. *See id.*, ¶ 65. "Anadarko's RCT served an internal audit function by reviewing the exploration team's methods for reporting on resources to prevent 'salesmanship and overly optimistic evaluations of exploration prospects.' " *Id.*, ¶ 66. Plaintiff alleges that the RCT examined "the Shenandoah project and more specifically its size." *Id.*, ¶ 67. Plaintiff alleges that while the RCT was evaluating Shen 4, which was drilled in 2015, "it became increasingly apparent to the development team that the exploration team was selectively ignoring relevant data." *Id*. Plaintiff alleges that the RCT "confirmed that the resource claims made by exploration executives needed a significant downward adjustment." *Id*.

Plaintiff alleges that others at Anadarko believed the statements about Shenandoah were incorrect. Plaintiff alleges that Anadarko geologist Paul Chandler "pointed out

numerous errors in the exploration team's methodology and stated that their resource statements were incorrect." *See id.*, ¶ 46. Plaintiff alleges that Chandler presented this information to Executive Committee members Darrell Hollek and/or Jim Kleckner. *See id.* Plaintiff alleges that in February 2017, Project Reservoir Engineer Doug Shotts had prepared a presentation that "included information about the geologic uncertainty surrounding Shenandoah," and "included an honest assessment of the size of the Shenandoah resource and the economic obstacles to its profit potential." *Id.*, ¶ 47. Plaintiff alleges that Leyendecker "abruptly canceled" the scheduled presentation because he "did not want the truth about the uncertainty in size and value of the resource to get out." *Id.*

Defendants argue that none of these allegations raise a strong inference of scienter because the inference cannot arise from the Individual Defendants' assignment to the Executive Committee and their presence at meetings during which the Shenandoah project was discussed. The allegations described above raise an inference of scienter that is at least as strong as the alternative inference that Walker, Gwin, and Daniels attended meetings but failed to pay attention and that these individuals received company reports but failed to read them. As to Leyendecker, the inference of scienter is at least as strong as the inference that Leyendecker simply chose not to believe Frye, the RCT, and others at Anadarko who had studied the Shenandoah project. Allegations that a defendant ignored significant red flags, supported by allegations of motive and opportunity, is enough to give rise to a strong inference of scienter on the part of that defendant. *See In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 712 (W.D. Tex. 2010) (citing *In re Spear & Jackson Sec. Litig.*, 399 F. Supp. 2d 1350, 1359 (S.D. Fla. 2005)).

Plaintiff alleges also that the Individual Defendants "monitored and/or oversaw the Shenandoah project" and were able to speak about the project at conference calls and meetings with investors. *See id.*, ¶ 149. On many occasions, the challenged statements were made during conference calls or at meetings during which more than one Individual Defendant was present. For example, Plaintiff alleges that Walker and Gwin were both present and making statements during an earnings call on October 28, 2015. *See id.*, ¶ 110. Similarly, Plaintiff alleges that Walker and Daniels were present and making statements during an earnings call on May 3, 2016. *See id.*, ¶ 121. Whenever a defendant "voluntarily chooses to speak publicly, he or she has a duty to tell the whole truth," and must disclose material, adverse facts that affect the

validity or plausibility of his statement. *In re ArthroCare*, 726 F. Supp. 2d at 716. The fact that only one of the Individual Defendants may have made a challenged statement to the public does not preclude an inference of scienter on the part of another Individual Defendant who was present and had the opportunity to correct the speaker at the time the inaccurate and misleading statements were made to the investing public. *See id.* (citing *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005)). "[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements." *Barrie*, 397 F.3d at 262.

