2021 WL 1167578
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

PHILLIP R. CRUTCHFIELD, Individually and on Behalf of All Others Similarly Situated
v.
MATCH GROUP, INC., AMANDA W. GINSBERG, and GARY SWIDLER

CIVIL ACTION NO. 3:19-CV-2356-S
|
Filed 03/26/2021

**MEMORANDUM OPINION AND ORDER**

KAREN GREN SCHOLER UNITED STATES DISTRICT JUDGE

**\*1** This Memorandum Opinion and Order addresses Defendants' Motion to Dismiss ("Motion to Dismiss") [ECF No. 38].[1] For the following reasons, the Court **GRANTS** the Motion.

**I. FACTUAL BACKGROUND**

This is a putative securities class action brought by co-lead Plaintiffs Phillip Crutchfield and Samir Ali Cherif Benouis ("Plaintiffs") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, against Defendants Match Group, Inc. ("Match"), Amanda Ginsberg ("Ginsberg"), and Gary Swidler ("Swidler"). The putative class consists of all persons and entities who purchased or otherwise acquired common stock of Match between November 6, 2018, and January 31, 2020 ("Relevant Time Period"). *See* ECF No. 37, Amended Class Action Complaint ("Amended Complaint" or "CAC") ¶1.

Match is a publicly traded company that operates various dating and matchmaking websites, including Match.com, Tinder, PlentyofFish, Meetic, and Pairs, among others. *Id.* ¶¶ 2, 14. During the Relevant Time Period, Swidler was Match's Chief Financial Officer ("CFO"), and Ginsberg was Match's Chief Executive Officer ("CEO"). *Id.* ¶¶ 15-16. Match's revenue is primarily derived from registered members who subscribe to a recurring "premium" or "paid" membership. *Id.* ¶¶ 2, 34. Members not subscribed to a premium membership can still use Match's basic functionalities for free. *See id.* ¶ 31. In addition to using typical reporting metrics like revenues and earnings, Match tracks its performance by evaluating the conversion rate from unpaid to paid memberships, "paid member count" ("PMC"), that is, the number of members on premium or paid membership accounts, and "average revenue per user." *Id.* ¶¶ 2, 47. Match's public filings and statements also routinely refer to "Subscribers," who are "users who purchase a subscription to one of [Match's] products," and "Average Revenue per Subscriber" ("ARPU"), which is "Direct Revenue from Subscribers in the relevant measurement period ... divided by the Average Subscribers in such period ... further divided by the number of calendar days in such period," as pertinent operating metric terms. ECF No. 39, Appendix of Exhibits in Support of Defendants' Motion to Dismiss ("Defs.' App.") 38, 163, 323, 460, 493, 525, 576, 617, 665, 699, 747. One of Match's key goals was to convert unpaid members into paid members. CAC ¶ 34.

According to the 170-page Amended Complaint, Match's revenue growth during the Relevant Time Period was driven, at least in part, by widespread fraudulent accounts consisting of scammers and "bots" (autonomous programs that can interact with systems or users).[2] *Id.* ¶ 36. Such fraud was "widespread knowledge" at Match, and Ginsberg and Swidler—as senior leaders—allegedly knew the statistics on the number of fraudulent accounts and had detailed discussions about Match's fraud problem with the Product Division or developers. *Id.* ¶¶ 39, 50. Match's fraud problem was also discussed during company-wide meetings. *Id.* While Match had a Fraud Department to flag and remove scammers, the Amended Complaint alleges that the department was insufficient, as it was comprised of only eight members who worked around the clock to review the hundreds of accounts flagged per day.[3] *Id.* ¶ 42. At Match.com, customer service representatives were also responsible for detecting fraudulent accounts that had slipped through Match's automatic flagging process. *Id.* ¶ 43.

**\*2** Plaintiffs allege that these review measures were

inadequate. *See id.* ¶ 44. One confidential witness—a Match.com senior finance manager—reported that "15% of all Match.com membership registrations were fraudulent." *Id.* A confidential witness at Tinder similarly stated that approximately 20% of Tinder's accounts were bots and/or fraudulent, and that Tinder did not adjust its membership numbers in financial reports to account for these fraudulent accounts. *Id.* ¶ 45. According to that witness, there was also "no doubt" that some fraudulent account holders paid to have premium Tinder account features to further advance their fraudulent activities. *Id.*

Defendants allegedly knew of these fraudulent users but failed to take necessary actions to address the problem, preferring instead to focus on the revenue-producing metrics. *Id.* ¶ 46. In support of this contention, Plaintiffs assert that Ginsberg and Swidler participated in monthly 30-minute presentations and received a monthly report that summarized Match brands' financial performance and forecasts using data that "did not adjust out the fraudulent accounts."[4] *Id.* Plaintiffs further allege that rather than striving to achieve accurate forecasts to identify and reduce fraudulent account activity, Ginsberg and Swidler were more focused on tracking revenue-generating data, such as each brand's PMC or ARPU. *Id.* ¶¶ 47-48. And to ensure that Match met previous forecasts, and to make it appear as if its membership was steadily growing on its earnings reports, Match purportedly employed various "gimmicks" to increase closing numbers, such as offering heavy discounts near the end of a quarter or year to increase PMC, upselling packages, reducing payment rates, and adjusting refund policies to maximize paid membership retention.[5] *Id.* The Amended Complaint claims that both Ginsberg and Swidler were well aware of these efforts. *Id.* ¶ 48. Another alleged strategy to increase paid subscriptions was to notify non-paying users that other members had "liked" them or sent them messages—even if those members were later discovered to be fraudulent—to entice the non-paying users to upgrade their memberships, which would enable them to view the "likes" and read the messages. *Id.* ¶¶ 66-69 (detailing Match.com's supposed marketing strategy).

The Amended Complaint also contends that the effect of fraudulent activities on Match's financial data was a "point of frustration" for Match and, particularly, for Ginsberg and Swidler. *Id.* ¶¶ 49, 91. Specifically, Plaintiffs assert that as PlentyofFish's employees weeded out fraudulent accounts, its PMC and ARPU numbers would also decrease—which led to PlentyofFish consistently lowering its previously forecasted financial numbers. *Id.* According to the Amended Complaint, Match only paid attention to its fraud problem when it

created a variance on forecasted PMC or ARPU figures. *See id.* ¶¶ 49, 54, 65.

**\*3** These fraudulent accounts were also relevant to an investigation and lawsuit by the Federal Trade Commission ("FTC"). In March 2017, the FTC requested information and documents from Match in connection with a civil investigation into Match.corn's business practices. *Id.* ¶ 153. Several months later, in November 2018, the FTC offered to settle potential claims regarding Match.com's marketing, chargeback, and online cancellation practices via a consent judgment, requiring certain changes in Match.com's business practices, and a $60 million payment. *Id.* Match and the FTC discussed this settlement proposal but did not reach a resolution. *Id.* On August 7, 2019, the FTC voted to bring claims against Match and referred the case to the U.S. Department of Justice ("DOJ"). *Id.* On September 25, 2019, Match reported that the DOJ opted not to pursue a civil case and referred the matter back to the FTC, which then filed a lawsuit against Match. *Id.* The lawsuit alleged that Match.com, among other things, "us[ed] artificial love interest ads to deceive customers into buying or upgrading subscriptions, fail[ed] to resolve disputed charges, and intentionally ma[de] it difficult to cancel subscriptions." *Id.* ¶ 165.

### A. *Alleged Misrepresentations*

Against this factual backdrop, Plaintiffs allege that Match defrauded investors. Specifically, Plaintiffs assert that Match made material misstatements and/or omissions, regarding: (1) the integrity of Match's membership base; (2) financial results reported in public filings; (3) certifications that Match had adequate internal controls; and (4) the FTC's investigation and lawsuit. *See id.* ¶ 88. Plaintiffs refer to these four categories of alleged misstatements respectively as: (1) Membership Integrity Fraud; (2) Reported Results Fraud; (3) Internal Controls Fraud; and (4) FTC Investigation Fraud. *Id.*

### (1) *Integrity of Match's Membership Base*

According to the Amended Complaint, Defendants made materially false and misleading misrepresentations regarding the integrity and quality of Match's membership in various public statements and filings. *See id.* ¶ 89. They are as follows:

• On November 6, 2018, Match issued a press release announcing its Q3 2018 financials, in which Ginsberg stated that Match "delivered another quarter of strong top and bottom line growth" and highlighted Match's "8.1 million" Average Subscribers, 29% growth in Total Revenue, and 6% ARPU growth from the last year. *See id.* ¶ 90.

• On November 7, 2018, Match held a conference call to discuss Q3 2018 financials, during which Defendants reiterated that "average subscribers reached nearly 8.1 million in Q3, up 23% year-over-year" and "subscriber and [ARPU] growth led to total revenue of $444 million for the quarter." Defendants also remarked on Match's growth in earnings before interest, tax, depreciation, and amortization ("EBITDA") and expressed "optimis[m]" that its "enhancements to the customer experience" would lead to "improved organic registrations." *Id.* ¶¶ 92-93.

• On February 6, 2019, Match issued a press release announcing Q4 2018 and full-year 2018 financial results, representing that Match's "Total Revenue grew 21% over the prior year quarter," driven by growth in Match's number of "Average Subscriber[s]" and ARPU. The press release also stated that "Average Subscribers increased to 8.2 million." *Id.* ¶ 95.

• On February 6, 2019, *Yahoo! Finance* published an article titled "Match Beats Estimates as Tinder's Growth is Fueled by International Users," in which Ginsberg stated that 2018 marked "the best year in our history for shareholders." *Id.* ¶ 97.

• On February 7, 2019, Match held a conference call to discuss Q4 2018 and full-year 2018 financial results, during which Defendants restated that "average subscribers reached over 8.2 million" and attributed Match's "total revenue growth of 21%" to the "17% subscriber and 4% ARPU growth." Defendants also stated that "over the past 3 years, [Match has] grown total revenue at a 21% annual rate, with 2018 total revenue exceeding $1.7 billion." *Id.* ¶ 99.

• On February 7, 2019, Match held a conference call to discuss Q4 2018 financial results, during which Defendants forecasted that "Match and Meetic continue to evolve their product, and we think that those brands will see growth again heading into next year as they resonate with serious-minded daters in their 30s and 40s." *Id.* ¶ 101.

