## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

ROBERT G. LINENWEBER, Individually
and on Behalf of All Others Similarly
Situated,

       Plaintiff,

v.

SOUTHWEST AIRLINES CO., GARY C.
KELLY, TAMMY ROMO, and MIKE
VAN DE VEN,

       Defendants.

Civil Action No. 3:20-CV-00408-K

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendants Southwest Airlines Co. ("Southwest"), Gary C.

Kelly, Tammy Romo, and Mike Van de Ven's Motion to Dismiss and Brief in Support

(the "Motion to Dismiss"), Doc. No. 27, Defendants' Appendix in Support of Defend-

ants' Motion to Dismiss, Doc. No. 28, Lead Plaintiffs ("Plaintiffs") Canadian Elevator

Industry Pension Trust Fund and Elevator Constructors Union Local No. 1 Annuity &

401(k) Fund's Opposition to Defendants' Motion to Dismiss the Consolidated Com-

plaint for Violations of the Federal Securities Laws, Doc. No. 29, Defendants' Reply in

Support of Motion to Dismiss, Doc. No. 30, Defendants' Motion to Dismiss Purported

"Scheme and Course of Business" Claim Under SEC Rule 10b-5(a) and (c), Doc.

No. 31, Plaintiffs' Opposition to Defendants' Second Motion to Dismiss, Doc. No. 32,

Defendants' Reply in Support of Motion to Dismiss Purported "Scheme and Course of

Business" Claim Under SEC Rule 10b-5(a) and (c), Doc. No. 33, and the Parties' Notices of Recent Authority and Responses thereto, Doc. Nos. 35, 37–38, 40–41, 43–44, 46–47, 49–50.  Upon consideration of the Parties' filings, the Court **GRANTS** Defendants' Motion to Dismiss and dismisses all claims asserted in Plaintiffs' Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint" or "Compl.").  Plaintiffs' claim that Defendants made misleading statements to investors fails because Defendants' alleged misstatements about deficiencies in Southwest's safety and regulatory compliance practices are generalized expressions of optimism that would not mislead investors or are neither false nor misleading on the facts alleged by Plaintiffs.  Plaintiffs' "misstatement" claim also fails because Plaintiffs do not plead with particularity that Mr. Kelly, Ms. Romo, or Mr. Van de Ven (the "Officer Defendants"), speaking as officers of Southwest, made their alleged misstatements severely recklessly or with the intent to mislead investors.  Plaintiffs' allegations do not suggest that the Officer Defendants actually learned of Southwest's alleged operational deficiencies or would have benefited from concealing them more than a typical executive would benefit from concealing moderately unfavorable news about his or her business. While Plaintiffs claim that Defendants are independently liable for engaging in a fraudulent or deceptive "scheme," Defendants' alleged scheme consists of making misstatements to investors.  Plaintiffs' "scheme" claim fails for the same reasons as their "misstatement" claim.  Since Defendants' alleged misstatements and scheme are their only alleged primary violations of the securities laws, Plaintiffs' remaining claim seeking to

hold the Officer Defendants derivatively liable for Southwest's primary violations fails for lack of a properly alleged primary violation.

## I.   BACKGROUND

### A. Southwest's Safety and Compliance Issues

This is a putative class action against Southwest.  The Court draws the following facts from Plaintiffs' class action Complaint and assumes they are true.

Southwest is a commercial passenger airline regulated by the Federal Aviation Administration ("FAA"), a division of the Department of Transportation ("DOT"). Compl. ¶ 18.  As of December 21, 2019, Southwest operated approximately 750 Boeing aircraft of various types.  *Id.* ¶ 29.   During the proposed class period, spanning February 7, 2017 through January 29, 2020, Gary C. Kelly was Southwest's CEO, Tammy Romo was Southwest's CFO, and Mike Van de Ven was Southwest's COO. *Id.* at 5 n.2; *id.* ¶¶ 18–21.  Mr. Kelly sat on Southwest's board of directors, which had a Safety and Compliance Oversight Committee.  *Id.* ¶ 136(j).  Mr. Van de Ven was Southwest's "Accountable Executive in all matters of Safety and Security" and responsible for Southwest's "Safety and Security Management System," or "SMS," an internal risk management system.  *Id.* ¶¶ 27, 129(b), 136(c).

Southwest has had a long and public history of "safety and maintenance issues." *Id.* ¶ 28.  Between 2009 and 2015, Southwest experienced a variety of safety incidents, including problems with aircraft engines and fuselage skin, as well as pilot error.  *Id.*

¶¶ 33, 37–38, 40, 41.  On multiple occasions, the FAA investigated, settled with, or fined Southwest for deficient maintenance and repair practices.  *Id.* ¶¶ 34–40.

During the proposed class period, four safety and regulatory compliance issues arose for Southwest.  First, the FAA granted Southwest airworthiness certificates for eighty-eight previously-owned aircraft unusually quickly and later discovered that some of the aircraft had maintenance or maintenance documentation deficiencies.  *Id.* ¶ 74.  Second, some of Southwest's flights experienced "balance weight" issues, meaning that the aircraft in flight carried excessive weight by FAA standards.  *Id.* ¶ 73.  Third, Southwest made unspecified changes to its pilot training program with the FAA's approval but without conducting an SMS risk assessment.  *Id.* ¶ 77.  Fourth, an engine on a Southwest aircraft failed in April 2018, releasing pieces of the engine's fan assembly that broke one of the aircraft's windows and caused the death of a passenger.  *Id.* ¶ 45.  Plaintiffs allege that Southwest subsequently lobbied for more time to conduct engine inspections designed to prevent similar incidents, but Plaintiffs do not contend that Southwest's failure to prevent the April 2018 engine failure violated FAA regulations or resulted from Southwest's other safety and compliance issues.  *Id.* ¶¶ 44, 50, 55.

In December 2017, the FAA opened an investigation into potential maintenance issues with Southwest's previously-owned aircraft.  *Id.* ¶ 74.  The FAA entered an action plan with Southwest permitting Southwest to inspect and repair the aircraft by July 2020.  *Id.* ¶ 75.  In January 2018, the FAA learned about Southwest's balance weight issues.  *Id.* ¶ 57.  The FAA entered an action plan with Southwest to correct the issues,

but Southwest continued reporting flights that carried too much weight under FAA standards. *Id.* ¶¶ 72–73.

By July 2018, DOT's Office of the Inspector General ("OIG") opened an investigation into the FAA's oversight of Southwest. *Id.* ¶ 58. In June 2019, the FAA removed three managers in the office overseeing Southwest "amid allegations of lax safety enforcement raised by agency whistleblowers and various government inquiries." *Id.* ¶ 61. Reporting on the removal, the *Wall Street Journal* noted that the OIG was investigating Southwest's previously-owned aircraft and balance weight issues. *Id.* Southwest's stock price fell by 0.59% in the next trading session. *Id.* ¶ 62.

On January 30, 2020, the *Wall Street Journal* reported that the OIG would release a report criticizing the FAA's oversight of Southwest and stating that FAA employees "raised concerns about the culture at Southwest" and complained about Southwest's resistance to providing the FAA with information. *Id.* ¶¶ 63, 67. Anticipated areas of criticism included the FAA's supervision of Southwest's handling of its previously-owned aircraft and balance weight issues. *Id.* ¶¶ 63–65. While noting that Mr. Kelly previously said "we have opportunities to improve" balance weight monitoring, the *Wall Street Journal* observed that Southwest "long held that heavier-than-expected baggage loads fall well within its planes' operating safety margins." *Id.* ¶ 65. Southwest had characterized the previously-owned aircraft and balance weight issues identified by the OIG as "differences of opinion between the airline and its regulators—and

sometimes between various groups of regulators—that didn't affect safety." *Id.* After the *Wall Street Journal*'s report, Southwest's stock price fell 1.89%. *Id.* ¶ 69.