 **\*10** ***Allegations of Motivation.***– Plaintiff has alleged also that Defendants were motivated to provide misleading information to investors and to conceal the scheme to defraud. *See* Complaint, ¶ 150. Plaintiff alleges that Defendants knew that disclosure of the adverse information about Shenandoah would "at least cost them their jobs," would have reduced the share price of Anadarko stock, and would prevent them from receiving "over $100 million in golden parachute payments." *Id.*

Each Individual Defendant was receiving a large salary. Plaintiff alleges that during "fiscal years 2015-2017, Walker received over $52 million in total executive compensation." *Id.*, ¶ 17. Plaintiff alleges that during that same time period, Gwin received $20.6 million in total executive compensation. *Id.*, ¶ 18. Plaintiff alleges that during 2015, Daniels received $6.5 million in total executive compensation and "engaged in insider sales of Anadarko common stock during the Class Period at inflated prices from which he received proceeds of $3.1 million." *Id.*, ¶ 19. Plaintiff alleges that Leyendecker received in excess of $4 million during fiscal years 2015-2017. *Id.*, ¶ 20.

***Conclusion Regarding Scienter.***– The Court has viewed all the factual allegations in the Complaint holistically and not in isolation. The Court has considered the allegations regarding motive and opportunity to enhance the strong inference of scienter raised by Plaintiff's allegations of Defendants' knowledge. Accepting the factual allegations in the Complaint as true, and considering inferences supporting as well as opposing scienter, the Court finds that Plaintiff has alleged with adequate particularity that each Defendant acted with the requisite scienter.

**F. Control Person Liability – § 20(a)**

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). A plaintiff who fails to state a claim for a violation of the Exchange Act similarly fails to state a claim under § 20(a). *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004).

Individual Defendants argue that the § 20(a) control person liability claim must be dismissed because Plaintiff has failed to allege a primary claim under § 10(b) and Rule 10b-5. As explained above, however, Plaintiff has adequately alleged the primary claim. Therefore, the § 20(a) claim is not subject to dismissal.

## VI. CONCLUSION AND ORDER

The sole issue before the Court at this time is whether the claims in Plaintiff's Complaint are adequately *alleged*, not whether the claims are likely to survive a motion for summary judgment following discovery. As discussed above, Plaintiff has adequately alleged their Exchange Act claims against Defendants. Accordingly, it is hereby

**ORDERED** that Defendants' Motion to Dismiss [Doc. # 60] is **DENIED**. It is further

**ORDERED** that the parties may begin to conduct discovery. It is further

**ORDERED** that by **February 5, 2021**, the parties shall submit to the Court proposed deadlines for Defendants to file their Answer to the Amended Complaint and for initial disclosures, and proposed date(s) for an initial scheduling conference.

SIGNED at Houston, Texas, this **19th** day of **January, 2021**.

**All Citations**

Slip Copy, 2021 WL 182316

## Footnotes

1   The case was originally filed by Georgia Firefighters' Pension Fund, and the caption reflects the original Plaintiff. However, by Order [Doc. # 41] entered May 15, 2020, the Court appointed Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Iron Workers Local #580 Joint Funds, and Building Trades United Pension Trust Fund as Lead Plaintiffs.

2   Rule 10b-5 provides:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

   in connection with the purchase or sale of any security.

   17 C.F.R. 240.10b-5.

3   Defendants argue that the allegations in the Complaint lack specifics. Plaintiff notes that its investigation is ongoing, that many of the relevant facts are within Defendants' exclusive control. *See* Complaint, p. 1 n.1. Plaintiff alleges also that Defendants have intimidated and threatened employees if they disclose "any aspect of Defendants' fraudulent scheme." *Id.*, ¶ 5(l). Plaintiff notes further that Frye's "whistleblower materials" were sealed until recently and remain heavily redacted. *See id.* at 1 n.1; ¶ 55.

**End of Document**                                                © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2021 WL 195370
Only the Westlaw citation is currently available.
United States District Court, M.D.
Tennessee, Nashville Division.

ST. CLAIR COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Individually and
on Behalf of All Others Similar, Plaintiff,
v.
ACADIA HEALTHCARE
COMPANY, INC., et al., Defendants.