*4 • On May 7, 2019, Match issued a press release announcing Q1 2019 financials, in which Match stated that "Total Revenue grew 14% over the prior year quarter," "Average Subscribers increased 16% to 8.6 million ... in the prior year quarter," and, "excluding foreign exchange effects, ARPU ... increase[d] 4% over the prior year quarter." *Id.* ¶ 105.

• On May 8, 2019, Ginsberg appeared on CNBC's "Squawk Alley" and stated that "Tinder did drive a ton of growth this quarter. And we hit actually a big milestone, at the end of the quarter we had five million subscribers." *Id.* ¶ 103.

• On May 8, 2019, Match held a conference call to discuss Q1 2019 financial results, during which Defendants restated that "average subscribers across [Match's] brands reached over 8.6 million in Q1." Defendants also reported stability in Match's ARPU and growth in direct revenue from North America and international markets. *Id.* ¶ 107.

• On August 6, 2019, Match issued a press release announcing Q2 2019 financials, in which Match noted growth in Total Revenue by "18% over the prior year quarter" and that "Average Subscribers increased ... to 9.1 million." *Id.* ¶ 109.

• On August 7, 2019, Match held a conference call to discuss Q2 2019 financial results, during which Defendants reiterated that "average subscribers across the company's brands reached over 9 million in Q2" and that Match reached "$498 million of total revenue for the quarter," driven by growth in subscribers and ARPU. Defendants also stated that for "the first time in [Match's] history, the number of international subscribers exceeded North American subscribers." *Id.* ¶ 111.

• On August 7, 2019, Match held a conference call to discuss Q2 2019 financials, during which Defendants expressed that Match has "made a lot of progress over the last couple of quarters, satisfactory rates are up, conversions up, [Match is] feeling really optimistic." *Id.* ¶ 113.

• On August 9, 2019, *Yahoo! Finance* published an article titled "Match Group Growth Accelerates," in which Ginsberg is quoted as saying that Match's "growth accelerated and our momentum enabled us to increase our full-year outlook while investing in the future." *Id.* ¶ 115.

• On September 10, 2019, at the Deutsche Bank 2019

Technology Conference in Las Vegas, Nevada, Swidler stated that subscriber growth for Match's brands in Canada "has basically stayed on trend from the Facebook launch of dating back in November of '18 to today. You don't see any interruption or effect on subscriber growth in Canada from the Facebook launch." Regarding other international markets, Match remarked that there was "acceleration of Tinder subscriber growth" during that same period. Swidler added that Match does not "[s]ee any deceleration of Tinder as a result of Facebook" and that Tinder is "very pleased with growth that [it is] showing on a year per year basis" in other countries, "even with Facebook dating in the market." Swidler then forecasted that Match is "on track ... to do what [it] thought this year." *Id.* ¶¶ 117-18.

• On November 5, 2019, Match issued a press release announcing its Q3 2019 financial results, stating that "Average Subscribers increased ... to 9.6 million" and "Total Revenue grew 22% over the prior year quarter." *Id.* ¶ 120.

• On November 6, 2019, Match held a conference call to discuss Q3 2019 financials, during which Defendants stated that Match "had another terrific quarter in Q3 with accelerated growth on top and bottom line" and "continued excellent performance at Tinder and improvement in non-Tinder subscriber trends." *Id.* ¶ 122.

**\*5** • On November 6, 2019, Match held a conference call to discuss its Q3 2019 financials, where Defendants stated that "year-over-year growth in average subscribers across [Match's] brands accelerated in Q3, with overall average subscriber growth of 19%," as compared with a year ago. Defendants stated that "[i]nternational subscriber growth was particularly strong, driven primarily by Tinder and Pairs," but that other "new bets" are contributing to subscriber growth as well, "giv[ing Match] confidence that [it] will have modest non-Tinder year-over-year subscriber growth in Q4." Defendants also remarked that the number of average subscribers is "just over 9.6 million" and overall company ARPU increased year-over-year. *Id.* ¶ 124.

• On December 2, 2019, *ProPublica* published an article titled, "Tinder Lets Known Sex Offenders Use the App. It's Not the Only One," in which an unidentified Match spokesperson told *Columbia Journalism Investigations* that Match could not implement a uniform screening protocol for sex offenders because Match does not collect enough

information from free users and "some paid subscribers." The spokesperson added that "[t]here are definitely registered sex offenders on [Match's] free products." The article also quotes Ginsberg as saying, "If there's bad behavior on one app," Match "can identify that user, [and] we'll kick him off all the apps." *Id.* ¶¶ 126-28.

Plaintiffs contend that each of the above statements was materially false and misleading for one or more of the following reasons:

• A "significant" percentage of accounts on Match's website brands were fraudulent, and Match's forecasts and operations reports generally did not adjust to exclude fraudulent accounts. Match also failed to disclose to investors that some paid subscribers were fraudulent users, fraudulent activity generated some of Match's marketing emails, and Match had inadequate staffing and resources to combat fraud.

• Match focused more on financial metrics, including revenues, EBIDTA, PMC, and ARPU, and increasing membership base, than on protecting users from fraudulent or otherwise dangerous account holders. Match only addressed fraud if it affected the forecasted PMC or ARPU numbers for its brands.

• Match's increase in users stemmed from deceptive marketing practices that "piggy-backed" on the existence of fraudulent accounts. Such conduct included Match using communications from fraudulent account holders to generate deceptive marketing emails to entice non-paying users to subscribe to access the purported communications from other account holders. And once subscribed, the member would face "deceptive guarantees" and "convoluted billing practices" preventing the member from cancelling his or her account.

• Match.com, specifically, employed deceptive and unfair practices to induce customers to subscribe and keep them subscribed.

• Match failed to disclose that its marketing practices, which were "based on fraudulent accounts," were the basis of an ongoing FTC investigation.

• Match brands generally did not affirmatively screen for sex offenders or other bad actors. And Match's responses to user complaints regarding sex offenders often failed to prevent further harm.

• Match misrepresented that the FTC's investigation regarding Match's marketing practices based on fraudulent accounts "lack[ed] merit," when, in actuality, the conduct was "sufficiently egregious and illegal that the FTC would file a complaint."

*See generally id.* ¶¶ 90-129.

### (2) *Match's Reported Financial Performance*

Plaintiffs also allege that Defendants' public filings and statements reported positive financial results and information that were materially false and misleading. *See id.* ¶ 136. Specifically, Plaintiffs assert that Match's Form 10-Qs and Form 10-K filed during the Relevant Time Period reported financial results and metrics regarding Match's revenues, earnings, PMC, and ARPU, among other financial data, but omitted that Match's financial figures included data from fraudulent accounts, including paid subscriptions, by "scammers, fraudsters, 'bots,' sex offenders, and other dangerous site users." *Id.* The Amended Complaint also alleges that Match failed to disclose the risks associated with fraudulent conduct. *See id.*

### (3) *Match's Internal Controls*

**\*6** The Amended Complaint alleges that Defendants materially misrepresented the quality and status of Match's "internal controls" when Ginsberg and Swidler certified under the Sarbanes-Oxley Act of 2002 ("SOX") that Match's Form 10-Qs and Form 10-K filed during the Relevant Time Period, "d[o] not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made ... not misleading" and do "fairly present in all material respects the financial condition, results of operations [,] and cash flows of [Match]," *Id.* ¶¶ 137-42. Plaintiffs also allege that the SOX certifications were false and misleading by claiming to have

"disclosed ... to [Match's] auditors and the audit committee of [Match's] board of directors ... [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Match's] ability to record, process, summarize[,] and report financial information; and ... [a]ny fraud, whether or not material, that involves management or other employees who have a significant

role in [Match's] internal control over financial reporting."

*Id.* ¶ 138. According to the Amended Complaint, these SOX certifications were false and misleading for the same reasons underlying the above-described Membership Integrity Fraud—i.e., that a significant percentage of Match brand accounts were fraudulent, Match did not adjust its financial reports to exclude or otherwise address these fraudulent accounts, Match focused more on financial metrics than protecting users, Match's user base increase stemmed from deceptive marketing, billing, and cancellation practices that "piggy-backed" on the existence of fraudulent accounts, and Match generally did not affirmatively screen for sex offenders or other bad actors. *Id.* ¶ 143. Regarding Ginsberg and Swidler specifically, the Amended Complaint alleges that they failed to disclose the significant deficiencies or material weaknesses in the design operation of Match's internal controls and "their ongoing fraud" by "refus[ing] to adjust forecasts and reported results to eliminate fraudulent accounts ... [and] willfully turning a blind eye toward" the alleged fraud. *Id.*

### (4) *The FTC's Investigation and Lawsuit*

Last, Defendants allegedly made several materially false and misleading public statements regarding the merits of the FTC investigation and lawsuit. *Id.* ¶ 144. Specifically, the Amended Complaint alleges that the following public statements were false and misleading:

• Match's February 28, 2019 Form 10-K and May 9, 2019 Form 10-Q stating:

Match Group believes that the FTC's legal challenges to Match.com's practices, policies, and procedures are without merit and is prepared to vigorously defend against them.

*Id.* ¶¶ 145, 149.

• Match's August 8, 2019 Form 10-Q stating:

Match Group believes that the FTC's claims regarding Match.com's practices, policies, and procedures are without merit and is prepared to defend vigorously against them.

*Id.* ¶ 151.

• Match's September 25, 2019 press release titled "Match Responds to FTC Lawsuit" stating:

The DOJ opted not to pursue the civil case and referred it back to the FTC who then filed a lawsuit against us today making completely meritless allegations supported by consciously misleading figures.

Fraud isn't good for business. That's why we fight it. We catch and neutralize 85% of potentially improper accounts in the first four hours, typically before they are even active on the site, and 96% of improper accounts within a day.

For nearly 25 years Match.com has been focused on helping people find love and fighting the criminals that try to take advantage of users. We've developed industry leading tools and AI that block 96% of bots and fake accounts from our site within a day and are relentless in our pursuit to rid our site of these malicious accounts.

**\*7** The FTC has misrepresented internal emails and relied on cherry-picked data to make outrageous claims and we intend to vigorously defend ourselves against these claims in court.

*Id.* ¶ 153.