On February 11, 2020, the OIG released its final report on the FAA's oversight of Southwest. *Id.* ¶ 71. In the report, the OIG found that more than 4,000 Southwest flights between March 2018 and March 2019 carried weight exceeding FAA allowances by 300 or more pounds, though only seven to twenty-four per month carried 1,500 or more excess pounds, the threshold weight Southwest believed negatively impacted safety. *Id.* ¶¶ 72–73. The OIG also found that the FAA's hasty approval of airworthiness certificates for Southwest's eighty-eight previously-owned aircraft violated FAA regulations. *Id.* ¶ 75. According to the OIG, by availing itself of the FAA's approval, Southwest operated twenty-four aircraft with "confirmed safety deficiencies" and forty-nine—possibly overlapping—aircraft without verifying that they complied with otherwise-applicable FAA regulations. *Id.* The OIG expressed concern about the "culture" at Southwest, including the possibility that Southwest "may have devised a process that allows them to potentially bypass" FAA review of Southwest's SMS risk assessments. *Id.* ¶¶ 77–78. As an "example," the OIG found that the FAA should not have approved the changes Southwest made to its pilot training program without requiring Southwest to conduct a risk assessment of the changes. *Id.* ¶ 77. Plaintiffs do not contend that Southwest's stock price fell when the OIG released its report.

Between 2017 and 2018—the only period overlapping with the period of Southwest's safety and compliance issues for which Plaintiffs provide data—Mr. Kelly sold

$13.6 million of his shares in Southwest, or 31.8% of his holdings; Ms. Romo sold $1.8 million of her shares, or 15.4% of her holdings; and Mr. Van de Ven sold $3.5 million of his shares, or 20.1% of his holdings.  *Id.* ¶ 137(e).

### B. Defendants' Alleged Misstatements

Plaintiffs contend that Defendants made dozens of statements between 2017 and 2020 that misleadingly downplayed or concealed Southwest's issues with balance weight on its flights, with maintenance of its previously-owned aircraft, with the training of its pilots, and with the proactive management of risks that led to the April 2018 engine failure on a Southwest aircraft.  Plaintiffs group these statements in six categories.  First, Defendants purportedly touted Southwest's safety record, their commitment to safety, and their commitment to encouraging employees to report safety issues.  *Id.* ¶¶ 85–97.  Second, Defendants allegedly asserted that the FAA independently and extensively regulated Southwest and that Southwest was dedicated to compliance with laws and regulations.  *Id.*  Third, Defendants allegedly suggested that Southwest engaged in regular and substantial maintenance of its aircraft and attributed unscheduled maintenance costs to factors other than Southwest's issues with balance weight and previously-owned aircraft maintenance.  *Id.* ¶¶ 99–122.  Fourth, Mr. Van de Ven allegedly stated that Southwest's balance weight program worked well for Southwest's Hawaiian operations.  *Id.* ¶ 124.  Fifth, Mr. Kelly allegedly boasted that Southwest's pilots were experienced and well trained.  *Id.* ¶¶ 126–128.  Finally, in SEC filings Mr. Kelly and Ms. Romo allegedly made certifications required by the Sarbanes-Oxley Act

("SOX") stating that they had designed Southwest's public disclosure controls and internal controls over financial reporting and that they disclosed significant deficiencies and material weaknesses in Southwest's financial reporting controls.  *Id.* ¶¶ 130–31.

### C. Procedural History

On February 19, 2020, Plaintiff Robert G. Linenweber filed this action against Southwest, Mr. Kelly, and Ms. Romo, alleging that they misled investors about Southwest's safety and maintenance practices and internal controls.  Doc. No. 1.  On May 18, 2020, the Court appointed Canadian Elevator Industry Pension Trust Fund and Elevator Constructors Union Local No. 1 Annuity & 401(k) Fund as Lead Plaintiffs.  Doc. No. 17.

Plaintiffs filed the operative Complaint on July 2, 2020.  The Complaint names Southwest, Mr. Kelly, Ms. Romo, and Mr. Van de Ven as Defendants and contains two counts.  Compl. ¶¶ 185–200.  In the first count, Plaintiffs assert a "misstatement" claim, alleging that that Defendants violated Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5(b) by making the misleading statements described in Section I.B to investors.  *Id.* ¶ 188.  In the same count, Plaintiffs also assert a "scheme liability" claim, alleging that Defendants violated SEC Rule 10b-5(a) and (c) by employing "devices, schemes, and artifices to defraud" or engaging in "acts, practices, and a course of business that operated as a fraud."  *Id.*  Plaintiffs, relying on the same "detail[s]" underlying their misstatement claim, contend that Defendants "engaged and participated in a continuous course of conduct to conceal adverse material information about

Southwest's maintenance and safety issues, as exacerbated by the Company's undue influence over the FAA." *Id.* ¶ 190. In the second count, Plaintiffs allege that the Officer Defendants controlled Southwest and are derivatively liable for Southwest's fraudulent misstatements and schemes under Section 20(a) of the Securities Exchange Act. *Id.* ¶¶ 198–99.

On August 17, 2020, Defendants moved to dismiss the Complaint, contending that Plaintiffs failed to plead, *inter alia*, that Defendants made actionable misstatements or did so severely recklessly or with the intent to deceive investors. Doc. No. 27. In response, Plaintiffs asserted that Defendants' Motion to Dismiss challenged Plaintiffs' pleading of their misstatement claim but not their scheme liability claim. Doc. No. 29 at 17. Defendants subsequently filed a "Motion to Dismiss Purported 'Scheme and Course of Business' Claim Under SEC Rule 10b-5(a) and (c)" (the "Second Motion to Dismiss"). In their Second Motion to Dismiss, Defendants contend that their initial Motion to Dismiss sought dismissal of Plaintiffs' claims in their entirety and that the arguments in the initial Motion to Dismiss apply equally to Plaintiffs' misstatement and scheme liability claims because the scheme liability claim relies on Plaintiffs' allegations that Defendants made misstatements. Doc. No. 31.

### D. Evidentiary Objections

Plaintiffs object to the consideration of exhibits filed by Defendants in support of their Motion to Dismiss as materials outside Plaintiffs' pleading. Doc. No. 29 at 16. The exhibits are an online news article referenced in Plaintiffs' Complaint, excerpts

from Southwest's SEC filings, an excerpt from a National Transportation Safety Board ("NTSB") Accident Report about the April 2018 engine failure on a Southwest aircraft, excerpts from the February 2020 OIG report on the FAA's oversight of Southwest, a chart tracking Southwest's stock price, and a press release and a transcript of an earnings call containing several of Defendants' alleged misstatements.  Doc. No. 28.