NO. 3:18-cv-00988
|
01/20/2021

JUDGE CAMPBELL, MAGISTRATE JUDGE NEWBERN

## MEMORANDUM

**\*1** Pending before the Court is Defendants' Motion to Dismiss (Doc. No. 40). Plaintiffs filed a Response in Opposition (Doc. No. 47), and Defendants filed a Reply (Doc. No. 50). For the reasons set forth more fully below, Defendants' Motion will be **DENIED**.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Lead Plaintiffs, New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund and the Chicago Laborers' Pension Fund, filed this securities fraud class action on behalf of purchasers of Acadia Healthcare Company, Inc. ("Acadia") securities between April 30, 2014 and November 15, 2018 (the proposed class period), against Acadia, Joey A. Jacobs, former Chairman of Acadia's Board of Directors and its Chief Executive Officer; Brent Turner, Acadia's President; and David Duckworth, Acadia's Chief Financial Officer, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and Securities and Exchange Commission (SEC) Rule 10b–5, 17 CFR § 240.10b–5. (Doc. No. 39). On May 31, 2019, Defendants

filed the pending motion to dismiss pursuant Rule 12(b)(6) for failure to state claim. (Doc. No. 40).

Acadia is a for-profit healthcare company that operates inpatient psychiatric facilities, residential treatment centers, and other facilities providing outpatient behavioral healthcare services in the United States, the United Kingdom ("U.K.") and Puerto Rico. (Doc. No. 39 ¶¶ 2, 28). The Consolidated Complaint ("Complaint"), filed on April 1, 2019, alleges that, throughout and before the Class Period, Defendants engaged in a scheme to defraud and mislead investors concerning patient care, staffing levels, and legal compliance issues, as well as Acadia's U.K. operations.

Plaintiffs allege that Defendants falsely represented that Acadia provided high-quality services, adequately staffed its facilities, and complied with applicable laws and regulations. (Doc. No. 39 ¶¶ 111-157). It was quality care, Defendants repeatedly emphasized, that drove new patients to Acadia facilities, created the demand necessary to grow its existing facilities, and was key to improving the performance and operations at the facilities Acadia acquired to fuel its growth. (Doc. No. 39 ¶¶ 42-45, 112-113). In reality, Acadia achieved growth by inadequately staffing facilities and cutting costs to extract higher profits at the expense of patient care and safety, and ran facilities rife with violence, sexual assault, and counter-therapeutic policies and practices. (Doc. No. 39 ¶¶ 47-60, 61-84, 185-186).

Additionally, Plaintiffs allege Defendants falsely represented that Acadia's $2.2 billion acquisition of The Priory Group, the U.K.'s largest chain of behavioral health centers, would contribute to positive financial growth. (Doc. No. 39 ¶¶ 91-108). Defendants repeatedly assured investors throughout 2017 that Acadia was on track to meet its financial targets and that the Company would experience margin improvement in the U.K. when, in fact, Acadia was not on track to meets its U.K. financial targets because of weakened patient census and increased labor costs that Defendants concealed. (Doc. No. 39 ¶¶ 158-178, 180-183).

**\*2** Defendants' fraud was revealed through a series of partial disclosures. The first occurred on October 24, 2017, when Acadia revealed that deteriorating performance in the U.K. had caused the Company to miss its 3Q17 revenue and earnings targets and substantially reduce its guidance for the remainder of the year, causing Acadia's stock price to drop 30%. (Doc. No. 39 ¶¶ 8, 180-81, 183-184). The second occurred on October 11, 2018, when Aurelius Value