• Match's November 6, 2019 statements during a conference call, where "Defendants" denied the FTC's allegations,[6] calling them "meritless" and stating that Match will "defend [itself] against that vigorously." *Id.* ¶ 155.

• Match's November 7, 2019 Form 10-Q stating:

Match Group believes that the FTC's claims regarding Match.com's practices, policies, and procedures are without merit and will defend vigorously against them.

*Id* ¶ 157.

The Amended Complaint alleges that while Match's February 28, 2019 Form 10-K served as a "partial corrective disclosure," incrementally decreasing Match's stock price, Defendants muted the corrective effects of the disclosure by "falsely reassuri[ng] investors that the FTC investigation [was] meritless," thereby buoying Match's stock price in the face of negative revelations. *Id.* ¶ 148. These alleged false reassurances continued throughout the Relevant Time Period and, according to Plaintiffs, were false and misleading for the same reasons Defendants' statements regarding Match's membership and internal controls were allegedly deceptive. *See id.* ¶¶ 149-58.

**B.** *Partial Corrective Disclosures*

Defendants' various misrepresentations were allegedly incrementally revealed through a series of "partial corrective disclosures" causing Match's stock inflation to "be removed in stages." *Id.* ¶ 159. The first drop occurred after Match filed its 2018 10-K in which Match disclosed the FTC's request for documents and civil investigation. *Id.* The 10-K also disclosed the FTC's November 2018 proposal to settle potential claims regarding Match.com's marketing, chargeback, and online cancellation practices via a consent judgment mandating certain business practice changes and payment of $60 million.[7] *Id.* After Match filed this 10-K, Match's stock price fell $0.40, or 0.72%, from $55.78 on February 27, 2019, to close at $55.38 on February 28, 2019. *Id.* ¶ 161.

On August 8, 2019, Match filed Form 10-Q for Q2 of 2019, in which Match disclosed that on August 7, 2019, the FTC voted to assert claims against Match and referred the matter to the DOJ.[8] *Id.* ¶ 162. Following this disclosure, Match's stock price fell $1.54, or 1.8%, from $87.17 per share on August 8, 2019, to close at $85.63 per share on August 9, 2019. *Id.* ¶ 163. The Amended Complaint alleges that as news of the FTC's action spread to Match's investors, Match's stock price dropped another $2.99, or 3.5%, by the close of the next trading day, August 12, 2019. *Id* ¶ 164.

**\*8** About a month and a half later, on September 25, 2019, the FTC announced in a press release that it had sued Match.com for, among other things, "using artificial love interest ads to deceive customers into buying or upgrading subscriptions, failing to resolve disputed charges, and intentionally making it difficult to cancel subscriptions." *Id.* ¶ 165. As a result of this news, the Amended Complaint alleges Match's share price fell $1.39, approximately 2%, from $72.83 per share on September 24, 2019, to close at $71.44 per share on September 25, 2019. *Id.* ¶ 166.

A day before filing its Form 10-Q regarding Q3 financials, on November 6, 2019, Match allegedly held an earnings call with analysts and investors during which Defendants disclosed that revenues were affected by increased legal costs from several lawsuits and Match expected additional legal costs in Q4 2019, which, in turn, would impact Match's margin for full-year 2019. *Id.* ¶ 167. The Amended Complaint alleges that when this news was disclosed, Match's share price fell $1.73, or 2.5%, from $68.77 per share on November 5, 2019, to $67.04 per share by the close of trading on November 6, 2019, *Id.* ¶ 168.

One month later, on December 2, 2019, *Columbia*

*Journalism Investigations* published an article purportedly revealing that, with the exception of paid subscribers on Match.com, Match does not generally screen for sexual predators. *Id.* ¶ 169. The article also indicated an admission by an unidentified Match spokesperson that there "are definitely registered sex offenders on [Match's] free products" and noted, through interviews of former Match employees, that Match was ill-equipped to handle users' complaints of sexual assault or rape. *Id.* ¶¶ 169-70. After this article was published, Match's share price dropped $2.06, or approximately 3%, from $70.48 on November 29, 2019, to $68.42 by the close of the next trading day, December 2, 2019. *Id.* ¶ 171.

Finally, on January 31, 2020, the House Committee on Oversight and Reform's Subcommittee on Economic and Consumer Policy issued a press release regarding its investigation into reports of underage use of dating applications and inappropriate use of personal data. *Id.* ¶ 172. The press release indicated the Committee's concerns with popular dating apps permitting registered sex offenders to use them, while the paid versions of these same apps screen them out. *See id.* The press release also noted that the Committee had sent Match a letter seeking information on its practices regarding these issues of ineffective screening of users and included a link to such letter in the release. *Id.* ¶ 173. Plaintiffs allege that upon publication of this press release and letter, Match's stock price fell by $2,83, or 3.5%, from $81.05 per share on January 30, 2020, to $78.22 per share at closing on January 31, 2020, *Id.* ¶ 174.

#### C. *Additional Allegations of Scienter*

In addition to asserting Defendants' general knowledge of the alleged fraud, Plaintiffs assert certain circumstantial factors that purportedly evidence Defendants' scienter. *See id.* ¶¶ 37-87, 182-203. Such circumstantial factors include:

• Ginsberg's and Swidler's stock-related gains[910] during the Relevant Time Period, *see id.* ¶¶ 182-85.

• Defendants' failure to disclose a 2016 SEC investigation, *see id.* ¶¶ 186-87.

• The timing of the resignations of former Match CEO Sam Yagan from his position as Vice-Chairman of Match's Board of Directors on September 24, 2019, and Ginsberg from her position as Match CEO and member of Match's Board of Directors,[11] announced on January 31, 2020, and

effective March 1, 2020, *see id.* ¶¶ 188-92.

**\*9** • Match's efforts to raise hundreds of millions of dollars in funds while its stock was trading at prices elevated by the alleged fraud, *see id.* ¶ 193.

• The fraud's alleged implication of the "core operations" of Match because direct revenue from subscribers comprised 98% of Match's total revenue, and the growth and quality of its subscriber base was "Match's lifeline," *id.* ¶¶ 194-95.

• Ginsberg's and Swidler's obligations to familiarize themselves with the alleged fraud before making public statements and signing SOX certifications, *see id.* ¶¶ 196-97.

• Match's internal Code of Business Conduct and Ethics, which requires "full" and "accurate" disclosure "in all reports and documents filed with or submitted to the [SEC] and in all other public communications made by [Match]," and for Match's officers and employees to be "honest" and "straightforward" in their business dealings, *id.* ¶¶ 198-203.

#### D. *Causes of Action Alleged*

Based on the foregoing allegations, Plaintiffs assert two claims. Count I alleges that Defendants violated Section 10(b) of the Exchange Act and Rule **10b**-**5** promulgated thereunder. Count II alleges that Ginsberg and Swidler violated Section 20(a) of the Exchange Act. Defendants move to dismiss all claims.

### II. LEGAL STANDARDS

#### A. *Rule 12(b)(6) Standard*

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The Court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the Court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

**\*10** In ruling on a Rule 12(b)(6) motion, the Court limits its review to the face of the pleadings. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). However, the Court may also consider documents outside of the pleadings if they fall within certain limited categories. First, a "court is permitted ... to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). Second, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Third, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (internal citations omitted); *see also, e.g., Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand") (internal citations omitted).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2012). At the motion to dismiss stage, the Court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *See Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

### B. *Rule 9(b) Standard*

Because the Amended Complaint alleges fraud, Plaintiffs must plead the elements of their claims with the heightened particularity required by Rule 9(b). *See, e.g., Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 914 (N.D. Tex. 1998). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)). Put simply, 9(b) requires the "who, what, when, where, and how" of the fraud. *United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

### C. **PSLRA** *Pleading Standard*

Pleadings in federal securities fraud actions must also comply with the strictures imposed by the **PSLRA**. *See* 15 U.S.C. § 78u-4(b). "The **PSLRA** has raised the pleading bar even higher and enhances Rule 9(b)'s particularity requirement for pleading fraud in two ways." *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017) (quoting *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 956 (5th Cir. 2016)). "First, the plaintiff must specify each statement alleged to have been misleading," *Id.* (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u-4(b)(1). "Second, for each act or omission alleged

to be false or misleading, plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." *Neimam*, 854 F.3d at 746 (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 78u-4(b)(2)(A).

## III. ANALYSIS A.

### *Section 10(b) Claim*

**\*11** Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Rule **10b-5** makes it unlawful to, in connection with the sale of a security, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). To state a claim for securities fraud under Section 10(b) and Rule **10b-5**, a complaint must plausibly allege: "(1) a material misrepresentation or omission; (2) scienter (a 'wrongful state of mind'); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a 'causal connection between the material misrepresentation and the loss.' " *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429 (5th Cir. 2019). Flere, the parties dispute the material misstatement or omission, scienter, and loss causation elements.

### (1) *Material Misstatement or Omission*

"A fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 213-14 (5th Cir. 2004) (citation omitted).[12] A misstatement or omission is material if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," *Rosenzweig*, 332 F.3d at 865 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988)). The total mix of information usually "includes information that is and has been in the readily available general public domain and

facts known or reasonably available to the shareholders." *Kapps*, 379 F.3d at 216 (citation omitted). "Materiality is not judged in the abstract, but in light of the surrounding circumstances." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993).

The Fifth Circuit has repeatedly held that generalized positive statements are immaterial. *See Emps.' Ret. Sys. v. Whole Foods Mt., Inc.*, 905 F.3d 892, 901 (5th Cir. 2018) (such statements do not alter "a reasonable investor's assessment of the company's prospects") (citation omitted); *see also id.* (quoting *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) ("Analysts and arbitrageurs rely on facts in determining the value of a security, not mere expressions of optimism from company spokesmen.")); *Rosenzweig*, 332 F.3d at 870 (press release stating defendant-company "was 'making steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws"); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001) ("[I]t is well-established that generalized positive statements about a company's progress are not a basis for liability."). Ultimately, disclosure is required under Section 10(b) and Rule **10b-5**(b) "only when necessary to make ... statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("[I]t bears emphasis that § 10(b) and Rule **10b-5**(b) do not create an affirmative duty to disclose any and all material information.") (internal quotations omitted).