The Court **SUSTAINS** Plaintiffs' objection in part and **OVERRULES** it in part. The Court may take judicial notice of facts outside Plaintiffs' Complaint that are generally known or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021).  The Court may also consider documents outside Plaintiffs' Complaint that are referenced in the Complaint and central to Plaintiffs' claims.  *Lampkin v. UBS Fin. Servs.*, 925 F.3d 727, 730 n.2 (5th Cir. 2019).  The Court will not consider the online news article because Defendants offer it to challenge Plaintiffs' factual allegations, and the contents of the article are not indisputably true.  *See Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *34 (N.D. Tex. Apr. 15, 2020) (O'Connor, J.) (taking judicial notice of website, but not "to test the reasonableness of Plaintiffs' allegations").  Defendants rely on the article as evidence that Southwest's efforts to lobby for more time to inspect engines in the wake of the April 2018 engine failure were more modest than Plaintiffs suggest.  Doc. No. 27 at 15 & n.33. The Court takes judicial notice of the SEC filings "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents'

contents." *Petrobras*, 9 F.4th at 255 (citation omitted) (affirming judicial notice of SEC filings). The Court takes judicial notice of the NTSB report and the OIG report as public records but does not accept the truth of disputed factual matters in either report. *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (affirming judicial notice of FDA records). The Court takes judicial notice of Southwest's stock price as a fact not reasonably subject to dispute. *Catogas v. Cyberonics*, 292 F. App'x 311, 316 (5th Cir. 2008) (taking judicial notice of stock prices). The Court takes judicial notice of the press release and transcript because they contain statements for which Plaintiffs claim that Defendants are liable, but the Court considers the documents "not for the truth of the matters asserted therein, but to reflect what was stated." *See Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 786 n.9 (S.D.N.Y. 2020) (collecting cases and taking judicial notice of investor call transcript); *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 884 (S.D. Tex. 2001) (taking judicial notice of conference call transcripts containing allegedly fraudulent statements); Compl. ¶¶ 85, 94.

Although, the Court generally "must consider" material outside Plaintiffs' Complaint properly presented for the Court's consideration, Defendants' exhibits are replete with unnecessary information. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Defendants have also selectively excerpted several of their exhibits to omit alleged misstatements. The only exhibits the Court finds useful are the press release and earnings call setting forth Defendants' allegedly fraudulent misstatements.

## II.   LEGAL STANDARD

The Court will dismiss a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) if Plaintiffs fail to plead facts sufficient to make the claim plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In assessing the plausibility of a claim, the Court assumes that Plaintiffs' factual allegations are true but does not assume that Plaintiffs' legal conclusions are true.  *Id.* at 678–79.  The Court requires Plaintiffs to plead fraud "with particularity."  Fed. R. Civ. P. 9(b).

Plaintiffs must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") because they invoke the private right of action implied in SEC Rule 10b-5 and assert that Defendants "[1] made an untrue statement of a material fact; or [2] omitted to state a material fact necessary in order to make . . . statements made, in the light of the circumstances in which they were made, not misleading."  15 U.S.C. § 78u-4(b).  Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference" that Defendants acted with "scienter," meaning with the intent to mislead buyers and sellers of Southwest securities or with severely reckless disregard of the danger that they were misleading buyers and sellers of Southwest securities.  15 U.S.C. § 78u-4(b)(1)–(2); *Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015).

## III.   PLAINTIFFS' MISSTATEMENT CLAIM

Two deficiencies require dismissal of Plaintiffs' claim that Defendants made fraudulent misstatements to investors in violation of Rule 10b-5(b).   None of

12

Defendants' alleged misstatements are actionably false or misleading, and Plaintiffs fail to plead with particularity facts giving rise to a strong inference that Defendants made any of the alleged misstatements with the intent to mislead investors or in severely reckless disregard of the possibility that they were misleading investors.

### A. Defendants' Alleged Misstatements Are Not Actionable

Defendants' alleged misstatements are not actionable because they would not mislead a prospective investor. *Police & Fire Ret. Sys. v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019). Some of Defendants' purported misstatements are generalized expressions of optimism that are short on factual content and difficult to prove true or false. Investors do not rely on such "puffery," so it does not violate Rule 10b-5(b). *Id.* The remainder of Defendants' purported misstatements are neither false nor misleading judged by the facts Plaintiffs' have alleged. *Masel v. Villarreal*, 924 F.3d 734, 748 (5th Cir. 2019).

#### 1. *Puffing Statements*

Many of Defendants' alleged misstatements about Southwest's safety standards are aspirational puffery rather and not actionable fraud. Plaintiffs accuse Defendants of misleading investors by stating that safety was Southwest's "top priority," "number one priority," "highest priority," and "uncompromising priority." Compl. ¶¶ 85, 88, 91–92. Plaintiffs similarly fault Mr. Kelly and Mr. Van de Ven for signing a 2017 press release stating that "[w]e continually work to create and foster a Culture of Safety and Security that proactively identifies and manages risks" and fault Mr.

13

Kelly for stating that Southwest's history "demonstrated [its] commitment to Safety." *Id.* ¶¶ 85, 91.  Other vague allegedly misleading statements include a nonparty Southwest employee's assessment that Southwest's maintenance systems were either "pretty good" or "really pretty darn solid"; Mr. Van de Ven's stated belief that Southwest focuses on providing a "safe," "reliable," "on-time," "hospitable," "efficient," and "enjoyable" operation and that Southwest's "weight balance program works well" for Southwest's Hawaiian operations; a Southwest press release thanking partners "who collaborated with us to safely prepare our operation" in Hawaii; and Mr. Kelly's statements that Southwest is the "gold standard" in hiring and training pilots and has pilots that are "well prepared," "confident of their skills," "deeply experienced and highly trained," and not in "need [of] new training."  *Id.* ¶¶ 90, 95–96, 104, 124, 126–28.  None of these statements are actionable because investors understand generalized commitments to laudable goals are not promises of specific actions or results and that executives' vague praise of their business is not a guarantee of quality.  *See In re Anadarko Petroleum Corp. Class Action Litig.*, 957 F. Supp. 2d 806, 820–21 (S.D. Tex. 2013) (generalized statements about prioritization of safety not actionable); *Plains All Am.*, 777 F. App'x at 731 (stated "commitment to proper systems and . . . intention to comply with regulations" not actionable); *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 765 (S.D. Tex. 2012) (generalized statements about strengthening "safety culture" not actionable).

A statement by Mr. Kelly characterizing Southwest's safety record as "impeccable" presents a closer question because of its strong terms and lack of aspirational

language, but it is also not actionable.  Compl. ¶ 94.  Mr. Kelly's statement is vague and difficult to falsify.  *See Johnson v. Pozen Inc.*, 2009 WL 426235, at \*22 (M.D.N.C. Feb. 19, 2009) (CEO's statement that drug had "unblemished" record despite genotoxicity concerns during its approval process too vague to be actionable), *rep. & rec. adopted*, 2009 WL 10680297 (M.D.N.C. Sept. 29, 2009).  The statement does not clearly refer to the balance weight, previously-owned aircraft maintenance, or pilot training deficiencies about which Defendants purportedly misled investors.  *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at \*10 (S.D.N.Y. Sept. 27, 2013) (statement that property had an "impeccable track record" not actionable because it did not address the specific problems at the property).  Nor would an investor understand Mr. Kelly to deny that Southwest faced safety issues.  Mr. Kelly delivered his statement in response to a question about the grounding of Boeing aircraft used by Southwest, and he added that "there are things that [Boeing] need[s] to address."  Doc. No. 28 at 181.  As Plaintiffs note, Southwest also had a public history of safety incidents prior to Mr. Kelly's statement. Compl. ¶¶ 28–60; *see Curry v. Yelp Inc.*, 2015 WL 7454137, at \*5 (N.D. Cal. Nov. 24, 2015) (statement that content was "authentic" not misleading because of other indications that inauthentic content existed), *aff'd*, 875 F.3d 1219 (9th Cir. 2017).  Plaintiffs' allegations fall short of the allegations in cases they cite for the proposition that "safety record" statements are actionable.  Doc. No. 29 at 23.  In the cited cases, investors were more likely to rely on the defendants' representations about their safety records because the defendants, unlike Mr. Kelly, touted the safety of specific

15

conditions that proved unsafe or compared their companies' safety records to competitors' records. *See In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *10 (E.D.N.Y. May 20, 2020) (statement about specific dam that failed); *In re ValuJet, Inc.*, 984 F. Supp. 1472, 1478 (N.D. Ga. 1997) (comparison of record with competitors'); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 617–18 (S.D.W. Va. 2012) (same).