published a report and released a video documenting systemic patient abuse and neglect at dozens of Acadia facilities caused primarily by understaffing. (Doc. No. 39 ¶¶ 9, 185). The report included an analysis of Centers for Medicare and Medicaid Services inspection reports from 2013 to 2018 for 31 of the 40 acute inpatient U.S. hospitals listed on Acadia's website. (Doc. No. 39 ¶ 10). The analysis found that federal inspectors uncovered staffing deficiencies at over 90% of these 31 Acadia hospitals, including repeated violations for insufficient nurses or qualified practitioners on hand. (Doc. No. 39 ¶ 10). Of these 28 hospitals with staffing deficiencies, 89% of those facilities were also cited by inspectors for patient care and safety deficiencies. (Doc. No. 39 ¶ 10). Following this news, Acadia's stock price declined by more than 11%. (Doc. No. 39 ¶¶ 10, 189).

Finally, on November 16, 2018, *Seeking Alpha* published an article entitled, "Acadia Healthcare: Very Scary Findings From A 14-Month Investigation," which revealed that the Company's rapid growth, as well as its revenue and margin increases, were attributed to cost-cutting and "reducing the quality of care." (Doc. No. 39 ¶¶ 11, 190). The article highlighted severe problems at seven of Acadia's facilities (facilities that were also featured in the October 2018 Aurelius Value report) and reported that, "due to the number of suicides at some of their facilities, Acadia's ability to accept certain patients has been restricted by state-level governments." (Doc. No. 39 ¶¶ 11, 190). On this news, Acadia's stock price declined by 26%. (Doc. No. 39 ¶¶ 11, 192).

## II. STANDARDS OF REVIEW

### A. Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6), permits dismissal of a complaint for failure to state a claim upon which relief can be granted. For purposes of a motion to dismiss, a court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Id*. at 678. A claim has facial plausibility when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. In reviewing a motion to dismiss, the Court construes the complaint in the light most favorable to the plaintiff, accepts its allegations as true, and draws all reasonable inferences in favor of the plaintiff. *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). Thus, dismissal is

appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Children's Servs.*, 679 F.3d 425, 429 (6th Cir. 2012).

### B. Securities Fraud Pleading Standards

Plaintiffs' securities-fraud claims implicate the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018). Accordingly, their complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (citations and internal quotation marks omitted).

The Private Securities Litigation Reform Act (PSLRA) imposes two additional pleading requirements. *See id*. (citing 15 U.S.C. § 78u-4(b)(1), (b)(2)). "Plaintiffs' complaint must specify each statement alleged to have been misleading along with the reason or reasons why the statement is misleading and state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. (citations and internal quotation marks omitted).

## III. ANALYSIS

To state a securities fraud claim under Section 10(b) of the Exchange Act and SEC Rule 10b–5(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) (quoting *Matrixx*, 563 U.S. at 37–38) (internal quotation marks omitted). Even with the heightened pleading standards applicable to a securities fraud case under Section 10(b), for purposes of ruling on a motion to dismiss for failure to state a claim, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in plaintiff's favor. *See Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 908 n. 6 (M.D. Tenn. 2019). Through their pending motion to dismiss, Defendants challenge the sufficiency of the Complaint's allegations as to the first and second elements.[1]

### A. Element One: Material Misrepresentation or Omission

**\*3**   "Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014).

Defendants argue that the Complaint fails to allege an actionable misstatement or omission because (1) the challenged forward-looking statements fall within the PSLRA's Safe Harbor, (2) the challenged "quality care" statements were not misleading or material, and (3) the challenged statement regarding substantial compliance with laws and regulations was not misleading.