### a. *Statements Regarding Integrity of Match's Membership Base*

**\*12** In support of their Membership Integrity Fraud theory, Plaintiffs assert a series of alleged misstatements by Defendants regarding: (1) Match's financial positions and revenue growth, ARPU, and "subscribers," among other performance metrics, *see, e.g.*, CAC ¶¶ 90, 92-93, 95, 97, 99, 101, 103, 105, 107, 109, 111, 113, 115, 117-18, 120, 122, 124; and (2) Match's current and forecasted operational conditions, *see, e.g., id.* ¶¶ 92-93 (optimism regarding enhancements to customer experience leading to improved organic registrations); *id.* ¶ 101 (Match continuing to evolve its product to resonate better with serious-minded daters in their 30s and 40s); *id.* ¶ 113 (noting increased satisfactory rates and conversions); *id.* ¶ 115 (referencing Match's growth and momentum enabling it to invest in the future); *id.* ¶

117-18 (noting Match is on track to "do what [it] thought this year"); *id.* ¶ 126 (Ginsberg stating that if "there's bad behavior on one app," "we'll kick him off all the apps"). Plaintiffs allege that these statements were false and misleading because Match did not additionally disclose or otherwise caveat that many of Match's users were fraudulent. Plaintiffs also assert that Match focused more on financial metrics and increasing membership than on protecting users from fraudulent and dangerous account holders and that much of Match's growth stemmed from deceptive practices to attract and retain paid subscribers. *See* ECF No. 42 ("Resp.") 14-17 (highlighting allegations from the CAC).

The Court disagrees. These statements regarding Match's financial and operational conditions are not, without more, false or misleading. As an initial matter, Plaintiffs do not allege facts supporting that any of Match's alleged statements regarding its finances were untrue. Instead, Plaintiffs argue that Match's representations were misleading because they omitted certain facts, for example, regarding the accounting of fraudulent users in financial disclosures and Match's marketing and user retention practices. *See id.* But one cannot conclude that, even when viewed in the light most favorable to Plaintiffs, these omitted facts, as described in the Amended Complaint, significantly alter the total mix of information that a reasonable shareholder would require to make an investment decision. *Rosenzweig*, 332 F.3d at 865. Importantly, while Plaintiffs repeatedly assert that, during the Relevant Time Period, a substantial percentage of Match's user accounts were fraudulent, the Amended Complaint does not specifically distinguish between allegedly fraudulent *paying* users, i.e., "Subscribers," whose accounts and payments would directly affect Match's financial reports, and *non-paying* users who merely use Match's free services. *See, e.g*, Resp. 1, 4, 14. Notably, references to "Direct Revenue," "Subscribers," "Average Subscribers," and "ARPU" in Match's financial disclosures explicitly refer to users who have "purchase[d] a subscription" to one of Match's products or otherwise paid "a la carte." *See, e.g*, Defs.' App. 38, 163, 323, 460, 493, 525, 576, 617, 665, 699, 747. Absent particularized allegations differentiating between paying and non-paying users, and the pervasiveness of alleged fraud among those groups respectively, it is unclear what, if any, material effect disclosure of the omitted facts regarding the integrity and quality of Match's membership would have on a reasonable investor reviewing Match's financial performance and Match's commentary regarding the same. *See Rosenzweig*, 332 F.3d at 865; CAC ¶ 89.

As to statements about Match's operations, the Court

finds that Match's comments regarding its optimism for improved organic registrations and other growth do not support Plaintiffs' claim that such alleged misstatements were material. CAC ¶¶ 92-93; *see also Nathenson*, 267 F.3d at 419 (finding statements regarding a product's "improved formulation" were mere "puffing" and constituted "optimistic generalizations" that were "inactionable"). Similarly, Match's remarks that it was "feeling really optimistic" and "on track ... to do what [it] thought this year" given its growth and progress are also in the category of generalized positive characterizations that are not actionable under securities laws. CAC ¶¶ 113, 115, 118; *see also Rosenzweig*, 332 F.3d at 870 (finding statement regarding a company "making steady progress" to be a "generalized positive characterization" unsupportive of a securities action).

**\*13** With respect to Ginsberg's alleged misstatement that "[i]f there's bad behavior on one app," referring to instances of sexual abuse or assault, Match "can identify that user, [and it]'ll kick him off all the apps," CAC ¶¶ 126-28, the Court finds that Plaintiffs have neither sufficiently pleaded a misstatement under Rule 9(b), nor alleged a material misstatement that would significantly alter the total mix of information, especially when considered in light of the surrounding circumstances. *See Rosenzweig*, 332 F.3d at 865; *Krim*, 989 F.2d at 1448. While Plaintiffs assert that Ginsberg issued the alleged statement on December 2, 2019 (the date of the article's publication), the article does not describe when or where Ginsberg made the statement at issue—and Plaintiffs have not clarified otherwise. Resp. 14; *see also* Defs.' App. 263. Adding to the ambiguity of when and where Ginsberg made the alleged misstatement, the article incorporates, in a *separate* section, a *different* quote attributed to Ginsberg from an interview that she conducted sometime "in 2018 with *The Wall Street Journal.*" Defs.' App. 260. Because Plaintiffs have failed to state when and where the alleged misstatement was made, Plaintiffs have failed to meet the requisite heightened pleading standards required by Rule 9(b). *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002) (emphasizing requirements of pleading "who, what, when, where, and how" under Rule 9(b) in the "[Fifth Circuit's] securities fraud jurisprudence and under the **PSLRA**"),

To be sure, even if Plaintiffs had adequately alleged the "when and where" of the alleged misstatement, the result would be no different because the statement would not have significantly altered the total mix of available information, especially considering the surrounding circumstances in which the statement was presented.

*Rosenzweig*, 332 F.3d at 865; *Krim*, 989 F.2d at 1448. In the same article that Ginsberg allegedly made a material misstatement, Match stated explicitly that "[t]here are registered sex offenders on [Match's] free products" and Match lacked a uniform screening protocol for such individuals. CAC ¶ 127. As Plaintiffs have not demonstrated that there is a substantial likelihood that disclosure of additional clarifications or facts would have significantly altered the total mix of information made available, the Court finds that Ginsberg's alleged misstatement is not material.[13] *See Rosenzweig*, 332 F.3d at 865.

#### b. *Statements Regarding Match's Reported Financial Performance*

Regarding Plaintiffs' Reported Results Fraud theory, the Amended Complaint fails to identify any misstatement in Match's Form 10-Qs or Form 10-Ks. Match's alleged misrepresentations under this theory are simply a recitation of Match's financial reports of its performance during certain quarters or periods. For example, Match's November 9, 2018 Form 10-Q describes growth in revenue stemming from an increase in the number "Subscribers," which are *paying users* to Match's products, as opposed to non-paying users. CAC ¶ 131 (emphasis added); *see also* Defs.' App. 38, 163, 323, 460, 493, 525, 576, 617, 665, 699, 747 (defining "Subscribers" as "users who purchase a subscription to one of our products" and "Average Subscribers" as the number of paying users who purchased a subscription to a Match service divided over a period of time). These financial statistics do not pertain to, nor would they have any reason to reflect, in this context, the underlying identities of paying subscribers.

**\*14** And while the Amended Complaint asserts in a conclusory fashion that at least some fraudulent users paid for Match subscriptions, it fails to describe particularly or otherwise specifically allege the extent of such fraud by paying users, how such fraud would affect Match's financial figures, if at all, and the degree to which Defendants knew of fraudulent users with paid subscriptions. *See* CAC ¶ 136. Insofar as Plaintiffs allege that Defendants misleadingly "omitt[ed] disclosure of the underlying misconduct ... specifically[,] the inclusion of illegitimate accounts in Match's reported results," Plaintiffs do not sufficiently explain how disclosure of this omitted fact would have, in the eyes of a reasonable investor, significantly altered the total mix of information available. *Id.; see also Rosenzweig*, 332 F.3d at 865.

To the contrary, Match reported in various public filings before and during the Relevant Time Period that there was and remained a risk of "offensive," "unlawful," or other "[i]nappropriate actions" by Match's users and that Match's "safeguards may not be sufficient to avoid harm" to its brands or business. *See, e.g.*, Defs.' App. 23, 146, 299, 600.

Regarding Plaintiffs' assertions that Defendants' misstatements in Match's Form 10-Qs or Form 10-K violated Item 303 of Regulation S-K, the Fifth Circuit has not addressed whether Item 303 creates a duty to disclose under the Exchange Act. *See Pier 1*, 935 F.3d at 436 (stating that the Fifth Circuit has "never held that Item 303 creates a duty to disclose under the Securities Exchange Act" and declining to address the issue because the case was resolved on other grounds). Other circuit courts are divided on Item 303's force in these contexts. *See id.* (comparing *Slratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015) ("Item 303 imposes the type of duty to speak that can, in appropriate cases, give rise to liability under Section 10(b).") with *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5.")). Although Plaintiffs implore the Court to side with the Second Circuit to find that Defendants had such a duty to disclose under Item 303, the Court finds that it need not decide this issue at this time because the Court resolves Plaintiffs' allegations regarding Match's reported results on other grounds. *See infra* § III(A)(2).

#### c. *Statements Regarding Match's Internal Controls*

Addressing the Amended Complaint's assertion that Ginsberg's and Swidler's SOX certifications regarding internal controls were themselves materially false and misleading, the Court finds that Plaintiffs have not plausibly alleged an actionable misstatement. In addition to generally reasserting their prior factual bases, Plaintiffs also contend that Ginsberg and Swidler failed to disclose deficiencies or weaknesses in the design operation of Match's internal controls to Match's auditors and the audit committee of Match's board of directors. *See* CAC ¶¶ 138, 143(a)-(f). Regarding this contention, however, Plaintiffs do not plead any facts supporting that Ginsberg and Swidler knew of such alleged deficiencies and material weaknesses in the "design or operation of internal control over financial reporting," much less intentionally withheld such information. *Id.* ¶ 138. Absent additional allegations, Plaintiffs' general assertion that

Ginsberg and Swidler knew of, yet failed to disclose, such faults is insufficient to state a claim for securities fraud under the heightened pleading standards. *See id.* ¶ 143.