The Court also rejects Plaintiffs' attempt to distinguish adverse puffery precedent by characterizing Defendants' alleged misstatements as statements about "widespread" issues rather than "isolated" events. Doc. No. 29 at 22. Counsel made a similar argument in *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.* (*Whole Foods II*), and the Fifth Circuit rejected it. 905 F.3d 892, 902 (5th Cir. 2018); Doc. No. 00514244139 (Plaintiff-Appellant's Opening Brief) at 50, *Whole Foods II*, 905. F.3d 892 (arguing "widespread overpricing" showed that statements about "transparency" and "value efforts" were false). Investors may expect different disclosures about widespread issues than they expect about isolated ones, but Plaintiffs have neither alleged that Defendants made their vague statements in contexts that gave the statements added specificity nor alleged that the statements were so inconsistent with the true condition of Southwest's business that savvy investors would struggle to reconcile the statements with reality. *Whole Foods II*, 905 F.3d at 902. *Compare, e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) (assurance of "steady progress" not actionable where business was merely struggling), *with Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58

F.4th 195, 217 (5th Cir. 2023) (assurance construction was "progressing" actionable where construction had nearly stopped).

### 2. *Statements That Are Neither False nor Misleading*

Plaintiffs fail to plead that Defendants' remaining alleged misstatements are false or misleading. The Court analyzes these alleged misstatements in seven groups.

### i. Statements About Maintenance Costs

Defendants' alleged misstatements about Southwest's maintenance costs are not misleading because they are accurate and do not imply that Southwest's maintenance, safety, and compliance issues did not exist. Defendants purportedly told investors that Southwest's use of a single aircraft type permits "simplified" maintenance, that Southwest "continues to invest significantly" in "aircraft maintenance record keeping," that most of Southwest's aircraft maintenance costs stemmed from payments to aircraft maintenance firms, and that fluctuations in Southwest's maintenance materials and repairs expenses primarily resulted from changes in fleet composition, airframe expenses, flight hours, engine leasing practices, and the timing of maintenance checks. Compl. ¶¶ 100–03, 105–18, 120–22. The alleged misstatements also include statements describing the costs of "unscheduled maintenance disruptions" and attributing unscheduled maintenance disruptions to factors including weather, negotiations with a mechanics union, and the grounding of flights. *Id.* ¶¶ 117–18, 120–22. Plaintiffs do not dispute that Southwest correctly described its costs or the factors driving them. Nor do Plaintiffs plead facts suggesting that Defendants' failure to discuss Southwest's

balance weight and previously-owned aircraft maintenance issues misled investors. Be-
cause investors typically receive distilled information from businesses, an accurate sum-
mary of a business's costs and cost drivers is not misleading unless it omits costs or
drivers significant enough that investors expect them to be summarized if they exist.
*See In re KBR, Inc. Sec. Litig.*, 2018 WL 4208681, at *5 (S.D. Tex. Aug. 31, 2018) (net
income and revenue figures not actionable for failure to disclose bribery because de-
fendants did not misleadingly identify factors in performance); *Marcu v. Cheetah Mobile
Inc.*, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020) (revenue drivers not actionable
because disclosures "did not, explicitly or implicitly, rule out other factors playing a
role in generating revenue"). Plaintiffs do not allege that Southwest's balance weight
and previously-owned aircraft maintenance issues were so significant.

> ii.   Statements About Safety and Compliance Policies

Plaintiffs fail to plead that Southwest's alleged misstatements in its safety and
compliance policies misleadingly downplayed or concealed Southwest's safety and com-
pliance issues. In a 2017 press release, Southwest allegedly stated that its employees
are "responsible" for maintaining the "highest levels of Safety and Security in our op-
eration and our workplaces," proactively "identifying and reporting hazards," contrib-
uting to a "positive Safety and Security culture and performance," and complying with
Southwest safety policies and procedures "along with all government regulations and
guidelines." Compl. ¶ 85. Southwest's 2016, 2017 and 2018 Forms 10-K allegedly
state that Southwest "has policies and procedures in place that are designed to promote

compliance with the laws of the jurisdictions in which it operates." *Id.* ¶¶ 86–87, 89. Southwest's 2017 Form 10-K also allegedly states that Southwest's participation in a "Required Navigation Performance" ("RNP") program produces "safer and more efficient flight patterns." *Id.* ¶ 87.  None of these statements are misleading because Plaintiffs fail to plead that Southwest's employees lacked responsibility for safety, compliance, and proactive risk management, that Southwest lacked compliance policies and procedures, or that Southwest's participation in the RNP program lacked safety benefits for Southwest's flights.  Investors know that the deployment of employees and development of policies and programs to mitigate safety and compliance issues is not a guarantee that problems will not arise.  *See Edgar v. Anadarko Petroleum Corp.*, 2018 WL 3032573, at *15 (S.D. Tex. June 19, 2018) (Rosenthal, C.J.) (statement that "'teams strive for ZERO incidents'" not misleading because the occurrence of an incident "does not mean that [the] teams did not strive for zero spills"); *KBR*, 2018 WL 4208681, at *6 (statement that defendant had compliance policies and trained employees to follow them not misleading though some employees engaged in bribery); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 635 (S.D. Tex. 2018) (Rosenthal, J.) (statement of substantial regulatory compliance not misleading though defendants violated some regulations).

### iii.   Statements About Regular Maintenance Checks

Plaintiffs do not plausibly allege that Southwest misled investors when it referred to its "regular maintenance checks."  Compl. ¶¶ 102, 110–11.  Plaintiffs contend that

19

the checks were not "regular" because Southwest operated twenty-four aircraft with safety deficiencies, flew forty-nine aircraft without verifying that they met U.S. aviation standards, and failed to address maintenance issues, but these failures are consistent with regular checks.  *Id.* ¶ 123(a).  Regular checks are consistent or structured checks, not immediate or exhaustive ones.  *Regular*, Oxford English Dictionary (2009 rev. ed.) ("Characterized by evenness, order, or harmony . . . or constituting a constant or definite pattern."); *see also Reese v. McGraw-Hill Cos.*, 293 F.R.D. 617, 624 (S.D.N.Y. 2013) (statement that ratings agency "regularly" reviewed ratings not misleading despite delays because it did "not provide any time frame" for review).  Plaintiffs fail to allege that Southwest's maintenance checks, even if imperfect, were irregular.  *Plains All Am.*, 307 F. Supp. 3d at 624 (statement that company "regularly assess[ed] pipeline integrity" with tools not misleading despite maintenance issues because the statement was "not about how well the tools worked or that they were 100 percent effective"); *Reidinger v. Zendesk, Inc.*, 2021 WL 796261, at *7 (N.D. Cal. Mar. 2, 2021) (statement that defendant regularly reviewed security not misleading despite security breach because statement did not guarantee security), *aff'd sub nom. Loc. 353, I.B.E.W. Pension Fund v. Zendesk, Inc.*, 2022 WL 614235 (9th Cir. Mar. 2, 2022).

###### iv.   Statements About FAA Regulation

Plaintiffs fail to plausibly allege that Southwest overstated the extent and quality of the FAA's regulation of the airline because Plaintiffs fail to plead facts inconsistent with Southwest's statements.   In 2019, Southwest allegedly stated that the "FAA

continues to exercise extensive regulatory oversight of the Company's operations." Compl. ¶ 97.  In a video about the grounding of Boeing aircraft, Mr. Kelly stated—in Plaintiffs' words—that "every operative detail is operated according to"—in Mr. Kelly's words—the "independent oversight" of the FAA.  *Id.* ¶ 92.  Plaintiffs do not explain whether the "operative details" to which they refer relate to an individual aircraft, a class of aircraft, or some other unit of operations.