1. Safe Harbor

"The PSLRA contains a safe-harbor provision for a forward-looking statement whereby a defendant is liable for such statements only if they were material; if the defendant had actual knowledge that the statements were false or misleading; and if the defendant did not identify the statements as forward-looking or insulate them with meaningful cautionary language." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 910 (M.D. Tenn. 2019) (citations and internal quotations omitted). "[F]or 'forward-looking statements' that are accompanied by meaningful cautionary language, the...the safe harbor provided for in the PSLRA makes the state of mind irrelevant." *Id*. (quoting *Miller v. Champion Enterprises Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (citing 15 U.S.C. § 78u–5(c)(1)(A)). "A company that chooses to speak, therefore, is protected against failed projections provided it identifies 'important factors that could cause actual results to differ materially from those in the forward-looking statements.' " *Id*. at 911 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir. 2001) (quoting 15 U.S.C. § 78u–5(c)(1)(A)(i)). Through their pending motion, Defendants argue that the challenged statements fall within the safe-harbor because they are forward-looking, were identified as such, and were accompanied by sufficient cautionary language.(Doc. No. 41 at 12-16).

Under the PSLRA, a "forward-looking statement" is defined as: "(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; [and] (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)[.]" 15 U.S.C. § 78u–5(i)(1).

The challenged statements at issue speak of earnings guidance, plans and objectives of management for future operations, and statements of future economic performance or are statements of assumptions underlying or relating to plans for future operations or future projections. (*See* Doc. No. 41 at 12-16 and Doc. No. 41-1 (citing Doc. No. 39 ¶¶ 121, 159, 160, 162, 163, 164, 165, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177)). The Court finds that these statements fall squarely within the PSLRA's definition of forward-looking statements. *See* 15 U.S.C. § 78u–5(i)(1); *see, e.g.*, *Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-CV-02475, 2019 WL 1450546, at \*7 (M.D. Tenn. Mar. 29, 2019) (citing *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 243 (6th Cir. 2015) (concluding that Tempur-Pedic's projection of between $1.60 and $1.65 billion in net sales and between $3.80 and $3.95 in earnings per diluted share were squarely within the PSLRA's definition of forward-looking statements); *Miller*, 346 F.3d at 677 (holding that statements speaking of earnings estimates and enhancement projections or objectives are "classically forward-looking")).

**\*4**   Defendants assert that the cautionary language in Acadia's 2015 Form 10-K, filed on February 25, 2016, was "undoubtedly meaningful" because it disclosed the exact risk Plaintiffs allege occurred – weakened patient admissions and increased agency labor costs. (Doc. No. 50 at 7). However, that cautionary language is only meaningful to the extent that such increases in labor costs and declines in patient volume had not already occurred at the time the respective challenged forward-looking statements accompanying the cautionary language were made.[2] As previously recognized by this Court, "[i]f a company were to warn of the potential deterioration of one line of business, when in fact it was established that that line of business had already deteriorated, then ...its cautionary language would be inadequate to meet the safe harbor standard. By analogy, the safe harbor would not protect from liability a person 'who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.' " *Weiner*, 365 F. Supp. 3d at 911

(quoting *In re Harmon Int'l Indus. Inc. Sec. Litig.*, 791 F.3d 90, 102-03 (D.C. Cir. 2015)).

In the present case, the meaningfulness of the cautionary statements in Acadia's Form 10-K cannot be determined without a determination of the facts – i.e. whether Acadia's U.K. Facilities were already facing increased labor costs and declines in patient volume at the time the respective challenged forward-looking statements were made. *See, e.g.*, *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-CV-01112, 2019 WL 6168254, at *16 (M.D. Tenn. Nov. 19, 2019). Accordingly, the Court is unable to determine whether the challenged forward-looking statements were accompanied by sufficient cautionary statements in ruling on the pending motion to dismiss.

2. Falsity

"The PSLRA mandates that," in order to survive a motion to dismiss, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting 15 U.S.C. § 78u–4(b)(1)); *see, e.g., In re Omnicare*, 769 F.3d at 480 n. 6 ("KBC does not need to recite in the Complaint the specific results of the audits, including the percentage of Omnicare claims audited or the non-compliance rate. Under the PSLRA, it is enough to identify the misrepresentations (the Form 10–K statements) and explain how they are false or misleading (they conflict with the results of the audits, which show billing irregularities).").