#### d. *Statements Regarding the FTC's Investigation and Lawsuit*

The Amended Complaint contends that Defendants' statements—regarding the FTC's investigation and lawsuit being "without merit" and that Match would "defend vigorously against them"—were materially false and misleading. CAC ¶¶ 145, 149, 151, 157. In support, Plaintiffs assert that Defendants knew a significant percentage of fraudulent members used its platform, Match did not focus on protecting legitimate users from fraudulent and dangerous users, and Match generally did not screen for sex offenders. *See id.* ¶¶ 153, 155; Resp. 19. While the parties have not cited, and the Court's independent research has not revealed, binding authority on what makes a company's statement regarding a pending government investigation or litigation materially false or misleading, district courts have routinely found that a company-issued statement regarding its belief that a pending lawsuit is unfounded or without merit is an opinion that is generally not actionable as a misstatement of fact. *See, e.g., Hall v. Johnson & Johnson*, Civil Action No. 18-1833 (FLW), 2019 WL 7207491, at \*19 (D.N.J. Dec. 27, 2019) (finding statements pertaining to "the Company['s] belie[f] [that] it has 'substantial defenses' to the Product Liability lawsuits ... clearly constitute opinions regarding the success of the litigation, rather than statements of fact" and rejecting plaintiff's argument that "because Defendants knowingly engaged in a fraudulent scheme to conceal the truth about its ... products, none of the statements regarding the viability of the lawsuits against the Company could have possibly been in good faith") (citations omitted); *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 756-57 (S.D.N.Y. 2018) (finding company's remarks that it "believe[s] the allegations [in a lawsuit] are unfounded and without merit" and that it intends to "pursue [its] rights, remedies and defenses in the litigation" were not actionable opinion statements); *In re SeaChange Int'l, Inc.*, Civil Action No. 02-12116-DPW, 2004 WL 240317, at \*8-9 (D. Mass. Feb. 6, 2004) (finding company's disclosure regarding an ongoing patent infringement suit was "not so incomplete as to mislead investors" where the company stated that it "was contesting [the] claim" and where the disclosure "contained no statements suggesting that [the company] would prevail in the litigation or implying that the impact of the litigation would be positive"). An opinion or prediction may nevertheless be actionable "if there is a gross disparity between prediction and fact," but a plaintiff must plead such gross disparity with particularity. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248, n.13 (5th Cir. 2009) (citation omitted); *see also id.* at 239 ("[T]he **PSLRA** requires a plaintiff to identify each allegedly misleading statement ... and explain why it is misleading, the so-called 'particularity' requirement."); FED. R. CIV. P. 9(b).

**\*15** In this case, the alleged misstatements pertain to Match's opinion and belief that the FTC's *legal* claims concerning Match.com's marketing, chargeback and online cancellation practices were "without merit." *See generally* CAC ¶¶ 145-58. Such contentions are clearly routine and aspirational opinions regarding the success of the litigation and not statements of fact. Furthermore, it is not evident from the Amended Complaint, considered in totality, that there was such a gross disparity between the facts alleged and the generalized opinions regarding the veracity of the FTC's legal challenges. *See Lormand*, 565 F.3d at 248, n.13.

Plaintiffs also have not asserted any facts regarding Defendants' actual knowledge of the viability of these legal challenges or of Match's ability (or inability) to vigorously defend against such claims. *See generally* CAC ¶¶ 145-58. It may well be that Match has certain legal defenses shielding it from liability separate and apart from disputing head-on the truthfulness of the FTC's factual allegations. *See also Hall*, 2019 WL 7207491, at \*19 (finding statements were not actionable where the plaintiff had not "identified any specific facts indicating that any of the Defendants possessed information regarding the viability of the lawsuits against the Company or suggesting that Defendants knew they had no viable [legal] defenses," such as lack of causation or other procedural issues).

Even if the Court were to focus strictly on whether Defendants misled investors on the legality of Match.com's practices, policies, and procedures, which Plaintiffs suggest is the core issue here, *see* Resp. 19 (describing reasons), Plaintiffs still have not stated a viable securities fraud claim because the Amended Complaint does not allege any facts creating a strong inference that, at the time Match made these statements, Defendants Knew that the alleged policies and practices were illegal. *See, e.g.*, CAC ¶ 104(d); *see also Edgar v. Anadarko Petroleum Corp.*, Civil Action No. 17-1372, 2019 WL 1167786, at \*15 (S.D. Tex. Mar. 13, 2019) (finding no actionable claim where a corporate executive wrongly certified the legality of a certain practice but the complaint allegations did not include facts that the corporate executive knew, or was told, that the company

was violating the law), *aff'd sub nom. Iron Workers Benefit & Pension Fund – Iron Workers Dist. Council Philadelphia & Vicinity v. Anadarko Petroleum Corp.*, 788 F. App'x 268, 269-70 (5th Cir. 2019) (per curiam) (finding company's statements that it "was in compliance with applicable laws and regulations" were not actionable because the allegations did not create a strong inference that at the time the allegedly false statements were made, the corporate executives were aware that the company was, as a matter of law, in violation of the applicable rules).

Regarding Plaintiffs' assertion that Match should have disclosed the FTC investigation earlier, Plaintiffs have not alleged how Match's failure to do so was materially misleading or how an earlier disclosure would have significantly altered the total mix of information available. Resp. 20 n.7; *Rosenzweig*, 332 F.3d at 865. "As a general matter, federal securities laws do not require corporations to disclose the initiation of a government investigation," *Brooks v. United Dev. Funding III, L.P.*, Civil Action No. 4:20-CV-00150-0, 2020 WL 6132230, at *20 (N.D. Tex. Apr. 15, 2020) (citation omitted); *see also In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) ("[A] government investigation, without more, does not trigger a generalized duty to disclose.") (citation omitted); *Markman v. Whole Foods Mkt., Inc.*, No. 1:15-CV-681-LY, 2016 WL 10567194, at *8 (W.D. Tex. Aug. 19, 2016) (noting that the "existence of an investigation, standing alone, does not automatically give rise to such a duty [to disclose an ongoing investigation into the company's business practices]") (citation omitted). Absent any allegations explaining how Match's failure to disclose the FTC's investigation earlier rendered specific statements by Match materially misleading, the Court finds that Plaintiffs have not alleged an actionable misstatement on such grounds.[14]

### (2) Scienter

**\*16** Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). As a general matter, when evaluating a complaint's scienter allegations, a court must "assess all the allegations holistically," *Diodes*, 810 F.3d at 956 (quoting *Tellabs*, 551 U.S. at 326), guided by a three-step framework: (1) "the factual allegations in the pleadings must be accepted as true"; (2) "the court

must consider the entire complaint, including documents incorporated into the complaint by reference and matters subject to judicial notice"; and (3) "the court must consider plausible inferences supporting as well as opposing a **strong inference** of **scienter**." *Id.* at 956-57 (internal citations omitted). Courts may first assess "each allegation individually and then consider[ ] the allegations as a whole," *Id.* at 957 (citing *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015)).

While scienter may be shown by an "intent to deceive, manipulate, or defraud," it may also be satisfied by showing the defendant acted with "severe recklessness," which is limited to those highly unreasonable omissions or misrepresentations involving not merely simple or even inexcusable negligence, but an "extreme departure from the standards of ordinary care" with a "danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994) (quoting *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993)). The allegations in the complaint "must be 'cogent and compelling,' not simply 'reasonable,' or 'permissible.' " *Neiman*, 854 F.3d at 747 (quoting *Tellabs*, 551 U.S. at 324). And while allegations of motive and opportunity can enhance the strength of the inference of scienter, such allegations standing alone will not suffice. *See Diodes*, 810 F.3d at 957.

To determine whether a corporate statement was made with the requisite scienter, courts look to the state of mind of the individual corporate official or officials who made the statement. *See Southland*, 365 F.3d at 366 ("For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."). The Fifth Circuit has explicitly "rejected the 'group pleading approach to scienter' "—opting to focus "on the state of mind of the corporate officials who make, issue, or approve the statement rather than the 'collective knowledge of all the corporation's officers and employees.' " *Diodes*, 810 F.3d at 957 (quoting

*Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)).

Courts following *Tellabs* must discount allegations from confidential sources, because they "afford no basis for drawing the plausible competing inferences required." *Shaw*, 537 F.3d at 535. However, at the very least, "such [confidential] sources must be described 'with sufficient particularity to support the probability that a person in the position occupied by the source ... would possess the information pleaded.' " *Id.* (internal citations omitted). The critical issue in assessing scienter is whether, when considered holistically, the allegations of fraud in the complaint are sufficiently connected to the alleged deceiving individuals such that a "**strong inference** of **scienter** on their part is appropriate." *Diodes*, 810 F.3d at 956; *Goldstein v. MCI WorldCom*, 340 F.3d 238, 249 (5th Cir. 2003). A complaint will only survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

#### a. *Intent to Deceive or Severe Recklessness*

**\*17** Plaintiffs primarily rely on statements by confidential witnesses to establish, through circumstantial allegations, that Ginsberg and Swidler acted with the requisite state of mind—either an "intent to deceive, manipulate, or defraud" or "severe recklessness."[15] *Lormand*, 565 F.3d at 251 (citation omitted). The Court finds that the Amended Complaint fails to allege sufficient particularized facts to show a strong inference of either. *Goldstein*, 340 F.3d at 249.

One of the Amended Complaint's primary allegations is that Ginsberg and Swidler knew of the pervasiveness of fraudulent users yet failed to account for or otherwise address them honestly in Match's public statements. Relying on confidential witness testimony, Plaintiffs assert that Ginsberg knew of Match's struggles with fraudulent accounts and spoke about them internally at company-wide meetings. *See* CAC ¶ 39; *see also id.* ¶ 50 (Ginsberg "would have known the statistics on the number of fraudulent accounts" having previously served as Match.com's CEO). Plaintiffs also allege that Ginsberg and Swidler were well aware of key metrics, such as PMC and ARPU, and attended monthly meetings to review Match's financials. *See id.* ¶¶ 46, 48. At these monthly meetings, fraudulent accounts afflicting Match brand

PlentyofFish were allegedly "a constant topic" and created a "point of frustration" with Ginsberg and Swidler. *Id.* ¶¶ 49, 91.