Assuming investors paid a premium for Southwest shares because they believed the FAA regulated Southwest more heavily rather than less heavily, Plaintiffs' doubly-qualified contention that Southwest "may have devised a process that allows them to potentially bypass" one aspect of FAA oversight—FAA review of Southwest's internal SMS risk assessments—does not show that Southwest's statements about the FAA's oversight misled investors.  *Id.* ¶ 98(f).  That Southwest "may" have "potentially" avoided FAA review of SMS risk assessments is consistent with "extensive" FAA oversight of Southwest.  An SMS "does not take the place of regular FAA oversight, inspection, and audits to ensure compliance with regulations."  *Id.* ¶ 27.  Plaintiffs also allege that the FAA repeatedly investigated Southwest before and during the proposed class period and levied fines and extracted settlements from Southwest.  *Id.* ¶¶ 33–41.

Plaintiffs' paraphrase of Mr. Kelly's statement about the FAA's "independent" oversight is too vague to permit the Court to infer that the statement is misleading from Plaintiffs' limited supporting allegations.  Plaintiffs allege that the FAA removed managers in the office that oversaw Southwest because their supervision was lax.  *Id.*

21

¶ 61.  Plaintiffs also allege that Southwest obtained airworthiness certificates for its previously-owned aircraft unusually quickly.  *Id.* ¶ 74.  These allegations are consistent with mere carelessness on the FAA's part, and Plaintiffs fail to allege with specificity that any FAA oversight Southwest unduly influenced affected the "operative details" Mr. Kelly stated were subject to "independent" supervision.  15 U.S.C. § 78u-4(b)(1); *see Loftus v. Primero Mining Corp.*, 230 F. Supp. 3d 1209, 1229 (C.D. Cal. 2017) (dismissing for failure to plead more than possibility that defendant improperly influenced tax ruling).  Mr. Kelly made his statement in response to the grounding of aircraft, and Plaintiffs do not allege that Southwest improperly influenced the FAA with respect to any matters related to the grounding.  Compl. ¶ 92; *cf. Vale*, 2020 WL 2610979, at \*14 (statement that auditors certified the stability of dams potentially misleading because plaintiffs alleged that defendants unduly influenced the certifications at issue).

### v.    Statements About Documentation and Reporting

Plaintiffs fail to show that Southwest's January 2017 commitment to "ensuring that no disciplinary action will be taken against any Employee for reporting a Safety or Security occurrence or hazards" was misleading when made.  Compl. ¶ 85.  Plaintiffs allege that Southwest "'pressured' mechanics to not document 'aircraft discrepancies,'" *id.* ¶ 98(g), and an investor could infer from Southwest's commitment that Southwest would not sabotage reporting of safety incidents by preventing documentation of them. *See BP*, 843 F. Supp. at 765–66 (defendant misled investors by "knowingly retaliating against workers who reported safety concerns, even while issuing statements explicitly

22

denying any retaliation").  Plaintiffs' pleading falls short of suggesting that Southwest sabotaged reporting because Plaintiffs do not allege that Southwest exerted pressure on mechanics around the time of Southwest's January 2017 commitment.  *See Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.* (*Cabot I*), 579 F. Supp. 3d 933, 951 (S.D. Tex. 2022) (Rosenthal, C.J.) (pleading insufficient where plaintiffs alleged that facts contradicting alleged misstatement could have arisen either before or after statement); *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 31 (1st Cir. 2022) (affirming dismissal where complaint provided "no meaningful way to compare defendants' disclosures and statements . . . with the contemporaneous state of the business").  Plaintiffs' allegations rely on the results of the OIG's investigation, which began in the summer of 2018, but do not describe the relevant period the OIG investigated.  Compl. ¶¶ 58, 78.

> vi.   Statements Taken Out of Context

Plaintiffs charge Defendants with two misstatements that are neither false nor misleading when considered in the context from which Plaintiffs removed them.

First, Plaintiffs contend Southwest falsely stated in SEC filings that it performed "substantially all line maintenance on its aircraft."  *Id.* ¶ 123(a).  Plaintiffs do not allege that Southwest's maintenance problems were issues of "line maintenance" or plead facts showing that Southwest failed to perform "substantially all" line maintenance on its aircraft.  Assuming Plaintiffs corrected those pleading deficiencies, Southwest's statement still would not be actionably misleading because, in context, Southwest

represented that it performed substantially all line maintenance that occurred on its aircraft, not substantially all line maintenance the aircraft required.  Southwest stated that it "performs substantially all line maintenance on its aircraft and provides ground support services at most of the airports it serves."  *Id.* ¶ 99.

Second, Plaintiffs contend that Mr. Van de Ven falsely told investors that Southwest had a "strong" operational "foundation" and that unexpected maintenance events were "behind Southwest."  *Id.* ¶ 119.  Mr. Van de Ven's full statement does not misleadingly imply that Southwest was free from the maintenance issues.  In context, Mr. Van de Ven stated:

> Our on-time performance for the quarter was 78.7, and that was just a tad lower than last year's 79.3.  And if we adjusted for the maintenance and the MAX [aircraft] impacts, our on-time performance would have modeled in the 83% range, and that would have put us second in the industry from a marketing carriers['] perspective.  That's a good indication that the network design and our operational approach are in sync and we have a strong operational foundation as we move forward.

Doc. No. 28 at 164.

### vii.   SOX Certifications

Plaintiffs fail to plausibly allege that Mr. Kelly and Ms. Romo's certifications of Southwest's SEC filings, made pursuant to SOX, misleadingly concealed Southwest's "internal control deficiencies" because Plaintiffs fail to identify any internal control deficiencies at Southwest.  Doc. No. 29 at 27; Compl. ¶¶ 130–132.  In their SOX certifications, Mr. Kelly and Ms. Romo stated that they designed, established, and maintained disclosure controls and internal controls over financial reporting for Southwest, and that they disclosed "all significant deficiencies and material weaknesses in the

design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Southwest's] ability to record, process, summarize and report financial information."  Compl. ¶¶ 130–31.

Plaintiffs fail to plead that Kelly and Romo's certification that they designed, established, and maintained disclosure controls was false or misleading.  Disclosure controls are processes "designed to ensure that information required to be disclosed" by a business in SEC filings "is recorded, processed, summarized and reported, within the time periods specified in the [SEC's] rules and forms."  17 C.F.R. §§ 240.13-15(e); 240.15d-15(e).  As set forth in this Section III.A, Plaintiffs have not adequately alleged that Defendants improperly failed to disclose any information, much less that Defendants' failures were so widespread as to create doubt that Defendants maintained disclosure controls.  *See Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 592 (N.D. Tex. 2021) (Scholer, J.) (SOX certifications not actionable where plaintiffs failed to identify anything defendants should have disclosed); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648–49 (S.D.N.Y. 2017) ("[A]llegations that . . . controls must have been deficient because they may have failed to detect some weaknesses . . . in some instances, are not sufficient.").