"[A] company has a duty to disclose hard information but not soft information unless other criteria are met." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019) (quoting *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008)). "Hard information is typically historical information or other factual information that is objectively verifiable. Such information is to be contrasted with 'soft' information, which includes predications and matters of opinion." *Id*. (quoting *Zaluski*, 527 F.3d at 572). With regard to soft information, "a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." *Id*. (quoting *In re Ford*, 381 F.3d at 569); *see also City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 675 (6th Cir. 2005) ("the protections for soft information end where speech begins.") (internal citation omitted). "Thus, once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to

that issue so as to make its disclosure misleading." *Weiner*, 365 F. Supp. 3d at 913 (citation and internal quotations omitted).

*i. "Quality Care" Statements*

According to Defendants, the Complaint alleges that Defendants' statements regarding the quality of Acadia's care services and adequacy of staffing at Acadia's facilities were misleading because Defendants failed to disclose that Acadia was understaffing facilities and had patient incidents. (Doc. No. 41 at 18). Defendants assert that these challenged quality care statements, (*see* Doc. No. 41-4 (citing Doc. No. 39 ¶¶ 112, 113, 115-120, 122-126, 131, 132, 134-140, 144-146, 160, 166)), are not actionable because Acadia disclosed its employee numbers, staffing costs, and that it had patient incidents. (Doc. No. 41 at 18-19; Doc. No. 50 at 3, 8).

**\*5** However, the Complaint does not allege that Defendants' statements about Acadia's facilities being adequately staffed and providing "high-quality services" were misleading because Defendants failed to disclose its employee numbers, staffing costs, and that it had patient incidents. Rather, it alleges these statements were misleading because Acadia did not provide high quality care services and achieved growth by inadequately staffing facilities and slashing costs, which led to widespread violence, sexual assault, and counter-therapeutic policies and practices in its facilities. (Doc. No. 39 ¶¶ 129, 148).

Additionally, Plaintiffs note that the total employee figures Acadia disclosed during the Class Period say nothing about the number of nurses, psychiatrists or medical technicians at each facility, the number of patients at each facility, staff-to-patient ratios or any other metric that would enable investors to determine whether Acadia's facilities were appropriately staffed. (Doc. No. 47 at 16). Plaintiffs assert that this information could not be reached from the reported total employee number given Defendants repeated statements that much of the necessary facility staff were not employed by Acadia and worked in their facilities as independent contractors or medical staff members. (Doc. No. 47 at 16 n. 5). Plaintiffs also assert that Defendants' statements about having some patient incidents did not come close to revealing or disclosing the systemic staffing and widespread past and ongoing patient issues alleged. (Doc. No. 47 at 17). The Court finds that the Complaint sufficiently alleges that "quality care" statements were false or misleading.

*ii. Statements about substantial regulatory compliance*

The Complaint alleges that Defendants' statement in its Forms 10-K that "[m]anagement believes we are in substantial compliance with all applicable laws and regulations" was misleading because "Acadia's facilities were in regular violation of CMS and state regulations regarding patient-to-staff ratios and other measures of patient safety or care." (Doc. No. 39 ¶ 149; *see also id*. ¶¶ 157, 185-186). Defendants argue that their alleged knowledge of regulatory violations at some of Acadia's facilities does not render their statement about Acadia's substantial regulatory compliance false or misleading because a reasonable investor would not infer from their statement that Acadia fully complied with every regulation or requirement. (Doc. No. 41 at 21 (citing *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 635 (S.D. Texas 2018)).