Although Plaintiffs' allegations may suggest that Ginsberg and Swidler had some idea of the prevalence of fraudulent users generally at Match, such allegations are insufficient to create a strong inference that Ginsberg's and Swidler's failure to disclose facts regularly and openly was intentionally deceiving or otherwise severely reckless. Match's financial statements make clear that its performance metrics rely on Match's number of paying users. *See* Defs.' App. 38, 163, 323, 460, 493, 525, 576, 617, 665, 699, 747; CAC ¶¶ 2, 47. Nevertheless, the Amended Complaint conflates paying and non-paying fraudulent users when it asserts, throughout the factual allegations, that Ginsberg and Swidler had "direct knowledge" that "between 15% and 20% of Match website users were perpetrators of fraud." CAC ¶ 176. Indeed, nearly all of the Amended Complaint's allegations regarding the extent of Ginsberg's and Swidler's awareness of fraudulent accounts do not differentiate between Defendants having purported knowledge of fraudulent *non-paying* users as opposed to *paying* users—the latter of which would have been reflected in Match's public financial reports and metrics. *See, e.g., id.* ¶¶ 36-37, 39, 46, 49-50, 64, 91, 177-80. And for those few allegations that specifically indicated "some" fraud by paying users, the Amended Complaint does not assert any facts to suggest a strong inference that Ginsberg and Swidler knew of, much less wanted to conceal, such information. *See id.* ¶¶ 3, 45, 91(a), 136, 177.

**\*18** Further, the Amended Complaint does not allege any cogent and compelling facts supporting a strong inference that Ginsberg and Swidler intended to hide or otherwise mislead investors regarding Match's fraudulent or dangerous users, or efforts to combat such users, generally. *See* *Tellabs*, 551 U.S. at 324. To the contrary, as Plaintiffs allege, Ginsberg held company-wide meetings about fraudulent accounts, and Match had a "Fraud Department" dedicated to reviewing and removing such accounts as well as a "wall of screens" displaying website usage, web-traffic patterns, and any unusual traffic spikes that could indicate the presence of "bots" or other fraudulent users. CAC ¶¶ 39-42, 180. And as the Amended Complaint notes, a **Match Group** spokesperson stated during an interview that Match "cannot implement a uniform screening protocol because it doesn't collect enough information from free users—and some paid subscribers—even when they pay for premium features" and that "[t]here are definitely registered sex offenders on our free products." *Id.* ¶ 127.

Plaintiffs have stated no allegations suggestive that Swidler or Ginsberg intended to misrepresent, or were otherwise severely reckless in their presentation of, Match's alleged user-related problems and protocols to combat such problems.[16]

Likewise, the allegations that Ginsberg and Swidler focused primarily on Match's "bottom line" and "revenue-producing metrics," do not, without more, suggest that their alleged failure to disclose the extent of Match's user-related problems—notwithstanding its alleged efforts to combat those very problems—was intentionally misleading or such an extreme departure from the standards of ordinary care as to amount to severe recklessness. *See id.* ¶¶ 46-49; *Tuchman*, 14 F.3d at 1067; *see also Ala. Elec. Pension Fund v. Asar*, 768 F. App'x 175, 185-86 (5th Cir. 2019) (quoting *Owens*, 789 F.3d at 539) ("This Court has declined to find a **strong inference** of **scienter** in goals that 'virtually all corporate insiders share.' "); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) (noting "desirability for growth is too universal a corporate goal to constitute a basis for scienter"). And while Plaintiffs allege that Ginsberg and Swidler grew frustrated by the effect of fraud on PlentyofFish's PMC and ARPU numbers, as though to suggest their resentment towards PlentyofFish's fraud-fighting efforts, the more compelling opposing inference is that Ginsberg and Swidler had concerns with the brand's previous financial projections.[17] *See id.* ¶ 49; *Tellabs*, 551 U.S. at 324; *see also Shaw*, 537 F.3d at 538 (finding defendant's instruction to "do something to fix" low revenue numbers "cannot contribute to a **strong inference** of **scienter** because it is 'susceptible to many interpretations, including innocent ones' ") (citation omitted); *In re Integrated Elec. Servs., Inc.*, No. 4:04-CV-3342, 2006 WL 54021, at *4 (S.D. Tex. Jan. 10, 2006) (holding that comment by corporate manager to employee regarding "[not] need[ing] to hear the details of [a] revenue problem" was too ambiguous to support **strong inference** of **scienter** and was "susceptible to many interpretations, including innocent ones"), *aff'd, Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546 (5th Cir. 2007).

The Court finds that the Amended Complaint's factual assertions regarding Match's business practices as to marketing and user retention similarly do not give rise to a strong inference that Ginsberg and Swidler intended, directly or by acting with severe recklessness, to deceive or manipulate investors through any of the alleged misstatements. *See* CAC ¶¶ 66-84. Plainly, it is not evident from the face of the Amended Complaint how any

of Ginsberg's and Swidler's alleged misstatements, regarding Match's internal controls and financial statistics and reporting, speak to or otherwise misrepresent anything about Match's marketing and user retention tactics, or the extent of Ginsberg's and Swidler's general knowledge and approval of the same.[18] *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *Shaw*, 537 F.3d at 539 ("This court has explained that 'general allegations and conclusory statements, such as stating [defendants] knew ... adverse material' do not contribute to a **strong inference** of **scienter**."); *id.* at 542 (noting that, without more, "defendants' status within the company is inadequate for an inference of knowledge about alleged misstatements"); *Southland*, 365 F.3d at 375-76 (finding allegations that failed to state "when, where or on what occasion or occasions" defendants learned of certain information as being "insufficient" to establish defendants' scienter).

**\*19** Plaintiffs further allege that Match retaliated against at least two confidential witnesses who were fired or asked to leave after they tried to protect members by encouraging them to hide their profile or cancel their memberships. *See* CAC ¶¶ 36, 85-87. But, again, these allegations make no mention of Ginsberg's or Swidler's role in either the underlying policies or the termination decisions. Even as to Match's alleged misstatements regarding Match.com's practices, policies, and procedures, and Match's overarching opinion and position on the FTC's investigation and lawsuit, the Amended Complaint fails to assert facts showing a strong inference that Ginsberg and Swidler either knew that Match had had no viable legal defenses or that they otherwise knew, or were told, that Match was violating the law. *See* CAC ¶¶ 145-157; *see also Hall*, 2019 WL 7207491, at *19 (finding no actionable claim where there were no allegations indicating that defendants "possessed information regarding the viability of the lawsuit" or that they "knew they had no viable [legal] defenses"); *Edgar*, 2019 WL 1167786, at *15 (finding no scienter where the defendant allegedly misrepresented the legality of a certain practice, but the complaint failed to "include facts that [he] knew, or was told, that [the company] was violating [the] law"); *see also supra* § III(A)(1)(d).

In sum, the Court finds that the Amended Complaint's allegations regarding the extent of Ginsberg's and Swidler's knowledge on these various aspects of Match's business do not evince an intent to deceive, manipulate, or defraud, or otherwise suggest that they acted with severe

recklessness when they made the alleged misstatements. Accordingly, absent more particularized allegations, the Court finds that Plaintiffs have not alleged facts sufficient to give rise to a **strong** **inference** of **scienter**.[19] *See Neiman*, 854 F.3d at 746.

### b. *Motive and Opportunity*

### i. Insider Trading

The Amended Complaint alleges that Ginsberg's and Swidler's scienter is evidenced by their "suspicious" stock transactions during the Relevant Time Period, resulting in their accumulating tens of millions of dollars. CAC ¶ 182. Plaintiffs further allege that these transactions were suspicious in amount because the monies gained far exceeded Ginsberg's and Swidler's salaries during the Relevant Time Period. *See id.* ¶ 184.

It is well established that "allegations of insider trading are essentially a form of motive and opportunity allegations." *Southland*, 365 F.3d at 368. And although the Fifth Circuit "requires more than allegations of motive and opportunity to withstand dismissal," appropriate allegations of motive and opportunity may nevertheless enhance an existing inference of scienter. *Id.* (quoting *Goldstein*, 340 F.3d at 250-51); *Cent. Laborers' Pension Fund*, 497 F.3d at 553 ("Insider trading alone cannot create a **strong** **inference** of **scienter**."). For insider trading to enhance such an inference, the alleged trading must occur "in suspicious amounts or at suspicious times." *Id.* (quoting *Abrams*, 292 F.3d at 435); *see also Abrams*, 292 F.3d at 435 (finding no **strong** **inference** of **scienter** where plaintiffs made "no allegations that these sales are out of line with prior trading practices or at times calculated to maximize personal profit"); *Southland*, 365 F.3d at 368 ("[I]nsider trading is suspicious only when dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.") (cleaned up); *see also Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 813 (N.D. Tex. Mar. 30, 2006). While prior trading history does not need to be pleaded as a per se matter, a plaintiff must nevertheless plead sufficient facts to show that the timing or scope is unusual. *See Cent. Laborers' Pension Fund*, 497 F.3d at 553.

*20 In the present case, the Court finds that the Amended Complaint's allegations of insider trading fail to give rise to a **strong** **inference** of **scienter**. For starters, Plaintiffs do not sufficiently allege that the timing or scope of the subject stock transactions were unusual or out of line with prior trading practices. *See id.; Abrams*, 292 F.3d at 435. Although describing Ginsberg's and Swidler's respective stock trading patterns before the Relevant Time Period is not a requirement per se, such information would be particularly probative where, as here, the allegedly suspicious insider sales would otherwise be asserted in a vacuum. *See Cent. Laborers' Pension Fund*, 497 F.3d at 553; CAC ¶ 182. As pleaded, the Amended Complaint is unclear as to whether Ginsberg's and Swidler's stock transactions were actually "in suspicious amounts or at suspicious times," as Plaintiffs claim, or if such transactions were part of more regular and systematic trading patterns. *Southland*, 365 F.3d at 368 (citation omitted); *see also Diodes*, 810 F.3d at 961 (noting that while other insiders sold stock during the class period, "there is no basis to infer that those trades were suspicious absent allegations about the individuals' prior trading practices"); *Fener*, 425 F. Supp. 2d at 813 ("Context is critical to the analysis.") (citation omitted).