Plaintiffs also fail to plead facts showing that Southwest's internal controls over financial reporting had misleadingly undisclosed significant deficiencies, material weaknesses, or other shortcomings.  Plaintiffs' allegations largely focus on Defendants' disclosures about Southwest's operations rather than Southwest's financial reporting, but

an "internal control over financial reporting" is a term of art describing processes directly related to financial reporting and "does not encompass . . . effectiveness and efficiency of a company's operations and a company's compliance with applicable laws and regulations, with the exception of compliance with the applicable laws and regulations directly related to the preparation of financial statements."  Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Release Nos. 33-8238, 34-47986, 68 Fed. Reg. 36636, 36640 (June 18, 2003) (codified at 17 C.F.R. §§ 240.13a-15(f), 240.15d-15(f)).  The Court cannot infer that Mr. Kelly and Ms. Romo's statements about Southwest's internal controls over financial reporting were false from Plaintiffs' conclusory allegations that the controls "were materially deficient," "not operating effectively," and lacking a "reasonable basis."  Compl. ¶ 132; *Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 685 (N.D. Tex. 2022) (Pittman, J.) (rejecting conclusory allegations that SOX certifications were false).

## B.  Plaintiffs Fail to Adequately Plead Scienter

Because the Court dismisses Plaintiffs' claims without prejudice, the Court notes that Plaintiffs allegations do not give rise to the requisite strong inference that Defendants made their purported misstatements with scienter.  15 U.S.C. § 78u-4(b)(2)(A). For each of Defendants' purported misstatements, Plaintiffs must allege that a particular corporate officer made the statement severely recklessly or with the intent to mislead investors. *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981–82 (5th

Cir. 2019).  The Court analyzes Plaintiffs' allegations holistically and finds the infer-ence that the Officer Defendants made their alleged misstatements with the required state of mind less compelling than the inference that Defendants acted at most negli-gently.  *Owens*, 789 F.3d at 536–37.

1.  *Generic Allegations About the Officer Defendants' Positions at Southwest*

Most of Plaintiffs' allegations establish only that the Officer Defendants were executives with responsibilities that touched on safety and compliance, which is not a sufficient basis from which to infer scienter.  Plaintiffs allege that Mr. Van de Ven was the "Accountable Executive in all matters of Safety and Security."  Compl. ¶ 136(c). Plaintiffs also allege that the Officer Defendants received reports about safety at South-west and that Mr. Kelly could have met with a Safety and Compliance Oversight Com-mittee that periodically assessed Southwest's safety and compliance practices.  *Id.* ¶¶ 136(d)–(e), (i)–(j).  Each Officer Defendant allegedly made statements about safety or compliance or made SOX certifications about Southwest's disclosure and financial controls.  *Id.* ¶¶ 136(f)–(h).

Plaintiffs' allegations about the Officer Defendants' roles at Southwest do not show that any of the executives were aware of the specific safety and compliance issues Southwest experienced before speaking about safety and compliance generally.  *See Neiman v. Bulmahn*, 854 F.3d 741, 749 (5th Cir. 2017) (defendant's role in a business and the existence of problems at the business provide at most limited evidence of sci-enter).  Plaintiffs do not allege that any Officer Defendant reviewed and understood

reports describing deficiencies in Southwest's balance weight measurements, its mainte-
nance of previously-owned aircraft, or its training of pilots.  *See Mun. Employees' Ret.
Sys. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 434 (5th Cir. 2019) (mere receipt of "numerous"
reports on inventory not strong evidence that officers misstated the specific risk of
inventory markdowns with scienter); *Edgar v. Anadarko Petroleum Corp.*, 2019 WL
1167786, at *16 (S.D. Tex. Mar. 13, 2019) (Rosenthal, C.J.) (allegations that em-
ployee could have reviewed procedures and realized they were deficient did not give
rise to inference of scienter), *aff'd sub nom. Iron Workers Benefit & Pension Fund v. Ana-
darko Petroleum Corp.*, 788 F. App'x 268 (5th Cir. 2019).  Nor do the Officer Defend-
ants' statements about safety or compliance indicate that the Officer Defendants were
aware of these specific deficiencies.  Plaintiffs do not allege that Defendants claimed
knowledge about the issues or—with one exception—spoke about them.  *See Pipefitters
Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345, 351 (5th Cir. 2012)
(per curiam) (defendants' generalized statements did not show they "were paying close
attention" to the subject matter of the statements); *In re Plains All Am. Pipeline, L.P.*,
245 F. Supp. 3d 870, 925 (S.D. Tex. 2017) (Rosenthal, C.J.) (officer's "high-level, gen-
eralized statements about the company's commitment to safety and its progress on
safety issues" did not support inference of scienter).  In 2019, Mr. Van de Ven stated
that Southwest's balance weight program for its Hawaiian operations "works well," but
the statement does not suggest that Mr. Van de Ven had knowledge of Southwest's
broader balance weight issues, and Plaintiffs do not allege that Southwest had material

balance weight issues in its Hawaiian operations.  Compl. ¶ 124; *see Pier 1*, 935 F.3d at

433 (defendants' knowledge of "Baltimore-specific" issues carried little weight because

allegedly undisclosed issues spanned "thousands of stores").

       2.  *Southwest's Core Operations*

    While safety and compliance generally may have been important to Southwest,

the Court cannot infer that Southwest's issues with balance weight, previously-owned

aircraft, or pilot training occurred so close to the "core" of its operations that the Officer

Defendants must have known of them.  The Fifth Circuit has rarely approved a "core

operations" theory of scienter where the corporate defendant is as large as Southwest.

*See Flotek*, 915 F.3d at 985 (collecting cases rejecting the theory where the corporate

defendant had approximately sixty or fewer employees).

    The magnitude of Southwest's maintenance and compliance issues in relation to

the scale of its operations is unclear at best.  Balance weight issues occurred approxi-

mately 4,000 times between March 2018 and July 2019, but Southwest's risk assess-

ments indicated that only seven to twenty-four per month may have "negatively im-

pact[ed] safety."  Compl. ¶¶ 72–73.  Only twenty-four previously-owned aircraft in

Southwest's fleet of nearly 750 aircraft had maintenance "discrepancies."  *Id.* ¶¶ 29,

75.  Southwest flew a total of forty-nine previously-owned aircraft without confirming

that they met "U.S. aviation standards," but the FAA authorized delayed confirmation.

*Id.* ¶ 75.  When the *Wall Street Journal* disclosed many of the OIG's concerns about

Southwest's safety and compliance issues, Southwest's stock price fell less than 2%.  *Id.*

¶ 168.   Taking the facts alleged by Plaintiffs as true, Defendants might have been negligent if they ignored the issues, but the issues were not so important to Southwest's health that the Court can infer that Defendants must have been aware of them.  *See Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 515 (S.D. Tex. 2017) (Rosenthal, C.J.) (maintenance issues of "one ship in a fleet of five" within one division of a company not plausibly issues of which officer must have known).

Nor were the issues with balance weight and previously-owned aircraft otherwise so obvious that the Officer Defendants must have discovered them.  Plaintiffs allege that past safety and compliance incidents put the Officer Defendants on notice of the issues, but Southwest's historical safety and compliance incidents were diverse, ranging from use of unapproved parts to pilot error.  Compl. ¶¶ 34, 40, 136(k), (m); *see Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 401 (S.D.N.Y. 2022) (past misconduct and government investigations not probative of scienter unless tied to subject matter of allegedly misleading statements).