In Response, Plaintiffs point out that the Complaint alleges that these violations did not just occur at some of Acadia's facilities but were chronic and pervasive throughout Acadia's acute inpatient facilities, which accounted for 40%-43% of Acadia's U.S. revenue throughout the Class Period. (Doc. No. 47 at 18 (citing Doc. No. 39 ¶¶ 185-186)). Additionally, Plaintiffs argue these alleged violations conflict with what reasonable investors expected based on Defendants' substantial compliance statements in Acadia's SEC filings. *Id*. (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("Investors do not, and are right not to, expect opinions contained in those statements to reflect baseless, off-the-cuff judgments, of the kind that an individual might communicate in daily life.")). The Court finds that the Complaint sufficiently alleges that Defendants' statement about substantial regulatory compliance was false or misleading.[3]

### 3. Materiality

**\*6** The Supreme Court has endorsed "a fact-intensive test" of materiality in securities fraud cases that is dependent "on the significance the reasonable investor would place on the withheld or misrepresented information." *See City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 555 (6th Cir. 2001) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988))). Accordingly, "the materiality inquiry requires the court to place itself in the shoes of a reasonable investor deciding whether to buy, sell, or retain the company's stock." *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at \*16 (M.D. Tenn. Dec. 18, 2017); *see, e.g., Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) ("Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available.") (citation omitted). Additionally, context must inform determinations of materiality. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472, 478 (6th Cir. 2014) ("as we have said and the Supreme Court has made clear, context matters when analyzing materiality") (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)). The question of whether alleged misrepresentations or omissions are material is a mixed question of law and fact. *See Helwig*, 251 F.3d at 563 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *see id*. (noting that "[c]ourts generally reserve such questions for the trier of fact.").

In the present case, Defendants appear to contend that their statements regarding the quality of the care services provided at Acadia facilities are inactionable puffery because the word "quality" is too vague to communicate anything important. (*See* Doc. No. 41 at 17 ("Indeed, as the Sixth Circuit held, 'statements describing a product in terms of "quality" or "best"...are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.' ") (quoting *Bridgestone*, 399 F.3d at 671); *see also* Doc. No. 50 at 8).

Defendants are correct that "[a] company's general boasts of quality are typically insufficient to establish liability under Section 10(b), because such statements usually 'lack[ ] a standard against which a reasonable investor could expect them to be pegged.' " *Grae*, 2017 WL 6442145, at \*14 (quoting *Bridgestone*, 399 F.3d at 671). However, "[t]he Sixth Circuit has made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism." *Id*. (citing *Bridgestone*, 399 F.3d at 671-72). "The key is whether the proposition at issue can be proven or disproven using standard tools of evidence. Thus, … vague statements not subject to verification by proof are generally deemed non-actionable puffery. But 'opinion or puffery...in particular contexts when it is both factual and material...may be actionable.' " *Bridgestone*, 399 F.3d at 674 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)) (emphasis omitted). As Plaintiffs point

out, Defendants' statements regarding staffing levels and the quality of care at Acadia's facilities are both capable of objective measurement and verification using standard tools of evidence. (*See* Doc. No. 47 at 15 (citing Doc. No. 39 ¶¶ 52-53, 187, 217)).

Viewing the Complaint in the light most favorable to Plaintiffs, the Court finds that a reasonable juror could conclude that Defendants' statements regarding staffing levels and the quality of care at Acadia's facilities were material misrepresentations.

### B. Element Two: Scienter

"To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). "In the securities-fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (internal quotations and citation omitted). "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.' " *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). "Recklessness is not negligence, but more 'akin to conscious disregard.' " *Id*. (quoting *PR Diamonds, Inc.*, 364 F.3d at 681).

 **\*7** "Under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Matrixx*, 563 U.S. at 48 (quoting 15 U.S.C.A. § 78u–4(b)(2)(A)).[4] "This standard requires courts to take into account 'plausible opposing inferences.' " *Id*. (quoting *Tellabs*, 551 U.S. at 323). "A complaint adequately pleads scienter under the PSLRA 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.' " *Id*. (quoting *Tellabs*, 551 U.S. at 324). The inquiry "[is] not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.*, 551 U.S. at 322-23. ("The

strength of an inference cannot be decided in a vacuum."). Rather, *"*[i]n making this determination, the court must review 'all the allegations holistically.' " *Matrixx*, 563 U.S. at 48 (quoting *Tellabs*, 551 U.S. at 326).