Moreover, aside from generally contending that Ginsberg's and Swidler's stock transactions were suspicious, and citing to all of the transactions made and trade-related profits accrued during the Relevant Time Period, Plaintiffs have not sufficiently explained how Ginsberg's and Swidler's transactions were "in suspicious amounts" or "at suspicious times." CAC ¶¶ 182-84; *Southland*, 365 F.3d at 368. According to Plaintiffs, Ginsberg's and Swidler's stock sales are suspicious in timing because they purportedly track the alleged misstatements, partial corrective disclosures, and resignations. *See* Resp. 26; CAC ¶ 185. Notwithstanding Plaintiffs' failure to specify what, exactly, the suspicious correlations are between Ginsberg's and Swidler's stock transactions vis-à-vis the factual allegations of the Amended Complaint, the stock transactions alleged actually appear to show that Ginsberg and Swidler followed a pattern when it came to selling many of their securities.

For example, the Amended Complaint shows that for three of the four days on which Ginsberg conducted stock sales during the Relevant Time Period, Ginsberg sold her shares on the same dates that her restricted stock units ("RSUs") vested—December 21, 2018 (selling 13,782 shares); February 9, 2019 (selling 18,049 shares); and December 21, 2019 (selling 13,783 shares). CAC ¶ 182(a). Similarly, for one of the two dates that Swidler

conducted stock sales during the Relevant Time Period, the date of the sale coincided with the same date that Swidler's RSUs vested—i.e., February 9, 2019 (selling 27,419 shares). *Id.* ¶ 182(b). While Plaintiffs maintain that Ginsberg's and Swidler's trading practices aligned with the dates of certain alleged misstatements or partial corrective disclosures, the more compelling opposing inference, at least as to these particular trades, is that Ginsberg and Swidler engaged in a pattern of trading that was tied to the vesting dates of the RSUs. *See* 🚩 *Tellabs,* 551 U.S. at 324; *see also* CAC ¶ 182. These trading patterns, in turn, do not support a **strong inference** of **scienter**.

Regarding the remaining stock transactions by Ginsberg and Swidler during the Relevant Time Period—occurring on May 30, 2019, and on February 11, 2019, respectively—the Amended Complaint does not explain what is unusual about the timing or scope of their trades on these dates. *See* 🚩 *Cent. Laborers' Pension Fund,* 497 F.3d at 553. When Ginsberg sold 247,906 of her shares on May 30, 2019, to net a return of $17,145,195, Swidler made no stock sales in the three months before or after in the Relevant Time Period. *See* CAC ¶ 182(a)-(b). Similarly, on February 11, 2019, when Swidler sold 413,000 of his shares to net a return of $23,812,515, the only stock sales that Ginsberg conducted in the three months before or after occurred on the dates that Ginsberg's RSUs vested (e.g., December 21, 2018, and February 9, 2019). This disparity in terms of when Ginsberg and Swidler sold their stocks, aside from the RSU vesting dates, also cuts against the Amended Complaint's allegations suggesting that there were particular misstatements or partial corrective disclosures that drove the alleged insider transactions. And as Plaintiffs have not alleged Ginsberg's and Swidler's prior trading history, it remains unclear if their trading in such large volume is actually unusual in scope.[20] *See* 🚩 *Cent. Laborers' Pension Fund,* 497 F.3d at 553.

**\*21** Considering the allegations in totality, as it must, the Court finds that Plaintiffs have not sufficiently alleged that Ginsberg's and Swidler's stock transactions during the Relevant Time Period occurred in suspicious amounts or at suspicious times. *See* 🚩 *Southland,* 365 F.3d at 368. Accordingly, the alleged insider stock transactions do not contribute to or otherwise enhance the strength of the inference of scienter.[21]

*ii. Offerings*

The Amended Complaint alleges that Match's February 8, 2019 announcement of its intention to commence a private offering of $300 million further evidences Match's corporate scienter. *See* CAC ¶ 193. In their Response, Plaintiffs assert that this private offering was suspiciously timed, as it was promptly followed by Ginsberg's and Swidler's stock sales from February 9-11, 2019, and by Match's disclosure of the FTC investigation and proposed settlement on February 28, 2019. *See* Resp. 26-27.

Although the Amended Complaint does not specify how, exactly, Match's announcement purportedly further evidences its corporate scienter, generally such contentions that corporate executives are motivated to commit fraud by the need to raise capital and sell stock at inflated prices have been rejected as insufficient to support an inference of scienter. *See* 🚩 *Abrams,* 292 F.3d at 434; 🚩 *Melder v. Morris,* 27 F.3d 1097, 1102 (5th Cir. 1994) (finding allegations that defendants sought to "inflate the price of the Company's common stock in order to ... successfully bring to fruition the offerings" and "enhance the value of [officers'] securities holdings and options" were insufficient to show a proper inference of scienter); *id.* ("Accepting the plaintiffs' allegation of motive ... would effectively eliminate the state of mind requirement as to all corporate officers and defendants."); *In re Azurix Corp. Sec. Litig.,* 198 F. Supp. 2d 862, 889-90 (S.D. Tex. 2002) ("Allegations that defendants attempted to inflate a company's stock price to facilitate the raising of capital do not establish scienter."), *aff'd sub nom.* 🚩 *Rosenzweig,* 332 F.3d 854. Given the Amended Complaint's generalized allegations that Match's private offering evidences Match's scienter and in light of the precedential authority on this issue, the Court finds that Plaintiffs' allegations regarding Match's February 8, 2019 private offering announcement do not support a **strong inference** of **scienter**. *See* CAC ¶ 193.

*iii. Resignations*

The Amended Complaint also alleges that Ginsberg's announcement of resignation on January 31, 2020, effective March 3, 2020, and former Match CEO Sam Yagan's announcement of resignation on September 24, 2019, support a **strong inference** of **scienter**. *See* CAC ¶¶ 188-92. Corporate resignations are generally "unavailing as proof of the commission of fraud." 🚩 *Southland,* 365 F.3d at 383; 🚩 *Abrams,* 292 F.3d at 434 (finding that resignation of key accounting officials did not have "any

scienter implications" where there were insufficient allegations showing that they knew of the underlying issues or that such issues "were the reason for their resignations"); *Rosenzweig*, 332 F.3d at 867 ("[T]he successive resignations of key officials ... is more likely probative only of the fact that the company was failing."); *see also* *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 725-26 (W.D. Tex. 2010) ("Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis."); *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 956 (S.D. Tex. 2016) (finding general allegation of CEO's resignation was "insufficient to plead scienter as to [him]").

**\*22** The Court similarly finds that Ginsberg's and Yagan's resignations, without more, do not bear on the scienter analysis. As discussed *supra* § III(A)(2)(a), the Amended Complaint does not sufficiently plead that Ginsberg acted with an intent to deceive, manipulate, or defraud, or that she was otherwise severely reckless in her conduct. *See* *Southland*, 365 F.3d at 366; *Tuchman*, 14 F.3d at 1067. Plaintiffs also do not plead any facts regarding Yagan's knowledge of the misconduct asserted in the Amended Complaint—much less that such misconduct was "the reason for [Ginsberg's and Yagan's] resignations." *Abrams*, 292 F.3d at 434. Furthermore, there may be compelling and innocent opposing inferences that may be drawn from Ginsberg's resignation, including—as Defendants referred to in their Reply—health reasons. *See* *Tellabs*, 551 U.S. at 324; Reply 12 n.26 ("[I]t was widely reported that Ginsberg resigned due to health reasons.").

### c. *"Core Operations" Doctrine ("Special Circumstances" Exception)*

Plaintiffs further attempt to plead an inference of scienter under the "core operations" doctrine, commonly referred to as the "special circumstances" exception. *See* CAC ¶¶ 194-95. Generally, a "pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams*, 292 F.3d at 432. The Fifth Circuit, however, has carved out an exception for "special circumstances," under which a plaintiff can plead scienter simply by "pleading a defendant's position in the company." *Neiman*, 854 F.3d at 749. To determine whether such "special circumstances" exist to justify the "rare" exception, courts must weigh and consider four factors: (1) size of the company; (2) criticality of the

transaction at issue to the company's continued vitality; (3) apparentness of the alleged misrepresentations to the speaker; and (4) internal inconsistencies among the defendant's statements. *See id.* at 749-50; *Diodes*, 810 F.3d at 958-59.

The Court finds that the special circumstances exception does not apply here. First, it is undisputed that Match, with 1,400 to 1,700 employees, is significantly larger than any of the companies in cases where the Fifth Circuit has found a special circumstance. *See* *Nathenson*, 267 F.3d at 425 (32 to 35 employees); *Dorsey*, 540 F.3d at 342 (no employees); Defs.' App. 137, 286 (indicating 1,400 and 1,700 Match employees by the end of 2018 and 2019 respectively); *see also* *Neiman*, 854 F.3d at 750 (no special circumstance where there were "over 60 employees"). Second, Plaintiffs have not sufficiently alleged that the purported fraud—stemming from the 15% to 20% of illegitimate users, whether paying or non-paying—was material enough to place this case in the special circumstances category. *See* *Neiman*, 854 F.3d at 750 (finding that an issue affecting 22.5% of the company's total output was "not material enough"); *Owens*, 789 F.3d at 540 (finding alleged misstatements concerning an asset that comprised 22% of the company's total portfolio did not implicate a special circumstance). Third, as explained *supra* § III(A)(2)(a), Plaintiffs have failed to allege sufficient facts indicating that it was readily apparent to Ginsberg and Swidler that their statements omitted material information or were otherwise false and misleading. *Diodes*, 810 F.3d at 959. Finally, the Amended Complaint does not indicate any internally inconsistent statements by Ginsberg and Swidler. *See id.* Considering each factor, the Court finds that Plaintiffs have not pleaded sufficient facts to show that this is the rare case where the special circumstances exception should apply. *See* *id.* at 958-59.

Accordingly, taking Plaintiffs' allegations as true and viewing the Amended Complaint as a whole, the Court finds that Plaintiffs have failed to allege sufficient facts with requisite particularity to support a **strong inference** of **scienter** as to Ginsberg and Swidler. Thus, there is no **strong inference** of **scienter** that can be imputed to Match. *See* *Southland*, 365 F.3d at 366.

### (3) *Loss Causation*

**\*23** Because the Court concludes that the Amended Complaint does not plausibly allege a material

misrepresentation or a **strong** **inference** of **scienter**, the Court "need not reach the issue of loss causation." *Owens, 789 F.3d at 546*.