Plaintiffs' allegation that FAA investigations put the Officer Defendants on notice of Southwest's balance weight and previously-owned aircraft issue lacks necessary detail.  Comp. ¶ 136(l).  Plaintiffs allege that, in 2017, the FAA investigated Southwest's maintenance of previously-owned aircraft, and, in 2018, the FAA investigated Southwest's balance weight measurements.  *Id.*  If the Officer Defendants were involved in the 2017 and 2018 investigations, they might have learned about the issues with balance weight and previously-owned aircraft, but Plaintiffs fail to allege whether,

30

when, and to what extent the Officer Defendants became involved in the investigations. *See Markman v. Whole Foods Mkt., Inc.*, 269 F. Supp. 3d 779, 786 (W.D. Tex. 2017) (failure to allege that defendants were aware of government investigation undermined inference of scienter), *aff'd sub nom. Whole Foods II*, 905 F.3d 892.  Plaintiffs also fail to allege that the Officer Defendants learned of any deficiencies in Southwest's remediation efforts that occurred after Southwest agreed to resolve the investigations by entering action plans with the FAA.  Compl. ¶¶ 98(b)–(c).  The existence of the investigations alone is weak evidence that the Officer Defendants made statements in severely reckless or intentional disregard of inconsistent facts uncovered by the investigations. *Compare Cabot I*, 579 F. Supp. 3d at 954–55 (notices of environmental violations alone did not give rise to strong inference that corporate officers made statements inconsistent with the notices), *with Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.* (*Cabot II*), 620 F. Supp. 3d 603, 631–32 (S.D. Tex. 2022) (Rosenthal, C.J.) (same pleading amended to allege that officers frequently received information about notices of violations and learned of business's failure to remediate violations gave rise to strong inference of scienter).

Plaintiffs' allegation that Mr. Kelly was on notice that his statements were misleading because he requested a meeting with the OIG similarly fails to describe what Mr. Kelly learned in requesting the meeting.  Compl. ¶ 136(c).  Plaintiffs' correspondingly fail to identify any alleged misstatement Mr. Kelly made that was inconsistent of knowledge he gained while making the request. *See In re Citigroup Sec. Litig.*, 2023 WL

2632258, at *22 (S.D.N.Y. Mar. 24, 2023) (regulators' communication of concerns to defendants did not support inference of scienter absent allegation that regulators communicated specific information inconsistent with defendants' statements).  Only two sets of alleged misstatements attributed to Mr. Kelly postdate his request for a meeting with the OIG, which occurred in September 2019 while the OIG was investigating the FAA's oversight of Southwest's balance weight measurements, maintenance of previously-owned aircraft, and other practices.  Compl. ¶¶ 63–65.

First, Southwest stated in a November 2019 Form 10-Q certified by Mr. Kelly that the "FAA continues to exercise extensive regulatory oversight of [Southwest's] operations."  *Id.* ¶ 97.  Mr. Kelly's request to meet with the OIG about the FAA's oversight is consistent with that statement.  In the same 10-Q, Southwest stated that changes in certain of its maintenance costs were primarily due to the timing of "regular" airframe maintenance checks.  *Id.* ¶ 122.  Plaintiffs contend that Mr. Kelly recklessly or intentionally misled investors by describing the checks as "regular," but that description was not suspicious.  Southwest made similar representations in prior SEC filings and was remediating maintenance issues with eighty-eight previously-owned aircraft for over a year before Mr. Kelly requested a meeting with the OIG.  *Id.* ¶¶ 75, 102, 110–12, 120–22.  Although the OIG subsequently concluded that Southwest operated forty-nine aircraft without conducting inspections that would otherwise be required, the FAA permitted Southwest to defer inspection of the aircraft.  *Id.* ¶ 75.  Assuming Mr. Kelly learned that the OIG believed up to forty-nine of Southwest's nearly 750 aircraft still

32

needed inspections at the time he requested a meeting with the OIG, it is doubtful that Mr. Kelly anticipated Southwest's repeated—and accurate—statement that "regular" airframe maintenance checks drove changes in maintenance costs might mislead investors.

Second, Mr. Kelly made statements on December 2019 and January 2020 praising the quality of Southwest's pilots' training. *Id.* ¶¶ 127–28. While the OIG later criticized Southwest for making changes to its training program without conducting a risk assessment, the FAA approved the changes, and neither Plaintiffs nor the OIG contend that the changes resulted in inadequate training or decreased passenger safety. *Id.* ¶ 77. Mr. Kelly likely would not have expected his praise of Southwest's pilots to be misleading to investors even if he knew about the OIG's procedural objections to Southwest's adjustment of its pilot training practices.

The Court rejects Plaintiffs' contention that the Officer Defendants made "internally inconsistent" statements revealing that they must have known of Southwest's maintenance and compliance issues because Plaintiffs do not identify any internally inconsistent statements. Doc. No. 29 at 31. Plaintiffs' allegations of inconsistency admittedly concern differences between the Officer Defendants' statements and the FAA's statements rather than internal inconsistencies in the Officer Defendants' statements. Doc. No. 29 at 31; *Neiman*, 854 F.3d at 750 (finding no internal inconsistencies where defendants' statements were not inconsistent).

### 3. *SOX Certifications*

Plaintiffs' failure to identify events putting the Officer Defendants on notice of Southwest's issues with balance weight, maintenance of previously-owned aircraft, and pilot training undermines Plaintiffs' contention that Mr. Kelly and Ms. Romo's misled investors with scienter when they made representations pursuant to SOX about Southwest's internal controls.  Plaintiffs have not shown that Mr. Kelly and Ms. Romo were aware or must have been aware of facts inconsistent with their certifications that they maintained Southwest's disclosure and financial reporting controls and disclosed deficiencies in financial reporting controls.  *See Izadjoo*, 237 F. Supp. 3d at 516–17 (SOX certifications did not support inference of scienter where plaintiffs insufficiently alleged that defendants learned of maintenance issue purportedly affecting disclosures); *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 857 (S.D. Tex. 2020) (SOX certifications did not support inference of scienter where plaintiffs failed to specify what subordinate told CFO about falsification of financials).  Because the rules implementing SOX require executives for virtually all public companies to provide certifications like Mr. Kelly and Ms. Romo's, inferring scienter from the certifications absent "glaring accounting irregularities or other 'red flags'" in the filings would "eviscerat[e] the pleading requirements for scienter."  *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 545 (5th Cir. 2008) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).

4. *The Officer Defendants' Motivations*

Plaintiffs' allegations that the Officer Defendants were motivated to mislead investors fail to distinguish the Officer Defendants' incentives from the incentives of most corporate executives and contribute little to the inference that the Officer Defendants made misstatements with scienter. Many of Plaintiffs allegations suggest only that overstating the quality of Southwest's safety and compliance practices would yield some benefit for Southwest by pleasing customers and regulators. Compl. ¶¶ 137(a)–(d). Such allegations do not weigh heavily in the Court's scienter analysis because they describe the ordinary benefits of falsely embellishing a business's operations, which are available to nearly all executives rather than a class of executives likely to commit fraud. *Heck*, 468 F. Supp. 3d at 857.

Plaintiffs' allegation that Defendants sold Southwest stock provides little additional reason to infer that the Officer Defendants were motivated to conceal Southwest's safety and compliance issues because the allegation similarly fails to distinguish between conduct common to executives and conduct probative of scienter. Ms. Romo sold a relatively small amount of Southwest stock—about $1.8 million in value, or 15.4% of her holdings, between 2017 and 2018. Compl. ¶ 137(e). In the same period, Mr. Van de Ven sold slightly more Southwest stock—about $3.5 million in value, or 20.1% of his holdings—and Mr. Kelly sold still more—about $13.6 million in value, or 31.8% of his holdings. *Id.* Executives frequently receive significant equity compensation and frequently sell the equity they earn. *Local 731 I.B. of T.Excavators & Pavers*

*Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016). Plaintiffs do not state whether Defendants' sales were unusually large, suspiciously timed, made spontaneously rather than pursuant to a plan, or otherwise particularly probative of scienter. *See, e.g.*, *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 369 (5th Cir. 2004) (distinguishing between unusually large sales shortly before a stock price peak and large sales during periods of price stability or explained by innocent circumstances).