Through their motion to dismiss, Defendants appear to argue that an inference of their innocence is stronger than the competing inference of scienter. (*See* Doc. No. 41 at 22-30).[5] In Response, Plaintiffs argue that a compelling inference of actual knowledge or recklessness disregard of the alleged scheme and the falsity of Defendants' misrepresentations can be derived from the allegations that: Defendants had intimate knowledge of patient admissions, staffing levels, and quality control issues and monitored those metrics on a daily basis; before the misconduct was revealed the Individual Defendants and one of Acadia's founders unloaded more than $600 million in Acadia stock while its price was inflated by fraud; Defendants installed compensation structures designed solely to reward short-term profit at the expense of patient care; and shortly after Defendants' fraud was revealed, Acadia's CEO and President were abruptly fired or resigned with no notice under highly unusual circumstances. (Doc. No. 47 at 22-31).

When the factual allegations are considered collectively, the Court finds that there is an inference that Defendants acted with actual knowledge or reckless disregard for the misleading nature of their statements that is at least as compelling as the innocence inference advanced by Defendants. *See, e.g.*, *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at \*20-21 (M.D. Tenn. Dec. 18, 2017).

### IV. CONCLUSION

 **\*8** For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 40) will be denied.[6] An appropriate order will enter.

WILLIAM L. CAMPBELL, JR.

UNITED STATES DISTRICT JUDGE

**All Citations**

Slip Copy, 2021 WL 195370

Footnotes

1    In their Reply, Defendants raised new arguments challenging the sufficiency of Plaintiffs' scheme liability allegations. (*See* Doc. No. 50 at 2-3). Defendants did not raise or articulate any arguments specific to the scheme liability allegations in their opening brief, (*see* Doc. No. 41), and the Court declines to consider the arguments raised for the first time in their Reply in ruling on the pending motion to dismiss.

2    Defendants have not identified specific cautionary statements that accompanied the challenged forward-looking statements in paragraphs 121, 165, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177 of the Complaint.

3    Defendants also argue that this statement about substantial regulatory compliance is not actionable because the Complaint does not allege facts demonstrating that Defendants had actual knowledge of its falsity. (Doc. No. 41 at 8, 20-22 (citing *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 471 (6th Cir. 2014) (the Complaint must "allege particular facts demonstrating that defendants had actual knowledge that their statements concerning soft information were false or misleading at the time that they were made.")). Defendants are correct that "[w]hen an alleged misrepresentation concerns 'soft information,' which 'includes predictions and matters of opinion,' a plaintiff must additionally plead facts showing that the statement was 'made with knowledge of its falsity.' " *In re Omnicare,* 769 F.3d at 470 (internal citations omitted). However, the Sixth Circuit has adopted the approach of analyzing this component as part of the scienter analysis. *See id.* at 470-71 (noting that "whether someone made a statement with the knowledge that it was false is, at bottom, a question of someone's state of mind—the general subject of a scienter inquiry.").

4    The Sixth Circuit has enumerated a "non-exhaustive list of factors that do not necessarily establish scienter, but are 'usually relevant' to its analysis," which includes allegations of:

     (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

     *Frank*, 646 F.3d at 959 n. 2 (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)).

5    Notwithstanding the Supreme Court's instruction that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," *Tellabs*, 551 U.S. at 326, Defendants challenge the sufficiency of Plaintiffs' scienter allegations by advancing arguments against factual allegations in isolation. (*See* Doc. No. 41 at 22-30).

6    Because Defendants seek dismissal of the Section 20(a) claims for secondary liability against the individual Defendants solely on the grounds that the Complaint fails to adequately allege a Section 10(b) violation, (*see* Doc. No. 41 at 30), the Section 20(a) claims likewise will not be dismissed.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.