#### B. *Section 20(a) Claim*

In addition to their Section 10(b) and Rule **10b**-**5** claim, Plaintiffs allege that Ginsberg and Swidler violated Section 20(a) of the Exchange Act in their roles as Match control persons during the Class Period. "Under Section 20(a), a person who exerts control over a person who violates any provision of the Securities Exchange Act can be held jointly and severally liable with the primary actor of the underlying securities law violation." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp., 565 F.3d 200, 206 n.4 (5th Cir. 2009)*. Nonetheless, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation." *Southland, 365 F.3d at 383* (citing *Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1021 n.8 (5th Cir. 1996)*).

As Plaintiffs have not stated a claim for a primary violation under the Exchange Act by any control person, Plaintiffs' Section 20(a) claims against Ginsberg and Swidler must also be dismissed.

### IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motion to Dismiss [ECF No. 38]. Because Plaintiffs have requested further leave to amend their complaint in response to a ruling from the Court identifying specific pleading deficiencies, and given the federal rules' liberal policy of allowing amendments to pleadings, the Court **GRANTS** Plaintiffs leave to amend their complaint. Plaintiffs must file an amended complaint by April 23, 2021. If an amended complaint is not filed within such time, Plaintiffs' claims will be dismissed with prejudice.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 1167578

### Footnotes

[1]    This case was transferred from the docket of Judge Ada Brown to the docket of this Court on February 2, 2021. *See* ECF No. 44.

[2]    The Amended Complaint also details allegations that Match brands failed to screen properly for sex offenders and felons. *See id.* ¶¶ 58-65.

[3]    It is unclear from the face of the Amended Complaint whether the Fraud Department is limited to Match.com only or if the department was part of Match, more broadly. *See id.* ¶ 42 (referring inconsistently to the Fraud Department(s) at Match and Match.com).

[4]    The Amended Complaint also asserts more generally that Ginsberg and Swidler would have been aware of any "red flags" regarding the effects of fraudulent users on Match brands' financial metrics given their interactions with leaders of the respective brands, their prior rotes with specific brands, and their presence at forecast meetings with other Match executives. *See id.* ¶¶ 64, 177-79. According to Plaintiffs, everyone in the headquarters building had knowledge of the number of fraudulent accounts, and a highly visible "wall of screens" at Match's headquarters tracked Match's website usage levels and traffic patterns and, in turn, could indicate fraudulent activity. *Id.* ¶ 180.

[5]    The Amended Complaint also alleges that Match used deceptive promotional offers and a purposefully convoluted and deceptive billing, cancellation, and refund model to increase and retain its paying-member base. *See id.* ¶¶ 70-84.

[6]    The Amended Complaint also references "DOJ complaints," but the DOJ appears to have declined to

pursue a civil case against Match—referring the matter back to the FTC. *Id.* ¶¶ 153, 155.

7    These statements prefaced Defendants' alleged misrepresentation regarding the veracity of the FTC's legal challenges. *See id* ¶ 145.

8    The Amended Complaint appears to erroneously note that Match filed its Form 10-Q for *Q3* financials on *August 9*, 2019. *See id.* ¶¶ 134, 141, 151 (indicating Match filed Form 10-Q regarding *Q2.* financials on *August 8*, 2019) (emphasis added).

9    Ginsberg gained a net profit of $16,339,578, from her sales of shares occurring on December 21, 2018; February 9, 2019; May 30, 2019; and December 21, 2019. *Id.* ¶ 182. Plaintiffs allege that this was suspicious when compared against her base salary of $500,000 and $750,000 in 2017 and 2018, respectively. *Id.* ¶ 184.

10   Swidler gained a net profit of $19,220,383, from his sales of shares occurring on February 9, 2019, and February 11, 2019. *Id.*¶ 182. Plaintiffs allege that this was suspicious when compared against his base salary of $550,000 in 2017 and 2018. *Id.* ¶ 184.

11   The Amended Complaint indicates Ginsberg's executive compensation package allowed her to stay on in an advisory role so that her stock options would continue to vest through February 2021, *See id.* ¶¶ 191-92.

12   While *Kapps* was brought under Section 11, the Fifth Circuit acknowledged that "many cases say that 'materiality,' as it is used in Section 11, in effect means the same thing as it does in section 10(b)." 379 F.3d at 215 (citing *Rosemweig v. Azttrix Corp.*, 332 F.3d 854, 873-74 (5th Cir. 2003) (holding that plaintiffs' claims under Section 11 fail because none of the challenged representations were material, and "[e]ven though the district court did not explicitly consider the materiality issue with respect to [Section] 11, its analysis would be identical" to that under Section **10b**-**5**)).

13   In addition, a reasonable reading of the article indicates that Ginsberg was affirming Match's commitment to user safety and "describing the company's response protocol." Defs.' App. 263, Such aspirational statements are distinguishable from specific promises and are more akin to generalized positive goals, which are not actionable. *See Police & Five Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) (finding statements describing "outlines of procedures," affirming company's "commitment to safety [and] ... proper systems," and emphasizing "intention to comply with regulations" constituted "corporate cheerleading" and were, therefore, not actionable); *see also id* (noting that notwithstanding defendants' ultimate failure to fulfill its "commitment to proper systems" and "comply with regulations," defendants' alleged misstatements were still "generalized positive goals rather than specific promises").

14   Finding that Plaintiffs have not alleged actionable material misstatements or omissions for various other particularized reasons, *see supra* §§ III(A)(1)(a)-(d), the Court does not reach a determination at this time regarding whether the **PSLRA's** "safe harbor" provision or the bespeaks caution doctrine apply to certain alleged misstatements.

15   Throughout the Amended Complaint, Plaintiffs impute factual allegations regarding knowledge and intent on "Defendants" or "Individual Defendants." *See, e.g.*, CAC ¶¶ 18, 35, 46-47, 49. "[T]he **PSLRA** requires the plaintiffs to distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365 (emphasis in original) (citation omitted). Accordingly, consistent with Fifth Circuit guidance, the Court will "not construe allegations contained in the [Amended Complaint] against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the [allegation] is specifically pleaded." *Id.*; *see also Owens*, 789 F.3d at 537-38 (holding allegations against "Individual Defendants" were not sufficiently "tied to a particular defendant" and, thus, "disregard[ing] the group-pleaded allegations

[to] discern whether the remaining allegations state a claim for relief as to each defendant").

16    While the Amended Complaint alleges that Ginsberg misleadingly stated that "[i]f there's bad behavior on one app ... we can identify that user, [and] we'll kick him off all the apps," as discussed *supra* § III(A)(1)(a), Plaintiffs have not sufficiently pleaded an alleged misstatement under Rule 9(b). CAC ¶ 128. Regardless, Plaintiffs have not stated facts supportive of Ginsberg's purported intent to deceive investors generally regarding the status of Match's safety protocols and procedures.

17    The Court notes that while Ginsberg's and Swidler's alleged frustration regarding PlentyofFish's lower financial numbers may be suggestive of motive, allegations of motive can only "enhance the strength of the inference of scienter" and, "standing alone," such allegations "will not suffice." *Diodes*, 810 F.3d at 957 (citations omitted).

18    *See, e.g.*, CAC ¶ 33 (alleging, without more, that Ginsberg knew and was aware of a tactic "to get people to sign up and forget about [their membership]" because she "focused on the Match.com site"); *id.* ¶ 69 (same); *id.* ¶ 83 (stating Ginsberg "would have known about consistent complaints that Match.com subscriptions were difficult to cancel" because she "projected herself internally as being very much about product, brand message, and public relations" and "would have company-wide discussions about user experience").

19    Plaintiffs also seek to bolster their allegations of scienter as to Ginsberg and Swidler by implicating: (1) their signing and SOX-certifying Match's public filings; and (2) purported violations of Match's Code of Ethics. *See* CAC ¶¶ 196-203; Resp. 35-36. These arguments are unavailing. SOX certifications, "standing alone, [are] not indicative of scienter." *Shaw*, 537 F.3d at 545. They are only "probative ... if the person signing the certification[s] was severely reckless in certifying the accuracy of the financial statements." *Id.* (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). From the Court's analysis of Plaintiffs' allegations, and as discussed *supra* § III(A)(1)(a)-(c), Plaintiffs have failed to plead sufficient facts showing that Ginsberg and Swidler knew of any material deficiencies in Match's internal controls or that they had a reason to know, or should have suspected that the financial statements contained material misstatements or omissions. Thus, the SOX certifications bearing Ginsberg's and Swidler's signatures are not probative of their scienter here. As to the alleged violations of Match's Code of Conduct, unlike in *Chamberlain*, the sole case on which Plaintiffs rely, where the individual defendant attested to having "carefully studied" the applicable code of ethics that "specifically acknowledge[d] the inherent illegality of [the restrained conduct] and expressly disavowed participation in such [conduct]," Match's Code of Ethics broadly expressed its commitment to providing accurate public disclosures under the law and its requirement that Match's directors, officers, and employees be "honest, lawful and in accordance with high ethical and professional standards." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 n.7 (E.D. Mich. 2010); CAC ¶¶ 199-200.

20    Plaintiffs also assert that, during the Relevant Time Period, Ginsberg and Swidler earned substantially more through stock transactions than through their respective salaries and bonuses. *See* CAC ¶ 184. But such alleged disparities alone do not establish an inference of scienter. *See* *Cent. Laborers' Pension Fund*, 497 F.3d at 553 (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (indicating that "whether the profits were substantial relative to the seller's ordinary compensation" is but one factor in determining whether a sale was "unusual in scope")). The financial compensation figures alleged by Plaintiffs also do not indicate how much, if any, of Ginsberg's and Swidler's total compensation in 2017 and 2018 was comprised of stocks or other securities. *See* CAC ¶ 184. As the Fifth Circuit has noted, "corporate executives, whose compensation often includes company stock, 'will trade those securities in the normal course of events.' " *Diodes*, 810 F.4d at 960-61 (adding that "there are many innocent reasons why an individual would sell stock at a given time") (citation omitted).

21    The Amended Complaint also asserts that the SEC initiated an investigation into Match on May 16, 2016, which ended January 3, 2017, and that Ginsberg and Swidler failed to disclose such investigation to the

public during that time period. CAC ¶ 186. But, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239 n.17. Here, Plaintiffs have not alleged that Ginsberg or Swidler were under a duty to disclose the alleged pre-Relevant Time Period SEC investigation. Thus, their failure to disclose the same was not "misleading" as a matter of law under Rule 10b-5. *Id.*

---

**End of Document**                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.