5. *Conclusion*

Considered holistically, Plaintiffs' allegations do not give rise to a strong inference that the Officer Defendants made their alleged misstatements severely recklessly or with the intent to mislead investors. Plaintiffs' allegations are largely unspecific and rely on the implausible assumption that the Officer Defendants must have known information inconsistent with their public statements because of their positions at Southwest and because they could have discovered such information. Plaintiffs fail to plead with specificity that any Officer Defendant had knowledge or motive strongly suggesting that he or she made any particular misstatement with scienter.

## IV.  PLAINTIFFS' SCHEME LIABILITY CLAIM

The Court dismisses Plaintiffs' "scheme liability" claim because it mirrors the "misstatement" claim the Court has already found insufficiently pled. Scheme liability refers to the liability imposed under Rule 10b-5(a) and (c) on defendants who "employ any device, scheme, or artifice to defraud" or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," in

either case "in connection with the purchase or sale of any security."   17 C.F.R. §§ 240.10b-5(a), (c).   A scheme liability theory may overlap, as it does here, with a "misstatement" liability theory.   Misstatement liability refers to the liability imposed under Rule 10b-5(b) on defendants who "make any untrue statement of a material fact or . . . omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"—again, "in connection with the purchase or sale of any security."   *Id.* § 240.10b-5(b).

While Plaintiffs contend that Defendants forfeited their challenge to Plaintiffs' scheme liability claim by addressing only Plaintiffs' misstatement claim in their Motion to Dismiss, Doc. No. 32 at 6, the Court agrees with Defendants that their Motion to Dismiss challenges both Plaintiffs' scheme liability and misstatement claims.   Doc. No. 31.   The first line of Defendants' Motion to Dismiss contains no qualification: "Defendants . . . move to dismiss the Amended Complaint."   Doc. No. 27 at 8.   Plaintiffs fault Defendants for devoting much of their Motion to Dismiss to discussing misstatements Defendants allegedly made, *see* Doc. No. 29 at 18, but Defendants' focus is understandable because Plaintiffs fail to clearly allege that Defendants engaged in a fraudulent scheme distinct from Defendants' series of alleged misstatements.   In the same count that they allege their misrepresentation claim, Plaintiffs allege: "As detailed *supra*, Defendants and the Company's officers, management and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about Southwest's maintenance and

safety issues, as exacerbated by the Company's undue influence over the FAA."  Compl. ¶ 190.  Plaintiffs' cross-reference apparently incorporates the same factual allegations made in support of Plaintiffs' misstatement claim.  If Plaintiffs' scheme liability claim is distinct from their misstatement claim notwithstanding the extensive overlap between the claims, Federal Rule of Civil Procedure 10(b) required them to plead it separately.  *In re Tupperware Brands Corp. Sec. Litig.*, 2023 WL 5091802, at *8 (11th Cir. Aug. 8, 2023) (Grant, J.) (affirming dismissal of scheme liability claim pled in the same count as misstatement claim, which required the reader "to discern for herself which allegations and facts in the complaint apply to the class shareholders' misrepresentation claim and which apply to the scheme liability claim").

In addressing the merits of Plaintiffs' scheme liability claim, the Court considers Defendants' Second Motion to Dismiss and the Parties' briefing of the Second Motion to Dismiss.  Doc. Nos. 31–33.  Contrary to Plaintiffs' contention, the Court has discretion to address successive motions to dismiss for failure to state a claim.  *Doe v. Columbia-Brazoria Indep. Sch. Dist.*, 855 F.3d 681, 686 (5th Cir. 2017).  The Court need not exercise that discretion because it construes Defendants' Second Motion to Dismiss and the Parties' briefing of the Second Motion to Dismiss as supplemental briefing of the issues raised in Defendants' Motion to Dismiss.  Defendants' Motion to Dismiss seeks dismissal of all of Plaintiffs' claims, and Defendants' Second Motion to Dismiss clarifies Defendants' position that Plaintiffs' scheme liability claim fails for the same

reasons Plaintiffs' misstatement claim fails.  Doc. No. 31 at 7–8.  Both Parties have had an opportunity to test that position, and additional briefing is unnecessary.

Defendants' scheme liability claim fails on the merits because Defendants' alleged scheme consists of misstatements, and Plaintiffs have not pled that the alleged misstatements are actionable or that Defendants made them with scienter. *Supra* Section III.  Plaintiffs do not identify any fraudulent or deceptive acts by Defendants other than purportedly misleading statements.  Defendants' alleged safety issues and regulatory violations are not themselves fraudulent or deceptive.  In their briefing, Plaintiffs confirm that Defendants' purported scheme was "portray[ing] . . . Southwest's aircraft as safe and compliant while concealing a wide-range of safety hazards and regulatory non-compliance issues."  Doc. No. 32 at 15.  Regardless of whether a properly pled scheme of the type described by Plaintiffs is cognizable under the scheme liability provisions of Rule 10b-5, Plaintiffs cannot escape the PSLRA's pleading standards by relabeling alleged misstatements as "portrayals."  Under the PSLRA, the burden to plead scienter with particularity applies in all private Rule 10b-5 securities fraud actions seeking damages.  15 U.S.C. § 78u-4(b)(2).  The burden to describe misstatements with specificity applies in "any private action" in which a plaintiff alleges that the defendant "made an untrue statement of a material fact" or "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading."  *Id.* § 78u-4(b)(1).

Plaintiffs' reliance on *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) as support for their scheme liability claim is misplaced because *Lorenzo* did not purport to lower the pleading standard for misstatement claims. Although Plaintiffs obliquely accuse Defendants' counsel of violating their ethical duties by failing to cite *Lorenzo* as binding adverse precedent, *Lorenzo* held only that an individual who disseminated statements knowing that they were false and misleading was liable under Rule 10b-5's scheme liability provisions. 139 S. Ct. at 1101; Doc. No. 32 at 12–13. After *Lorenzo*, a scheme liability claim based solely on misstatements must still meet the pleading standard for a misstatement claim. Otherwise, as the Second Circuit observed in affirming the stronger rule that "misstatements and omissions alone do not suffice for scheme liability," plaintiffs would circumvent Congress's directive that they plead misstatements with particularity and detail the reasons the misstatements are false by calling misstatements "schemes." *SEC v. Rio Tinto PLC*, 41 F.4th 47, 48, 52 (2d Cir. 2022).

Since the only fraudulent or deceptive acts identified by Plaintiffs are Defendants' alleged misstatements and Plaintiffs fail to meet the pleading standard for a misstatement claim, the Court dismisses Plaintiffs' misstatement-based scheme liability claim. *See Stephens v. Uranium Energy Corp.*, 2016 WL 3855860, at *23–24 (S.D. Tex. July 15, 2016) (Rosenthal, J.) (dismissing scheme liability claim where alleged misstatements were not actionable and other conduct did not involve actionable fraud or deception).

## V.   PLAINTIFFS' CONTROL PERSON CLAIM

Because Plaintiffs fail to plead fail to plead a primary violation of Rule 10b-5 on either their misstatement or scheme liability theory, the Court dismisses their claim that the Officer Defendants are derivatively liable for Southwest's primary violations of Rule 10b-5 as persons controlling Southwest. *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996).

## VI.   CONCLUSION

The Court **GRANTS** Defendants' Motion to Dismiss and dismisses Plaintiffs' claims in their entirety without prejudice.  Plaintiffs **MAY FILE** a motion for leave to file an amended pleading within 14 days of the entry of this Order.  If Plaintiffs file a motion for leave to file an amended pleading, Plaintiffs **SHALL FILE** as attachments thereto (1) a proposed amended pleading and (2) a redline showing the differences between the proposed amended pleading and Plaintiffs' Complaint.

**SO ORDERED**.

Signed September 19th, 2023.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

41